# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| IN RE:  BISON LAND & MINERALS LLC<br>DEBTOR | CASE NO. 23-01140-JAW<br>CHAPTER 11 |
| IN RE:  ENTEC SERVICES, LLC<br>DEBTOR | CASE NO. 23-01141-JAW<br>CHAPTER 11 |
| IN RE:  GEARY TRIGLETH<br>DEBTOR | CASE NO. 23-01504-JAW<br>CHAPTER 11 |

## MOTION TO DISMISS OR, ALTERNATIVELY, TO MODIFY THE AUTOMATIC STAY

Sparrow Oil & Gas LLC ("Sparrow"), Greg Pollard ("Pollard"), and Kiat "Kenny" Tze Goh ("Goh") (together, the "Sparrow Creditors") file this Motion to Dismiss or, Alternatively, to Modify the Automatic Stay (the "Motion"), requesting that the Court dismiss the above-captioned bankruptcy cases[1] for cause under 11 U.S.C. § 1112(b)(1) or, alternatively, modify the automatic stay under 11 U.S.C. § 362(d)(1) to allow state-court litigation to proceed in North Dakota.

### Introduction

Geary Trigleth ("Trigleth")—the managing and majority member of Bison Land & Minerals, LLC ("Bison") and sole owner of EnTec Services, LLC ("EnTec")—filed these bankruptcy cases to spite his business partners, Pollard and Goh, and thwart the litigation that the Sparrow Creditors had filed against the Debtors in North Dakota. Indeed, Trigleth has revealed his spiteful motives in his own communications after the petition date, including in text messages to Pollard:

---

[1] Because all three bankruptcy cases are interrelated and should be dismissed for the same or similar reasons and based on the same underlying facts, the Sparrow Creditors are filing an identical motion in each of the three cases.



Bison was formed, in part, to drill and operate the West Dry Creek well in Renville County, North Dakota. While drilling the well, the Debtors and the Sparrow Creditors had agreed that Bison would transfer its interest in its North Dakota assets (including the West Dry Creek well) to Sparrow, an entity owned by Pollard and Goh. In exchange, Pollard and Goh would withdraw from Bison. But when the drilling was complete, Trigleth became enraged that drilling operations had exceeded the forecasted budget. Trigleth refused to provide an accounting to Pollard and Goh, which prohibited them from paying vendors and moving to the completions phase. And Trigleth then refused to follow through with the parties' agreement, threatening to plug the well and dilute Bison's working interests instead.

So the Sparrow Creditors sued the Debtors in North Dakota for, among other things, an order requiring the Debtors to specifically perform the agreement. The Sparrow Creditors also sought a temporary restraining order and preliminary injunction to prohibit the Debtors from plugging Bison's well and diluting its working interests.

The Debtors responded by filing these cases and did so (a) after the North Dakota court had entered a temporary restraining order and preliminary injunction against the Debtors, finding that the Sparrow Creditors had shown a substantial likelihood of success on the merits of their claims, (b) after the Debtors had violated that injunction and before a contempt hearing, and (c) shortly before trial in July 2023.

For the reasons below, the totality of the circumstances warrants dismissal of the bankruptcy cases under § 1112(b)(1). Not only did Trigleth file the cases as a litigation tactic and in bad faith—as his own communications make clear—but Trigleth's individual filing terminated his right to participate in the governance of Bison under Delaware's Limited Liability Act: Thus, Trigleth can no longer manage or direct Bison's activities as a debtor-in-possession. This Court should accordingly dismiss these bankruptcy cases, allowing the North Dakota litigation to proceed to a swift resolution, as it was scheduled to do. A resolution in favor of the Sparrow Creditors would allow Sparrow to be assigned Bison's interests in its North Dakota oil and gas wells (as agreed), obtain an accounting from Trigleth to pay vendors, and move to the completions phase of the West Dry Creek well. Doing so is in the best interests of all creditors and the estate. Alternatively, the Court should modify the automatic stay to allow the North Dakota litigation to proceed to conclusion, thereby resolving the parties' dispute and providing much needed certainty moving forward.

Facts

A.  **Bison begins drilling the West Dry Creek well.**

1. Bison (a Delaware limited liability company) is an oil and gas exploration company with activities in North Dakota, Mississippi, and Louisiana.

2. Trigleth formed Bison in 2019 and is its managing, majority member. (Order Granting Preliminary Injunction (the "PI"), attached as Exhibit 1 ¶ 3.) Pollard and Goh became members in 2022 after making contributions to the company (PI ¶ 3) with Pollard contributing three "top" oil and gas wells and Goh contributing capital. (Pollard Decl. ¶ 5, attached as Exhibit 2.) In exchange, Pollard and Goh each received a 22.5% ownership share in Bison. (Pollard Decl. ¶ 6.)

3. Bison thereafter began operating four oil and gas wells in Renville County, North Dakota, including the three top wells that Pollard contributed and the West Dry Creek well. (PI ¶ 2.)

4. The West Dry Creek well was to be drilled as a horizontal well, with Bison's three top wells having been in successful production for some time.

5. So, in 2022, Bison prepared to drill the West Dry Creek well and engaged EnTec—owned by Trigleth—to do the drilling. (PI ¶ 4.) While Trigleth stayed in Mississippi, Pollard travelled from Texas to North Dakota to oversee the operations. (PI ¶ 4.)

6. During the project, the Debtors and the Sparrow Creditors entered into an agreement that Bison would assign its interests in its North Dakota assets (i.e., the four oil and gas wells in Renville County, North Dakota, including the West Dry Creek well) to Sparrow, a company owned by Pollard and Goh. (PI ¶ 5.) The parties agreed that Bison would reserve a 15%

carried working interest in the West Dry Creek well. (PI ¶ 5.) In exchange, Pollard and Goh agreed to transfer their interests in Bison to Trigleth and withdraw from Bison. (PI ¶ 5.) The agreement was memorialized in communications between the parties, with the parties having agreed to all material terms (the "Agreement"). (PI ¶¶ 5, 21-22.)

7. But drilling the West Dry Creek well was a challenge. (PI ¶ 6.) The winter conditions were extreme, drilling personnel quit, and EnTec's rig broke down. (PI ¶ 6.) Trigleth himself "realiz[ed] the weather ha[d] been a large problem with hands and equipment." (PI ¶ 6 (quoting Trigleth Email of Dec. 19, 2022, attached as Exhibit D to Pollard Decl.).)

8. Despite these conditions, Pollard continued overseeing operations on the ground. (PI ¶ 6.) And the well was successfully drilled in January 2023. (PI ¶ 7.) Elated, Trigleth emailed Pollard "Great job!!" (PI ¶ 7 (quoting Trigleth Email of Jan. 16, 2023, attached as Exhibit E to Pollard Decl.).) Also, early reports indicated that the well had production potential (Pollard Decl. ¶ 15), and so the parties began preparing for the completions operations phase to begin. (PI ¶ 7.)

9. Given the conditions and the rig having broken down, drilling expenses exceeded the budget. (PI ¶ 8.) To pay outstanding invoices and get the well into production, Pollard and Goh requested an accounting from Trigleth to assess next steps in paying the expenses. (PI ¶ 9.)

10. It was then that Trigleth flipped on his business partners.

**B.    Trigleth turns on Pollard and Goh.**

11. Trigleth refused to provide an accounting and was enraged that invoices had been charged to Bison and EnTec. (PI ¶ 9.) Despite Pollard and Goh's attempts to work things out, Trigleth turned up the heat, threating Pollard and Goh. (*See* generally Pollard Decl. at its Exhibits F through K.) Trigleth's tirades included:

5

> You hiding crying piece of shit!!' You and your crooked partner! Let's go mother fucker. Fuck you you punk!!

(Trigleth Email of Feb. 7, 2023 at 8:45:46 p.m., attached as Exhibit H to Pollard Decl.; *see also* PI ¶ 10.)

12. Trigleth even threatened to plug the newly drilled well that day, refusing to follow through on the transfer of interests to Sparrow:

> What are you two morons don't understand is that bison. Has controls of all and every percent of that interest in that well. You have no rights to transfer. Or sell any by law. Neither one of you fucking morons know what you're doing and I'm gonna have to educate you dumb motherfuckers. Obviously Sparrow went and spent these funds not Bison. What a fucking stupid name anyway.
> I will contact all investor's tomorrow and we will all have a meeting with me and discuss details!! I will plug this fucking well if you guck with me!! You total piece of shot. You run around and hide from everyone. Why don't you take a quick trip to ND. Because you are a ducking coward and no paying piece of shit!! Meet me in ND and let's find out whom owes whom!!

(Trigleth Email of Feb. 7, 2023, at 8:54:01 p.m., attached as Exhibit H to Pollard Decl.; *see also* PI ¶ 10.)

13. Trigleth's threats worsened and turned personal and physical:

> I should just whip you ass!!

\*\*\*

> I would bitch slap your punk ass boy!!! I'm an old man and would kick you punk ass!!

\*\*\*

> Kenny you are a total moron. Greg. You couldn't lead yourself to a lunch counter!! Which you never miss!! Absolutely total morons and I will plug this mother fucker you fuck with me!!!! Try me!!!

\*\*\*

6

> As of now our intention is to plug the well. Abandon the location and move on!!! Not worth the trouble to deal with an asshole like you!!

\* \* \*

> Tomorrow Bison starts plugging procedures on WDC 1-H. Will set plugs on well and abandon.

\*\*\*

> I will send out a plugging report to all investors tomorrow. Then plug the well. You just don't really understand how much I don't give a fuck!!! I can afford to run this up your non paying re mugging ASS!

\*\*\*

> Cheaper to plug than complete. Sparrow has billings to them also. Let's see how this all works out!! I forgot more about how this industry works than yiu will ever know!!

(*See* Trigleth Emails of Feb. 7, 2023, attached as Exhibit H to Pollard Decl.) Trigleth even threatened to plug the other three wells that Pollard had contributed to Bison. (PI ¶ 11.)

14.     Critically, North Dakota law prohibited Trigleth from unilaterally plugging any oil and gas wells without prior approval from the appropriate state regulatory authorities. (PI ¶ 28 (citing N.D.C.C. § 38-08-04(1)(b)(1) and N.D. Admin Code § 43-02-03-33.)

15.     Despite Trigleth's baffling about-face, Goh attempted to push through and discuss available funds, getting an accounting, and completing the agreed-on transfer to Sparrow. (PI ¶ 11.) But Trigleth turned his sights on Goh:

> I am going to stump break your ass moron!! Tired of the ASIAN BULLSHIT AND ATTITUDE. THERE WAS NOT A COMPLETE DOCUMENT TO EVEN AGREE NOR EXECUT!! I will stick this well up your punk ass!!!

(Trigleth Email of Feb. 8, 2023 at 10:02:19 a.m., attached as Exhibit I to Pollard Decl.).

7

16. Goh and Pollard also had reason to believe Trigleth began contacting vendors, service provides, working-interest owners, and other third parties in the industry, disparaging the Sparrow Creditors. (Pollard Decl. ¶ 26; *see also* Trigleth Email of Feb. 10, 2023, attached as Exhibit K to Pollard Decl.)

17. Pollard and Goh retained counsel who wrote Trigleth in February 2023, requesting he cease contacting third parties. (PI ¶ 12; *see also* Letter of Feb. 10, 2023, attached as Exhibit L to Pollard Decl.) Trigleth responded with a customary tirade, including more than a dozen threatening emails. (PI ¶ 12; Trigleth Emails of Feb. 10, 2023, attached as Exhibit M to Pollard Decl.)[2] And Trigleth again threatened to plug the wells. (PI ¶ 12.) And to further spite his business partners, Trigleth then attempted to transfer or sell Bison's working interests in the West Dry Creek well to others only to dilute his partners' interests. (PI ¶ 12; *see also* Trigleth Email of Feb. 9, 2023, attached as Exhibit R to Pollard Decl.)

18. Exasperated, and having exhausted all attempts to resolve the dispute, the Sparrow Creditors had no choice but to seek emergency relief against Trigleth to keep him from plugging the wells, contacting third parties, and diluting Bison's interests, as well as to force Trigleth to consummate the Agreement and provide an accounting.

C. **The Sparrow Creditors file suit against Trigleth and obtain injunctive relief against him.**

19. On February 22, 2023, the Sparrow Creditors filed a motion for a temporary restraining order against the Debtors in the District Court for the Northeast Judicial District of

---

[2] Trigleth's profanity-laced, threatening emails were unrelenting, many of which—but not even all—are attached as exhibits to Pollard's Declaration.

8

Renville County, North Dakota (the "North Dakota Case"), which the North Dakota Court granted on March 3, 2023.

20. Specifically, the North Dakota Court entered a temporary restraining order enjoining the Debtors from:

a. Plugging or taking any steps in furtherance of plugging or otherwise causing harm to any of the Four Wells;

b. Transferring, diluting, or otherwise affecting the nature and quantum of Bison's interest in any of the Four Wells or underlying leases;

c. Transferring, diluting, or otherwise affecting the nature or quantum of any of Bison's oil, gas, or mineral interests in North Dakota;

d. Taking any actions towards the three TOP wells outside of normal production activities in the ordinary course of business; and

e. Undertaking any work or actions, including completions operations, unless and until Pollard and Goh are provided information as to the proposed work, an accounting, and be permitted to be present and consent to the actions performed.

(*See* Order Granting Plaintiffs' Motion for Temporary Restraining Order (the "TRO"), attached as Exhibit 3.)

21. Days later, the Sparrow Creditors filed a complaint against the Debtors in the North Dakota Case, seeking, among other things:

a. A permanent injunction to prohibit the Debtors from plugging the wells and dilute the working interests in the wells;

b. An order requiring the Debtors to specifically perform the Agreement, including by Bison transferring the North Dakota assets to Sparrow;

c. Damages against the Debtors for breach of contract and breach of fiduciary duties;

d. An accounting of all Bison's accounts.

9

(Complaint, attached as Exhibit 4.) A jury trial was set for July of 2023. (*See* Docket, attached as Exhibit 5.)

22. The Sparrow Creditors also filed a motion for a preliminary injunction against the Debtors, which—after a hearing on March 30, 2023—the North Dakota Court granted. In doing so, the North Dakota Court found and held that the Sparrow Creditors had shown a substantial probability of succeeding on the merits of their complaint. (*See generally* PI.) Among other things, the Court found and held that (for purposes of a preliminary injunction):

   a. The parties' agreement constituted a binding contract that the Sparrow Creditors could specifically enforce under North Dakota law. (PI ¶¶ 19-22)

   b. Under Delaware law, including the Delaware Limited Liability Company Act, Trigleth owed Pollard and Goh fiduciary duties that would be breached if the wells were plugged or Bison's working interests diluted. And Trigleth had breached his fiduciary duties by failing to provide an accounting. (PI ¶¶ 23-27.)

   c. Trigleth's threats to plug and abandon the wells would violate North Dakota law: "Spitefully plugging the wells or diluting Bison's working interest would fly in the face of North Dakota's statutory and regulatory schemes preventing waste." (PI ¶ 29; *see also* PI ¶¶ 28-30).

23. Ultimately, the North Dakota Court preliminarily enjoined the Debtors from taking the same actions outlined in the TRO. (PI ¶¶ 33-34.)

24. Trigleth ignored the TRO and PI. Instead, he violated their terms by having work undertaken at the wells without informing the Sparrow Creditors and without providing them an accounting. And so the Sparrow Creditors were forced to file a motion for contempt sanctions against the Debtors. (*See* Brief in Support of Plaintiffs' Motion for Contempt Sanctions, attached as part of Collective Exhibit 6.) On May 10, 2023, a notice of hearing on that motion was filed and served, but Bison and EnTec filed for bankruptcy in this Court days later on May 15, 2023, and Trigleth filed his bankruptcy case the next month on June 30, 2023.

10

25. The North Dakota Case was stayed and the trial set for July was cancelled.

26. Thereafter, Trigleth has made his intentions clear: He filed these cases to spite the Sparrow Creditors, to dodge the North Dakota Court's injunctive orders, and to delay the inevitable judgment in that case enforcing the Agreement.

27. Indeed, after the petition date, Trigleth texted Pollard to flaunt the bankruptcy filings. (Trigleth Text Messages to Pollard, attached as Exhibit 7.) Also after the petition date, Trigleth emailed the Sparrow Creditors' counsel in the North Dakota Case, *again* threatening to plug and abandon (i.e., "P & A") the wells:

> Spencer,
> No response and or ideas to pay your bills!! I am changing my proposal from completion to P & A. I'm am tired of trying to fix your incompetent clients idiotic debts and problems. Total Morons!!
> gt

(*See* Trigleth Emails to Ptacek, attached as Collective Exhibit 8.) Trigleth's other emails to the Sparrow Creditors' North Dakota counsel during these bankruptcy cases not only flaunt the bankruptcy filings, but they are shockingly offensive. (*Id.*)

28. Notably, during the 341 Meeting of Creditors in the Bison and EnTec cases, Trigleth feigned ignorance as to why he had been sued in North Dakota. During the 341 Meeting of Creditors in Trigleth's individual bankruptcy case, Trigleth suggested the Sparrow Creditors had filed suit simply to "harass" him. But Trigleth's emails and texts belie that testimony.

29. To date, the Debtors have not adequately explained how they intend to reorganize under Subchapter V. The Debtors have only advised that they foresee seeking out capital contributions that would dilute the interests of Bison's minority members.

11

30.     But based on the history between the Sparrow Creditors and the Debtors, as well as based on Trigleth's stated intentions along the way and during these bankruptcy cases, it is clear that Trigleth filed these cases out of spite and bad faith. The Court should dismiss the bankruptcy cases and allow the North Dakota Case to proceed to conclusion so that, among other things, the Sparrow Creditors can take ownership and control of the wells as agreed, have the vendors paid, and ensure completion of the West Dry Creek Well.

**Argument**

A.   **The Court should dismiss the Bankruptcy Cases for cause under 11 U.S.C. § 1112(b)(1).**

Section 1112(b)(1) provides:

> [O]n request of a party in interest . . . the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

"Because § 1104 does not apply in a subchapter V case," bankruptcy courts lack the "power to appoint a chapter 11 trustee or an examiner [and so are] restricted to converting or dismissing [a] case under § 1112(b)." *In re Ozcelebi*, 639 B.R. 365, 383 (Bankr. S.D. Tex. 2022).

Section 1112(b)(4), in turn, defines "cause" as, among other things: "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public[; and] (E) failure to comply with an order of the court . . . ." That list, however, is non-exhaustive. *In re Ozcelebi*, 639 B.R. at 383. Instead, the "inquiry under § 1112 is case-specific, focusing on the circumstances of each debtor.'" *Id.* at 384 (quoting *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 371–72 (5th Cir. 1987)). For

example, "although not specifically enumerated, bad-faith conduct also constitutes cause to convert or dismiss a case." *Id.* at 384.

As set forth below, cause warranting dismissal exists here for two reasons: First, Trigleth has lost the right to participate in the governance of Bison by virtue of his individual bankruptcy petition; Second, the Debtors filed these bankruptcy cases in bad faith.

### 1. Trigleth no longer has the right or authority to participate in the governance of Bison.

Cause exists to dismiss Bison's bankruptcy case because Trigleth—the majority managing member of that Debtor—no longer has the right to participate in the governance of that Debtor due to his filing an individual bankruptcy petition. He is, accordingly, no longer authorized to be Bison's representative in its bankruptcy case, and he can no longer manage or direct its activities as a debtor-in-possession. Trigleth is the sole member of Bison that decided to put the company into bankruptcy. But without any right to manage the company moving forward, Trigleth cannot reorganize Bison and have it file a confirmable plan.

Specifically, Bison is a Delaware limited liability company. And § 18-304 of the Delaware Limited Liability Act provides:

> A person ceases to be a member of a limited liability company upon the happening of any of the following events:
> > (1) Unless otherwise provided in a limited liability company agreement, or with the consent of all members, a member:
> > ...
> > > b. Files a voluntary petition in bankruptcy . . . .

6 Del. C. § 18-304. Thus, when Trigleth filed his individual petition, he implicated § 18-304, which, by its terms, terminated Trigleth's membership interest in Bison.

13

To be sure, § 365(e)(1) of the Bankruptcy Code precludes the enforcement of *ipso facto* clauses in executory contracts and state statutes under certain circumstances. But as the Supreme Court of Delaware has held, the Bankruptcy Code does not preempt § 18-304 in its entirety. *Zachman v. Real Time Cloud Servs. LLC*, 2021 WL 1561430, at *3 (Del. April 20, 2021) (citing *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 762 (Del. Ch. 2004) (Strine, J.)). Instead, statutory provisions, such as § 18-304, "are not preempted by the Bankruptcy Code to the extent that they divest members who file for bankruptcy of the right to participate in the management of the company but not of their economic rights." *Id.* (collecting cases). Thus, after a member files a voluntary bankruptcy petition, that member's interest in the limited liability company is extinguished under § 18-304 with the exception of that member's economic interest. *Id.* So when Trigleth filed his individual petition, § 18-304 automatically extinguished Trigleth's right to manage and participate in the governance of Bison, prohibiting him from managing or directing Bison as a debtor-in-possession moving forward. And that shake-up in management constitutes sufficient cause to dismiss Bison's bankruptcy case. *See In re New Towne Dev., LLC*, 404 B.R. 140, 149 (Bankr. M.D. La. 2009) (cause existed to appoint chapter 11 trustee because membership dispute (over a limited liability company debtor) "effectively ha[d] paralyzed [Debtor's] management"). Indeed, the result of Trigleth's individual filing is that the Pollard and Goh are now in control of management of Bison under § 18-304, and neither Pollard nor Goh wish to keep Bison in bankruptcy.

  **2.  The Court should dismiss all three bankruptcy cases for cause because the Debtors filed the cases in bad faith.**

Based on the totality of the circumstances, cause—including the Debtors' bad faith—warrants dismissal of all three bankruptcy cases.

As the movant, the Sparrow Creditors bear the initial burden to "establish a *prima facie* showing of bad faith," after which the burden shifts "to the [D]ebtor[s] to offer proof that the petition was in fact filed in good faith." *In re Archdiocese of New Orleans*, 632 B.R. 593, 601 (Bankr. E.D. La. Aug. 4, 2021) (quoting *In re Namer*, 141 B.R. 603, 606 (Bankr. E.D. La. 1992)). Courts examining the issue make "two relevant inquires in determining good faith: (i) whether the petition serves a valid bankruptcy purpose, and (ii) whether it was filed merely to obtain a tactical litigation advantage." William L. Norton, III, Norton Bankr. Law and Prac. 3d § 103:6 ( July 2023 Update) (citing *In re 15375 Memorial Corp. v. Bepco, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009)). Factors establishing bad faith include:

- "The debtor has one asset . . . ."
- "The secured creditors' liens encumber this tract."
- "There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments . . . ."
- "The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court."
- "[T]he debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford."
- "Bankruptcy offers the only possibility of forestalling loss of the property."
- "There are sometimes allegations of wrongdoing by the debtor or its principals."

*In re Little Creek Dev. Co.*, 779 F.2d at 1073. Other factors include:

- "the prepetition conduct of the debtor has been improper;"
- "the petition effectively allows the debtor to evade court orders;"

- "reorganization essentially involves the resolution of a two-party dispute;" and
- "the debtor filed solely to create the automatic stay."

Norton *supra* at § 103:23 (collecting cases). Ultimately, the determination is based on the totality of the circumstances. *Id.* at § 103:6. And the totality of the circumstances here warrants dismissal:

**First,** the Debtors did not file these cases to fulfill a bankruptcy purpose. To the contrary, Trigleth has made it abundantly clear that he filed the cases to spite the Sparrow Creditors and as a litigation tactic to thwart their efforts in the North Dakota Case. Trigleth flaunted the bankruptcy filings in his text messages to Pollard, as well as in his emails to the Sparrow Creditor's counsel. And during the 341 Meetings of Creditors in all three cases, Trigleth admitted that he filed the cases to avoid the litigation in North Dakota. What is more, the trial in the North Dakota Case was fast approaching, having been set for July 2023. The circumstances make clear that the Debtors filed these cases to forestall an inevitable judgment in the Sparrow Creditors' favor.

**Second**, the Debtors filed these cases to evade the TRO and PI that was entered by the North Dakota court. As noted above, Trigleth ignored the TRO and PI by continuing work on the West Dry Creek well without consulting with the Sparrow Creditors or providing an accounting, requiring the Sparrow Creditors to file a motion for contempt sanctions. But Bison and EnTec filed their bankruptcy cases before the hearing on that motion was held. The Fifth Circuit addressed a similar situation in *In re Kruger* and affirmed a bankruptcy court's order of dismissal where the debtor had, among other things, filed a petition to avoid state court contempt proceedings, avoid a state-court injunction, and because the debtor no longer liked the state court venue and believed the judge was biased against him (similar to the motives that Trigleth texted Pollard, set out above). 812 F.3d 365, 374-75 (5th Cir. 2016).

**Third**, as set forth above and in the complaint in the North Dakota Case, the Sparrow Creditors have alleged wrongdoing by the Debtors, including breach of contract and fiduciary duty. This specifically included Trigleth threating to plug the wells in violation of North Dakota law and diluting Bison's working interests in violation of his fiduciary duties and managing member. Notably, the North Dakota had found that the Sparrow Creditors had shown a substantial likelihood of success on the merits of those claims. And, again, the Sparrow Creditors moved to hold the Debtors in contempt for violating the PI and TRO.

**Fourth**, Bison and EnTec (a) have no employees, (b) have no cash flow, and (c) have no available sources of income (at present) to sustain a plan of reorganization or to make adequate protection payments, given Trigleth refused to provide an accounting to pay vendors and move to the completion stage.

Accordingly, the totality of the circumstance—and Trigleth's own words—shows that the Debtors filed these cases in bad faith to spite the Sparrow Creditors and as a litigation tactic. The Bankruptcy Code was designed "to afford breathing space and a fresh start for the 'honest but unfortunate debtor.'" *In re Krueger*, 812 F.3d 365, 373 (5th Cir. 2016) (quoting *Grogan v. Garner*, 498 U.S. 279-286-87 (1991). The Bankruptcy Code was not designed to give one litigant the upper hand in a two-party dispute. This Court should dismiss these cases, allowing the North Dakota Case to proceed to a swift resolution so that the Sparrow Creditors can be assigned Bison's interests in the North Dakota wells (as agreed), obtain an accounting to pay vendors, and proceed to the completion stage of the West Dry Creek well.

**B.     Alternatively, the Court should terminate the automatic stay to allow the North Dakota Case to proceed to conclusion.**

Alternatively, the Court should terminate the stay in the bankruptcy cases to allow the North Dakota Case to proceed to conclusion and resolve the parties' dispute.

"Section 362(d)(1) provides that the bankruptcy court may grant relief from the automatic stay 'for cause' [and] [s]uch 'cause' includes allowing an action to proceed to completion in another tribunal." *In re Armstrong and Guy Law Office, LLC*, 2007 WL 4571152, at *1 (Bankr. S.D. Miss. Dec. 21, 2007). To determine whether cause exists to terminate the stay and allow state-court litigation to proceed, bankruptcy courts examine the twelve *Sonnax* factors. *Id.* (quoting *In re Sonnax Indus., Inc.*, 907 F.2d 1280 (2d Cir. 1990)). Not all the *Sonnax* factors are relevant in every case. *In re Armstrong and Guy Law Office, LLC*, 2007 WL 4571152, at *1-2; *see also In re The Consolidated FGH Liquidating Trust*, 419 B.R. 636, 648 n. 10 (Bankr. S.D. Miss. 2009). And the *Sonnax* factors that are applicable here weigh in favor of terminating the stay to allow the North Dakota Case to proceed to conclusion:

**First**, relief in the Sparrow Creditor's favor in the North Dakota Case would completely resolve the issues among the parties.

**Second**, allowing the North Dakota Case to proceed would not interfere with the timing of the bankruptcy case, as the North Dakota Case is ready for trial and was indeed about to be tried in July 2023 but for the filing of these bankruptcy cases. Thus, the North Dakota Case can be swiftly resolved if the stay is lifted.

**Third**, the North Dakota court has expertise to hear the litigation before it, as that litigation concerns the ownership of North Dakota property and issues of North Dakota state law, including North Dakota oil and gas law and regulations.

18

**Fourth**, the North Dakota Case would not prejudice the interests of other creditors or other interested parties. To the contrary, resolution of the issues in North Dakota will benefit all interested parties. To the extent the Sparrow Creditors prevail, the Sparrow Creditors intend to have vendors paid and move the West Dry Creek well into the completions phase.

**Fifth**, a judgment in favor of the Sparrow Creditors will not be subject to equitable subordination under § 510(c).

**Sixth**, a judgment in favor of the Sparrow Creditors requiring the Debtors to specifically perform the Agreement would not result in a judicial lien avoidable by the debtor under § 522(f).

**Seven**, the interest of judicial economy and the expeditious and economical determination of litigation for the parties supports allowing the North Dakota Case to proceed to resolution, as that litigation is ready for trial.

**Eight,** as noted above, the North Dakota Case had progressed to the point where the parties were prepared for trial.

**Last**, the impact of the stay on the parties and the balance of the hurt weighs in favor of lifting the stay, particularly given that Trigleth filed the cases to spite the Sparrow Creditors and thwart the litigation.

Accordingly, to the extent the Court is not inclined to dismiss these cases, the Court should alternatively modify the automatic stay to allow the North Dakota Case to proceed to a conclusion.

**For these reasons,** the Sparrow Creditors respectfully request that the Court:

A.  Dismiss these bankruptcy cases; or

B.  Alternatively, modify the stay to allow the North Dakota Case to proceed to a conclusion.

Dated: August 10, 2023.

        **SPARROW OIL & GAS LLC,**
        **GREG POLLARD, AND**
        **KIAT TZE GOH**

By: /s/ Timothy J. Anzenberger
      Timothy J. Anzenberger (MSB No. 103854)
      ADAMS AND REESE LLP
      1018 Highland Colony Parkway, Suite 800
      Ridgeland, MS 39157
      Telephone: 601.353.3234
      Facsimile: 601.355.9708
      tim.anzenberger@arlaw.com

## CERTIFICATE OF SERVICE

Service provided via Notice of Electronic Filing through the Court's Electronic Filing System upon all parties signed up to receive such notices.

Dated: August 10, 2023.

        /s/ Timothy J. Anzenberger
        Timothy J. Anzenberger