**Exhibit "1"**

| | |
|---|---|
| STATE OF NORTH DAKOTA | IN DISTRICT COURT |
| COUNTY OF RENVILLE | NORTHEAST JUDICIAL DISTRICT |

| | |
|---|---|
| Greg Pollard, Kiat Tze "Kenny" Goh, and Sparrow Oil & Gas LLC,<br><br>Plaintiffs,<br><br>v.<br><br>Geary Trigleth, Bison Land & Minerals LLC, and EnTec Services, LLC,<br><br>Defendants. | Case No. 38-2023-CV-00007<br><br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

[¶ 1]    Before the Court is the Motion for Preliminary Injunction filed by Plaintiffs Greg Pollard ("Pollard"), Kiat Tze Goh ("Goh"), and Sparrow Oil & Gas LLC ("Sparrow") pursuant to N.D.R.Civ.P. 65(a). Plaintiffs request the Court restrain Defendants Geary Trigleth ("Trigleth"), Bison Land & Minerals, LLC ("Bison"), and EnTec Services, LLC ("EnTec") (collectively, "Defendants") from undertaking certain harmful actions concerning four oil and gas wells and related mineral interests in Renville County, North Dakota. The Court previously granted Plaintiffs' request for a temporary restraining order as to the same issues. *See* Doc. ID# 34. Upon review and consideration, the Court hereby **GRANTS** Plaintiffs' motion for preliminary injunction. The Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

[¶ 2]    Bison is currently the operator of record for the following four oil and gas wells in Renville County: (1) West Dry Creek 1H ("West Dry Creek") (NDIC No. 39417); (2) RUSCH 1 (NDIC No. 13826); (3) RUSCH 2 (NDIC No. 14424); and (4) FRANK W. MCCRORY 1

(NDIC No. 3284) (the parties refer to the latter three wells as the "TOP wells"). Doc. ID# 4, ¶ 4. The West Dry Creek well and three TOP wells are collectively referred to as the "Four Wells".

[¶ 3] Bison is a limited liability company engaged in oil and gas exploration. Bison was formed in 2019 under Delaware law by Trigleth and, in early 2022, Pollard and Goh also became members of Bison. Doc. ID# 4, ¶¶ 5–6. Bison is currently the operator of record for the Four Wells in Renville County. *See id.* In addition to operating in North Dakota, Bison operates in Louisiana and Mississippi. *See generally id.* The three members of Bison did not execute and unanimously agree to an operating agreement, as only a draft was circulated. *See* Doc. ID# 6.

[¶ 4] From the spring and through the fall of 2022, Bison prepared to drill the West Dry Creek well in Renville County. Doc. ID# 4, ¶¶ 7–8. Preparations included securing leases, submitting filings to the North Dakota Industrial Commission ("Commission"), communicating with and obtaining participants in the project, securing insurance and bond documents, and undertaking numerous other steps required to drill an oil and gas well. *Id.* Bison engaged EnTec, which is Trigleth's company, to drill the West Dry Creek well. *Id.* EnTec spud the well on December 9, 2022. Doc. ID# 4, ¶ 12. Pollard had traveled to North Dakota from out of state to oversee drilling operations. *Id.* Trigleth, who also resides out of state, did not travel to North Dakota but was in regular contact with Pollard through e-mail and other means regarding work completed and issues that arose. *Id.*

[¶ 5] During the process of drilling the West Dry Creek well, communications also involved the parties' agreement wherein Sparrow would be assigned Bison's interests in North Dakota and take over operations of those wells, subject to Bison/Trigleth reserving a 15% interest in the West Dry Creek well, and Pollard and Goh transferring their shares in Bison to Trigleth and withdrawing from Bison. Doc. ID# 4, ¶ 13. Sparrow is a limited liability company in which

2

Pollard and Goh are members. *Id.* This agreement was memorialized in communications between Trigleth and Pollard. *See* Doc. ID# 42–43.

[¶ 6] During the drilling of the West Dry Creek well, multiple challenges arose. These included extreme winter weather conditions and storms, drilling personnel quitting, and the rig itself breaking down. *Id.* ¶ 14. Trigleth acknowledged via a December 19, 2022 e-mail that he "realize[d] the weather has been a large problem with hands and equipment." Doc. ID# 9. Pollard continued to oversee drilling operations during this time. *See generally* Doc. ID# 4.

[¶ 7] On January 16, 2023, Pollard reported that the West Dry Creek well was successfully drilled and that the project would need to move to the completions operations phase after the drilling rig was demobilized. Doc. ID# 4. Trigleth responded via e-mail: "Great job!!" Doc. ID# 10. Pollard and Trigleth exchanged further communications in the weeks that followed as to planning and undertaking the completions phase, along with noting positive reports as to the well's production potential. *Id.* Pollard conveyed proposed steps for completing the well to Trigleth on January 30, 2023. Doc. ID# 4, ¶ 15.

[¶ 8] After the West Dry Creek well was drilled, in late January and early February 2023, Bison received batches of invoices from companies that provided materials or services for drilling the West Dry Creek well. *Id.* ¶ 16. Pollard analyzed the expenses incurred when compared to the forecasted budget to take into account expenditures due to the issues faced during the drilling of the West Dry Creek well, such as the rig breaking down. *Id.* On February 7, 2023, Pollard wrote to Trigleth and Goh that (1) they were "extremely over budget," (2) they "need[ed] a follow up on the accounting of the ~$1.1 million spent prior to drilling operations commencing[,]" and (3) that they needed to complete the West Dry Creek well so it was in production. Doc. ID# 11.

[¶ 9] Pollard and Goh attempted communicating with Trigleth to remedy payment and accounting issues in order to proceed with completing the West Dry Creek well and effectuating the transfer of North Dakota interests from Bison to Sparrow, but Trigleth became difficult to work with. Doc. ID# 4, ¶ 17. Trigleth refused to provide accounting information that Pollard and Goh requested and became upset that invoices were charged to Bison and EnTec. *Id.* Pollard attempted scheduling times for discussion to "see what we can do to get this worked out." Doc. ID# 12.

[¶ 10] Trigleth, however, began to threaten Pollard, Goh, and the oil and gas wells in Renville County. On February 7, 2023, Trigleth proclaimed:

> You hiding crying piece of shit!!' You and your crooked partner! Let's go mother fucker.
> Fuck you you punk!!

Doc. ID# 13. He also threatened to plug the newly drilled West Dry Creek well that same day, while disavowing the transfer to Sparrow:

> What are you two morons don't understand is that bison. Has controls of all and every percent of that interest in that well. You have no rights to transfer. Or sell any by law. Neither one of you fucking morons know what you're doing and I'm gonna have to educate you dumb motherfuckers. Obviously Sparrow went and spent these funds not Bison. What a fucking stupid name anyway.
> I will contact all investor's tomorrow and we will all have a meeting with me and discuss details!! I will plug this fucking well if you guck with me!! You total piece of shot. You run around and hide from everyone. Why don't you take a quick trip to ND. Because you are a ducking coward and no paying piece of shit!! Meet me in ND and let's find out whom owes whom!!

Doc. ID# 13. Many subsequent e-mails from Trigleth on February 7, 2023, also threatened plugging the well. *See* Doc. ID# 13. These e-mails include, inter alia, those that Trigleth sent as follows:

> As of now our intention is to plug the well. Abandon the location and move on!!!
> Not worth the trouble to deal with an asshole like you!!
> * * *
> Tomorrow Bison starts plugging procedures on WDC 1-H. Will set plugs on well and abandon.

4

> \* \* \*
>
> Cheaper to plug than complete. Sparrow has billings to them also. Let's see how this all works out!! I forgot more about how this industry works than yiu will ever know!!

Doc. ID # 13.

[¶ 11] Trigleth continued to make similar threats in days that followed. The next day, on February 8, 2023, Trigleth stated: "The only thing that is going to happen on that well is to pour cement and plug it at this point!!" Doc. ID# 14. Trigleth has also threatened to plug the three TOP wells. Doc. ID # 24. Goh again attempted to discuss available funds, accounting, and completing the transfer to Sparrow, but Trigleth responded with additional threats and personal attacks towards Goh. *See* Doc. ID# 15.

[¶ 12] Pollard and Goh then attempted to communicate with Trigleth through their counsel. Counsel first wrote Trigleth on February 10, 2023, requesting he cease contacting vendors, customers, working interest owners, and other third parties. Doc. ID# 17. Trigleth responded with more than a dozen e-mails that made additional threats. *See* Doc. ID# 18–19. Pollard and Goh's counsel again wrote Trigleth on February 17, 2023, requesting Trigleth cease improper communications and provide a status update regarding the West Dry Creek well. Doc. ID# 21. But Trigleth responded by expressing his intent to plug the three TOP wells. Doc. ID# 22. Additionally, Trigleth has attempted to transfer and/or otherwise sell Bison's working interest in the West Dry Creek well. Doc. ID# 4, ¶ 31; *see also* Doc. ID# 23.

[¶ 13] This Court previously granted Plaintiffs' request for a temporary restraining order on similar grounds and then set a hearing. *See* Doc. ID# 34. Subsequently, Plaintiffs served each of the defendants. *See* Doc. ID# Nos. 35 (service on Bison), 36 (service on EnTec), and 46 (service on Trigleth). Though Trigleth was personally served less than fourteen days before the preliminary injunction hearing, the Court finds that he had constructive notice of the hearing and Plaintiffs'

5

motion as a result of his role as the managing member of both Bison and EnTec, both of which were served more than fourteen days before the hearing. *See* Doc. ID# 44. Though they had notice, Defendants chose not to appear.

## CONCLUSIONS OF LAW

[¶ 14] "The civil remedy of an injunction is provided for by N.D.R.Civ.P. 65, N.D.C.C. ch. 32-05, and N.D.C.C. ch. 32-06." *G&D Enterprises v. Liebelt*, 2020 ND 213, ¶ 28, 949 N.W.2d 853. Generally speaking, "[p]reventive relief consists in prohibiting a party from doing that which ought not to be done. It is granted by injunction, temporary or final." N.D.C.C. § 32-05-03. "A preliminary injunction prevents irreparable injury until the court decides whether to issue a permanent injunction at trial." N.D.R.Civ.P. 65(a). Before reaching the substance of a motion for preliminary injunction, the Court concludes that Plaintiffs have satisfied all notice requirements set forth in Rule 65.

[¶ 15] As to the merits, the North Dakota Supreme Court has stated the following factors are appropriate to consider in determining whether injunctive relief should be granted:

(1) substantial probability of succeeding on the merits;
(2) irreparable injury;
(3) harm to other interested parties; and
(4) effect on the public interest.

*F-M Asphalt, Inc. v. N. Dakota State Highway Dep't*, 384 N.W.2d 663, 664 (N.D. 1986). The Court adopted these factors—known as the *Dataphase* factors—from the Eighth Circuit. *Id.* (citing *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir.1981)). This Court's analysis of these factors in deciding whether to grant a preliminary injunction is subject to the abuse of discretion standard of review. *Id.* (citing *Schauer v. Jamestown College*, 323 N.W.2d 114, 115 (N.D.1982)). Plaintiffs satisfy each of these elements.

### I. Plaintiffs have a substantial probability of succeeding on the merits.

[¶ 16] Plaintiffs satisfy the substantial probability factor, which does not impose upon Plaintiffs a requirement to "prove a mathematical probability of success at trial." *Dataphase Sys.*, 640 F.2d at 113; *accord PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143 (8th Cir. 2007) ("In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win."). "Rather, a court should flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *Calvin Klein Cosms. Corp. v. Lenox Lab'ys, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987).

[¶ 17] Plaintiffs' complaint alleges that Defendants have threatened to plug the wells, threatened to transfer Bison's working interest in them, and have refused to provide an accounting. Plaintiffs seek a declaratory judgment regarding the parties' rights and obligations, including their entitlement to an accounting. Plaintiffs also seek injunctive relief prohibiting Defendants from plugging or otherwise irreparably harming any of the wells, continuing any operations while excluding Pollard and Goh, and transferring Bison's working interest. Plaintiffs further allege claims for specific performance of the parties' agreement under which Sparrow is to be assigned Bison's interests in North Dakota and take over operations of those wells, breach of contract, and breach of fiduciary duties arising out of Defendants' conduct.

[¶ 18] Plaintiffs fulfill the first factor of a substantial probability of succeeding on the merits for multiple reasons.

#### A. Plaintiffs have shown a likelihood of success on their specific performance claim.

[¶ 19] During the process of drilling the West Dry Creek well, an agreement was reached between Sparrow, Pollard, and Goh on one side and Trigleth and Bison on the other. The parties'

7

agreement was that Sparrow (a limited liability company in which Pollard and Goh are members) would be assigned Bison's interests in North Dakota and take over operations of those wells, subject to Bison/Trigleth reserving a 15% interest in the West Dry Creek well, Pollard and Goh transferring their shares in Bison to Trigleth, and Pollard and Goh withdrawing from Bison. Furthermore, Sparrow would retain certain interests in Louisiana operations. Plaintiffs seek the remedy of specific performance to enforce this agreement.

[¶ 20] North Dakota has codified a party's right to specific performance. *See* N.D.C.C. ch. 32-04. With respect to the agreement to transfer real property interests in this case, "[i]t is to be presumed that the breach of an agreement to transfer real property cannot be relieved adequately by pecuniary compensation and that the breach of an agreement to transfer personal property can be thus relieved." N.D.C.C. § 32-04-09; *see Dale Expl., LLC v. Hiepler*, 2018 ND 271, ¶ 11, 920 N.W.2d 750 ("Section 32-04-09, N.D.C.C., presumes that 'the breach of an agreement to transfer real property cannot be relieved adequately by pecuniary compensation.'"); *see also Landers v. Biwer*, 2006 ND 109, ¶ 8, 714 N.W.2d 476 (similar); *Jonmil, Inc. v. McMerty*, 265 N.W.2d 257, 259 (N.D. 1978) (similar). Indeed, it is reversible error to not apply the section 32-04-09 presumption in real estate contract cases. *See Dale Expl.*, at ¶ 13. When applied, "the N.D.C.C. § 32-04-09 presumption [is] that damages are inadequate to remedy a breach of an agreement to transfer real property." *Id.* at ¶ 22. And the presumption constitutes established evidence in Plaintiffs' favor. *See* N.D.R.Ev. 301(a) ("In a civil case, unless a statute or these rules provide otherwise, if facts giving rise to a presumption are established by credible evidence, the presumption substitutes for evidence of the existence of the fact presumed."). The Court must then consider "[w]hether specific performance would be just and reasonable as to"

Plaintiffs, *Rohrich v. Kaplan*, 248 N.W.2d 801, 807 (N.D. 1976), along with Plaintiffs' good faith, *see Landers*, 2006 ND 109, ¶ 9 (outlining "the equitable considerations for specific performance").

[¶ 21] Plaintiffs have made this showing at the preliminary injunction stage. *See generally* Pollard Decl. Trigleth manifested his assent to the agreement in writing. The parties had discussed and agreed to the material terms of the agreement prior to when the West Dry Creek well was spud on December 9, 2022. Three days later, on December 12, 2022, Pollard e-mailed Trigleth a copy of the written restructuring agreement and stated, in pertinent part: "I got the restructure agreement in today. It's attached and ready to review. I believe it is as we have discussed." Doc. ID# 42–43. Trigleth confirmed in writing that he agreed as to all material proposed terms—which are at issue in this case—apart from certain terms involving EnTec not at issue:

> The EnTec Services LLC company can't be part of this agreement. I had already made other decisions on that company.
> *Everything else looks good.* I do need to review the exhibits.

*Id.* (emphasis added). Subsequently, in late January 2023—shortly before Pollard requested Trigleth provide an accounting of investor funds—Trigleth confirmed the transfer from Bison to Sparrow while proposing steps to effectuate completing the deal. *Id.* Some of Trigleth's additional, proposed steps were outside the scope of the previously agreed to attached contract. *See id.*

[¶ 22] The material terms effectuating transfer for which Plaintiffs seek specific performance were agreed to in writing. Trigleth typed his name when indicating his agreement to Pollard's proposal. Section 09-06-04(3), N.D.C.C., requires for the transfer of real property that "some note or memorandum thereof is in writing and subscribed by the party to be charged[.]" Section 09-06-04(3) does not require that a signature be handwritten. At this stage, the Court finds this sufficient—courts routinely recognize that "[a]n e-mail sent by a party, under which the

9

sending party's name is typed, can constitute a writing for purposes of the statute of frauds[.]" *Newmark & Co. Real Est. Inc. v. 2615 E. 17 St. Realty LLC*, 80 A.D.3d 476, 477 (N.Y. App. Div. 2011)[1]; *see also, e.g., Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002) (holding that "the sender's name on an e-mail satisfies the signature requirement of the statute of frauds" in a UCC statute of frauds case); *Princeton Indus., Prod., Inc. v. Precision Metals Corp.*, 120 F. Supp. 3d 812 (N.D. Ill. 2015) (similar and collecting cases); *Gillis v. Wells Fargo Bank, N.A.*, 875 F. Supp. 2d 728, 735 (E.D. Mich. 2012) ("While the typical e-mail message lacks a hand-written signature and contains only the typed name of the sender, courts have found this sufficient to constitute a signature for purposes of the statute of frauds." (collecting cases)). The same is true in this case. Under the applicable standard, Plaintiffs satisfy showing they are likely to succeed on their specific performance claim.

**B.     Pollard and Goh are likely to succeed on their fiduciary duty and accounting claims.**

[¶ 23] Trigleth acted as the manager or managing member of Bison. As Bison was organized in Delaware, the Court applies Delaware law with respect to the internal operating processes of the company. *See* N.D.C.C. § 10-32.1-72 ("The law of the state or other jurisdiction under which a foreign limited liability company is formed governs . . . [t]he internal affairs of the company[.]"). "Delaware law presumes that managers of limited liability companies owe fiduciary duties unless explicitly disclaimed." *Largo Legacy Grp., LLC v. Charles*, No. CV 2020-0105-MTZ, 2021 WL 2692426, at *12 (Del. Ch. June 30, 2021). And unless expressly limited, "the manager has a fiduciary duty to manage the entity in its interest and in the

---

[1] The North Dakota Supreme Court found an e-mail insufficient in a recent case, but because the e-mail was from an attorney, and there was no written document in the record providing that attorney agency authority. *Lund v. Swanson*, 2021 ND 38, ¶ 20, 956 N.W.2d 354. Here, the party against whom specific performance is sought sent the e-mail.

10

interests of its members." *Id.* (citations omitted). These duties include duties of care and loyalty. *Id.*

[¶ 24] Pollard and Goh establish a probability of success under these standards. If Trigleth proceeds to plug the wells or dilute the working interest of Bison, he will have violated duties owed to Pollard and Goh as members of Bison. It would also violate the agreement with Sparrow, as shown *supra*. Additionally, Pollard and Goh are entitled to information regarding Bison's activities and accounting records by statute. *See* Del. Code Ann. Tit. 6, § 18-305; N.D.C.C. § 10-32.1-42.[2] Separately, Pollard and Goh are entitled to an equitable accounting given the parties' relationship and Trigleth's control over the relevant documents and information. *See Ritter, Laber & Assocs. V. Koch Oil, Inc.*, 2004 ND 117, ¶ 31, 680 N.W.2d 634 ("Equitable jurisdiction for an accounting may be invoked when (1) there is a fiduciary relationship between the parties, accompanied by a duty on the part of the defendant to render an account, (2) there are mutual accounts, or, if the account is all on one side, the account is complicated, and (3) there is a need for discovery.").

[¶ 25] While Bison's general counsel had previously prepared and provided a *draft* proposed operating agreement, one was not formally executed and agreed to by all members to limit the above duties. Bison's three members did not clearly and unambiguously agree to limit Trigleth's fiduciary duties with an operating agreement executed by all three members. Under

---

[2] Section 18-305 provides exclusive jurisdiction to Delaware courts. Because Delaware's statute does not apply, North Dakota's LLC inspection statute may therefore govern despite the fact Bison was formed in Delaware. *See Havlicek v. Coast-to-Coast Analytical Services, Inc.*, 46 Cal. Rptr. 2d 696, 697 (Cal. App. 2d Dist. 1995) (California statute permitting inspection applied in case involving Delaware corporation); *Sachs v. Adeli*, 26 A.D.3d 52, 58 (N.Y. App. Div. 2005) (New York law applied with respect to inspecting a Delaware LLC's records, notwithstanding Del. Code Ann. tit. 6, § 18-305). Section 10-32.1-42, N.D.C.C., therefore permits Pollard ang Goh to seek an accounting.

11

Delaware law, "it is now settled . . . that the removal of default fiduciary duties through an LLC agreement must be accomplished with clear and unambiguous language." *77 Charters, Inc. v. Gould*, CV 2019-0127-JRS, 2020 WL 2520272, at *9 (Del. Ch. May 18, 2020); *see also Largo Legacy Group*, 2021 WL 2692426, at *13 ("Such agreements can disclaim fiduciary duties, but drafters 'must do so clearly, and should not be incentivized to obfuscate or surprise investors by ambiguously stripping away the protections investors would ordinarily receive.'").

[¶ 26] But even if the Court were to find the operating agreement applies, Pollard and Goh still show a likelihood of success. The operating agreement states "that the Managing Member shall (i) have an implied duty of good faith and fair dealing in performing the terms of this Agreement to the extent required by the Act and (ii) not engage in any conduct that constitutes willful misconduct or gross negligence in performing its obligations under this Agreement (the obligations described in clause (i) and (ii) above being hereinafter referred to as the 'Standard of Conduct')." Exhibit A to Pollard Decl., at p. 4. The conduct at issue violates these standards. The operating agreement also provides the members with access to "books and records." *Id.* At pp. 25-26. And it specifically mandates that "the Managing Member shall furnish to each Member, no less than quarterly and at the expense of the Company, a balance sheet as of the end of such quarter and statement of income and expense for the quarter then ended." *Id.* Trigleth has not provided such information.

[¶ 27] In sum, Plaintiffs show a likelihood of success on the merits when considering obligations Trigleth owes them.

### C.     The threatened conduct would violate North Dakota law.

[¶ 28] The conduct Plaintiffs seek to enjoin would also violate North Dakota law in multiple ways. *First*, North Dakota law prevents Trigleth from unilaterally plugging any oil and

12

gas wells without receiving Commission approval. "The [C]ommission has the authority . . . [t]o regulate . . . [t]he drilling, producing, *and plugging of wells*, the restoration of drilling and production sites, and all other operations for the production of oil or gas." N.D.C.C. § 38-08-04(1)(b)(1).[3] As a result, prior to plugging a well, "[t]he operator or the operator's agent shall file a notice of intention (form 4) to plug with the director, *and obtain the approval of the director*, prior to the commencement of plugging or plug-back operations." N.D. Admin. Code § 43-02-03-33 (emphasis added).

[¶ 29] *Second*, there is no question that the West Dry Creek well has the potential to become a successfully producing well, and the three TOP wells have been in production for some time. Spitefully plugging the wells or diluting Bison's working interest would fly in the face of North Dakota's statutory and regulatory schemes preventing waste. "One of the purposes of N.D.C.C. ch. 38-08 is to protect minerals by preventing the waste of oil and gas, which includes the unnecessary destruction of oil or gas." *Vogel v. Marathon Oil Co.*, 2016 ND 104, ¶ 24, 879 N.W.2d 471 (citing N.D.C.C. §§ 38-08-01, 38-08-02(19), and 38-08-03). In codifying N.D.C.C. ch. 38-08, the Legislative Assembly found it "to be in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as *will prevent waste*. . . ." N.D.C.C. § 38-08-01 (emphasis added); *see also* N.D.C.C. § 38-08-03 ("Waste of oil and gas is prohibited."). Thus, "[a]ll operators . . . shall at all times conduct their operations in the drilling, equipping, operating, producing, *plugging*, and site reclamation of oil and gas wells in a manner that will *prevent waste*." N.D. Admin. Code § 43-02-03-06 (emphasis added).

---

[3] Plugging an abandoned well may be an appropriate action when the well has not produced oil or gas in paying quantities for over a year. *See* N.D.C.C. § 38-08-04(1)(a)(12).

[¶ 30] It would be improper for Trigleth or Bison (at Trigleth's direction) to plug any of the Four Wells in this setting, particularly without Commission approval. Such needless and improper actions may result in the Commission imposing civil penalties onto Bison, which Pollard and Goh have an interest in preventing as members in the company. Additionally, Pollard and Goh may have a cause of action under the Environmental Law Enforcement Act, N.D.C.C. ch. 32-40. *See Vogel*, 2016 ND 104, ¶¶ 24–28. Royalty and interest owners may likewise present claims. The same actions also run afoul common law waste: "Waste may be defined as an unreasonable or improper use, abuse, mismanagement, or omission of duty touching real estate by one rightfully in possession, which results in a substantial injury." *Meyer v. Hansen*, 373 N.W.2d 392, 395 (N.D. 1985). Simply put, plugging the oil and gas wells under the circumstances of this case would constitute improper use, abuse, and mismanagement.

\* \* \*

[¶ 31] For the above reasons, Plaintiffs satisfy the first factor. Plaintiffs are likely to succeed on a multitude of claims asserted in this action. A preliminary injunction would protect their rights and preserve the status quo.

## II. Plaintiffs will suffer irreparable harm absent a grant of the injunction.

[¶ 34] Courts exercise their discretion in granting preliminary injunction "in light of preserving the status quo and protecting the rights of the applicant pending a determination on the merits." *Vorachek v. Citizens State Bank of Lankin*, 461 N.W.2d 580, 585 (N.D. 1990) (citing *Gillies v. Radke*, 78 N.D. 974, 54 N.W.2d 155 (1952)). Thus, a plaintiff must demonstrate that, "if the preliminary injunction is not granted, the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Id.*; *see also, e.g., Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) (noting that the threshold inquiry is whether

there has been a showing of irreparable harm). There are multiple ways to demonstrate irreparable harm, including the following:

> An injury is irreparable when it cannot be adequately compensated in damages, and it is not necessary that the pecuniary damage be shown to be great. Acts which result in a serious change of, or are destructive to, the property affected either physically or in the character in which it has been held or enjoyed, do an irreparable injury.

*Viestenz v. Arthur Twp.*, 78 N.D. 1029, 1039, 54 N.W.2d 572, 578 (1952) (quoting 43 C.J.S., Injunctions, § 23) (cleaned up); *accord Voracheck*, 461 N.W.2d at 585.

[¶ 35] Here, Plaintiffs show irreparable harm. Defendants have threatened to damage the Four Wells, refused to provide an accounting, and attempted to transfer the working interest in the West Dry Creek well to third parties. The harm this motion seeks to protect from would result in a serious and destructive change to the business and real property interests at issue.

[¶ 36] As drilling for the West Dry Creek well was being completed, data indicated that the well may be prosperous and even a "flowing well." Trigleth himself sent an enthusiastic e-mail response once Pollard shared that information. If the well were plugged now, as Trigleth has suggested will happen, it would be difficult to ascertain just how much revenue would be lost. *See also Textron Fin. Corp. v. Childress*, 5:09-CV-00149-SWW, 2009 WL 10676813, at *4 (E.D. Ark. May 29, 2009) (granting temporary restraining order preventing disposition of collateral).

[¶ 37] The uncertainty of the ultimate recovery of oil from the well, combined with the unpredictable prices of commodities like oil and gas, would render calculation of damages difficult if not impossible. It is for similar reasons that, if Trigleth dilutes the working interest in the West Dry Creek well, Pollard and Goh would suffer irreparable harm, as monetary damages for the dilution of Bison's interest in production from the wells would be difficult to ascertain. If Trigleth

15

and/or Bison either plug or damage the wells, or dilute the interest, they would destroy Plaintiffs' ability to develop the premises. *See White Rock Oil & Gas*, 2020 WL 8268881, at *6. Moreover, it would destroy the benefit of the bargain that Plaintiffs were to receive under the agreement that Sparrow would take over the North Dakota properties in exchange for Pollard and Goh giving up their shares in Bison and withdrawing. And such actions would destroy Plaintiffs' goodwill with royalty owners as well as working interest owners, who invested in the West Dry Creek well believing that the operator would retain an interest and participate in the well, not merely act as a contract operator. *See EZ Blockchain*, 589 F. Supp. 3d at 1109 ("Potential loss of consumer goodwill qualifies as irreparable harm.").

### III. The irreparable harm to Plaintiffs outweighs any perceived harm to Defendants.

[¶ 38] A preliminary injunction would not harm Defendants but merely preserve the oil and gas wells and working interest in those wells. There is no cognizable harm to Defendants in precluding them from wrongfully transferring Bison's interest to third parties. Nor is there harm to Defendants in pausing any operations so Pollard and Goh may receive information and be present to monitor operations. The potential harm to Plaintiffs, by contrast, is great.

### IV. Public policy supports granting the preliminary injunction.

[¶ 39] The final factor is also satisfied. As legislatures determine public policy in our system of government, courts often look to legislation in deciding this factor. *See, e.g., White Rock Oil & Gas*, 2020 WL 8268881, at *7 (D.N.D. Dec. 30, 2020) ("Granting the preliminary injunction will serve the public interest as stated by the North Dakota Legislature."); *Schulz v. U.S. Boxing Ass'n*, 105 F.3d 127, 134 (3d Cir. 1997) ("[W]e turn to the enactments of the state legislature as an authoritative source."); *Rodriguez v. Molina*, --- F. Supp. 3d ---- ,

16

No. 422CV00183SMRHCA, 2022 WL 2287805, at *6 (S.D. Iowa June 24, 2022) ("Congress made several findings on the public interests at stake in cases such as these ones.").

[¶ 40] North Dakota's Legislative Assembly has found it "in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as *will prevent waste*[.]" N.D.C.C. § 38-08-01; *see also* N.D.C.C. § 38-08-03 ("Waste of oil and gas is prohibited."). In pertinent part, "waste" means:

> "Waste" means and includes:
> a. Physical waste, as that term is generally understood in the oil and gas industry.
> b. The inefficient, excessive, or improper use of, or the unnecessary dissipation of reservoir energy.
> c. The locating, spacing, drilling, equipping, operating, or producing of any oil or gas well or wells in a manner which causes, or tends to cause, reduction in the quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations, or which causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas.

N.D.C.C.§ 38-08-02(19).

[¶ 32] The Court issuing a preliminary injunction would further the public interest in preventing waste. The order would ensure that productive wells are not plugged or otherwise damaged. As would the order further the public interest in efficient development by not wrongfully transferring working interest, so that Plaintiffs may develop the premises. The fourth factor also tilts for Plaintiffs.

## ORDER

[¶ 33] **ACCORDINGLY, IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. ID# 40) is **GRANTED**, and, pending trial on the merits, Defendants are hereby enjoined and restrained from:

1. Plugging or taking any steps in furtherance of plugging or otherwise causing harm to any of the Four Wells;

2. transferring, diluting, or otherwise affecting the nature or quantum of Bison's interest in any of the Four Wells or underlying leases;

3. transferring, diluting, or otherwise affecting the nature or quantum of any of Bison's oil, gas, or mineral interests;

4. taking any actions towards the three TOP wells outside of normal production activities in the ordinary course of business; and

5. undertaking any work or actions, including completions operations, unless and until Pollard and Goh are provided information as to the proposed work, an accounting, and are permitted to be present and consent to the actions performed.

[¶ 34] This order shall apply to Defendants and all their respective officers, agents, servants, employees, attorneys, and persons acting in concert of participation with them.

Dated this 4th day of April, 2023.

Hon. Michael P. Hurly
District Court Judge

78785561 v1