<u>**Exhibit "2"**</u>

STATE OF NORTH DAKOTA                    IN DISTRICT COURT

COUNTY OF RENVILLE                       NORTHEAST JUDICIAL DISTRICT

| | |
|---|---|
| Greg Pollard, Kiat Tze "Kenny" Goh, and Sparrow Oil & Gas LLC,<br><br>Plaintiffs,<br><br>v.<br><br>Geary Trigleth, Bison Land & Minerals LLC, and EnTec Services, LLC,<br><br>Defendants. | Case No. ___38-2023-CV-00007___<br><br><br>**DECLARATION OF<br>GREG POLLARD** |

I, Greg Pollard, certify to the best of my knowledge that the statements set forth in this instrument are true and correct.

[¶ 1]    I am over eighteen years of age, am of sound mind and body, and under no legal disability. I have personal knowledge of the facts set forth in this declaration, and if called to testify in person about those facts, could and would do so completely and under oath.

[¶ 2]    I submit this declaration in support of Plaintiffs' Motion for Temporary Restraining Order in the above-captioned action.

[¶ 3]    During the relevant times below, I was, and currently am, a member of Bison Land & Minerals, LLC ("Bison"). Prior to the dispute leading to this action, my title was Chief Operating Officer.

[¶ 4]    Bison was organized under the laws of Delaware. Upon information and belief, Geary Trigleth caused the documents that created Bison to be filed in Delaware in 2019. Mr. Trigleth's title was "President / CEO" of Bison.

[¶ 5]    Kiat Tze "Kenny" Goh and I became members of Bison in exchange for certain

personal contributions, effective March 20, 2022. For my contribution, I assigned three oil and gas wells in Renville County, North Dakota, to Bison. These wells are: (1) RUSCH 1, API No. 33-075-01283; (2) RUSCH 2, API No. 33-075-01298; and (3) FRANK W. MCCRORY 1, API No. 33-075-00163 (collectively, the "TOP wells"). Mr. Goh made a monetary contribution to Bison in exchange for becoming a member. Mr. Goh's title was EVP of Exploration.

[¶ 6]    Mr. Goh's and my contributions provided us each with a 22.5% membership interest in Bison.[1] While a draft, proposed operating agreement for Bison was provided by Bison's then counsel, I am not aware that all members collectively agreed to execute it. Attached as **Exhibit A** is a true and correct copy of the proposed Amended and Restated Limited Liability Company Agreement of Bison Land & Minerals LLC.

[¶ 7]    Since Mr. Goh and I became members of Bison, its oil and gas strategy has been focused in three geographic areas: North Dakota, Mississippi, and Louisiana.

[¶ 8]    With respect to North Dakota, during the spring and summer of 2022, Bison made plans to drill the West Dry Creek 1H well, API No. 33-075-01491 ("West Dry Creek well"), which was part of the Smith Embayment Project. These preparations included securing necessary leases, submitting filings to the North Dakota Industrial Commission ("Commission"), communicating with participants in the project, securing insurance and bond documents, and undertaking numerous other steps required to drill an oil and gas well. Bison secured executed participation agreements from a number of participants regarding the Smith Embayment Project. Attached as **Exhibit N** is a true and correct exemplar copy of the Participation Agreement – Smith Embayment Project.

[¶ 9]    By mid-September 2022, Bison was approaching commencing drilling operations.

---

[1]  These interest percentages would change slightly in the future, with Geir Rorstad acquiring 2%.

I personally contributed substantial effort in various steps. Bison had engaged EnTec Services, LLC ("EnTec") to drill the West Dry Creek well. Upon information and belief, EnTec is Trigleth's company. Personnel and equipment were at the site conducting preparatory work by mid-October 2022.

[¶ 10] Riley Amos, EnTec's Senior Operations Manager on location, would generally send summaries of actions completed to me via e-mail, and I would in turn forwarded those summaries to Mr. Trigleth. It was not until mid-November 2022, however, that the Commission provided the approval necessary to commence drilling operations.

[¶ 11] Once final approval was received from the Commission on November 16, 2022, Mr. Trigleth acknowledged drillings plans to move forward via e-mail. Attached as **Exhibit B** is a true and correct copy of the e-mail Mr. Trigleth sent me on November 16, 2022.

[¶ 12] EnTec spud the well on December 9, 2022. I traveled to North Dakota to oversee drilling operations. Mr. Trigleth did not travel to North Dakota, but I kept him apprised as to the status of drilling operations. Mr. Trigleth confirmed via e-mail to me that he was reviewing invoices and reviewing EnTec's costs. Attached as **Exhibit C** is a true and correct copy of the e-mail Mr. Trigleth sent to me on December 13, 2022.

[¶ 13] During the process of drilling the West Dry Creek well, communications also involved the parties' agreement wherein Sparrow (a limited liability company in which Mr. Goh and I are members) would be assigned Bison's interests in North Dakota and take over operations of those wells, subject to Bison/Mr. Trigleth reserving a 15% interest in the West Dry Creek well, and Pollard and Goh would transfer their shares in Bison to Trigleth and withdraw from Bison. Other aspects of this agreement are not described in this declaration.

[¶ 14] We faced multiple challenges while drilling the well. These included extreme

winter weather conditions and storms, drilling personnel quitting, and, as the most critical issue, the rig itself breaking down. On multiple days, operations were unable to proceed because suppliers were unable or unwilling to travel during the frigid conditions. I informed Mr. Trigleth as to the challenges faced during drilling operations. Attached as **Exhibit D** is a true and correct copy of an e-mail Mr. Trigleth sent to me on December 19, 2022, acknowledging challenges with drilling the West Dry Creek well.

[¶ 15]  On January 16, 2023, I reported that the West Dry Creek well was successfully drilled and that the project would need to move to the completions operations phase once the drilling rig was demobilized. Attached as **Exhibit E** is true and correct copy of an e-mail I received from Mr. Trigleth in response, dated January 16, 2023. I exchanged with Mr. Trigleth further communications in the weeks that followed as to planning and undertaking actions to complete the well. We also discussed data we received from drilling the well, and that the oil production noted was positive.

[¶ 16]  In late January and early February 2023, Bison began to receive various invoices from companies that provided materials and/or services. I proceeded to analyze costs and determined that the West Dry Creek well project was over budget. On February 7, 2023, I expressed my concerns to Mr. Trigleth and Mr. Goh via e-mail. Attached as **Exhibit F** is a true and correct copy of my e-mail sent on February 7, 2023.

[¶ 17]  Mr. Goh and I attempted to resolve any issues with Mr. Trigleth as to budgetary and other concerns and sought to effectuate completion of the West Dry Creek well. We also sought to effectuate transfer of Bison's North Dakota interests to Sparrow. Mr. Trigleth, however, became difficult to work with. Mr. Trigleth refused to provide the accounting information and became upset that invoices were charged to Bison and EnTec. Attached as **Exhibit G** is a true and

correct copy of e-mails exchanged to this effect on February 7, 2023.

[¶ 18]  In particular, Mr. Trigleth became angered when I requested an accounting of the roughly $1.4 million in investor funds that Bison had previously received. Neither Mr. Goh nor I ever received a complete accounting regarding these investor funds from Mr. Trigleth.

[¶ 19]  Mr. Trigleth did not thereafter meaningfully engage with Mr. Goh and me. He, instead, sent a series of e-mails on February 7, 2023, threatening Mr. Goh, myself, and the oil and gas wells. Attached collectively as **Exhibit H** are true and correct copies of these e-mails Mr. Trigleth sent.

[¶ 20]  Mr. Trigleth provided other correspondence and/or communications to Mr. Goh and/or me that were threatening to us, the wells in Renville County, and/or our counsel.

[¶ 21]  Attached as **Exhibit I** is a true and correct copy of an e-mail exchange with Mr. Trigleth on February 8, 2023.

[¶ 22]  Attached as **Exhibit J** is a true and correct copy of an e-mail exchange I was copied on, between Mr. Goh and Mr. Trigleth, during February 7–8, 2023.

[¶ 23]  Attached as **Exhibit K** is a true and correct copy of an e-mail from Mr. Trigleth on February 10, 2023.

[¶ 24]  Mr. Goh and I retained counsel, who sent letters to Mr. Trigleth on our behalf.

[¶ 25]  Attached as **Exhibit L** is a true and correct copy of a letter dated February 10, 2023, from our counsel to Mr. Trigleth. In response to counsel, Mr. Trigleth sent ten e-mails that same day and the following morning. True and correct copies of those e-mails are attached as **Exhibit M**.

[¶ 26]  Further, around the same time, Mr. Goh and I have reason to believe that Mr. Trigleth has disparaged us and Sparrow to working interest owners and third parties in the oil and

gas industry in North Dakota, including service companies and vendors with whom we anticipate having ongoing business relationships. Mr. Trigleth also made statements concerning Mr. Goh, Sparrow, and me to participants.

[¶ 27]   Mr. Trigleth's threats have been unrelenting.

[¶ 28]   Attached as **Exhibit O** are true and correct copies of two subsequent e-mails dated February 11, 2023, from Mr. Trigleth and directed towards Mr. Goh and me.

[¶ 29]   Attached as **Exhibit P** is a true and correct copy of our counsel's letter to Mr. Trigleth dated February 17, 2023.

[¶ 30]   Attached as **Exhibit Q** is a true and correct copy of Mr. Trigleth's response e-mail to our counsel, also dated February 17, 2023.

[¶ 31]   Mr. Goh and I have become concerned, due to previous discussions with Mr. Trigleth, that Mr. Trigleth intends to dilute Bison's working interest. Mr. Trigleth intends on transferring Bison's working interest in the West Dry Creek well to third parties. For example, on February 9, 2023, Mr. Trigleth sent an e-mail to numerous third parties stating that Bison was selling 24% additional interest in the West Dry Creek well. The same e-mail to third-parties blamed Mr. Goh, Mr. Pollard, and Sparrow. A true and correct copy of the e-mail sent on February 9, 2023, is attached as **Exhibit R**.

[¶ 32]   Mr. Trigleth has also threatened to plug and abandon the TOP wells. For instance, attached as **Exhibit S** is a true and correct copy of text messages Mr. Trigleth has sent to me.

[¶ 33]   Mr. Goh and I have not been provided any information as to operations or accounting. Mr. Trigleth has excluded us from company functions. He has also demanded that we no longer have any input into the West Dry Creek well.

[¶ 34]   Mr. Trigleth has indicated he is planning to perform work on the West Dry Creek

6

well as early as next week, the week of February 27, 2023. He has not explained the scope of the work.

I declare, under penalty of perjury under the law of North Dakota, that the foregoing is true and correct.

Dated this 22nd day of February, 2023.

Greg Pollard

*Draft of June 19, 2022*

---

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**BISON LAND & MINERALS LLC**

(A Delaware limited liability company)

Dated as of March 20, 2022

---

THE INTERESTS REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND MAY NOT BE TRANSFERRED WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS (OR EXEMPTIONS THEREFROM) AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY THAT ARE SET FORTH IN THIS LIMITED LIABILITY COMPANY AGREEMENT.

# TABLE OF CONTENTS

**Page**

**ARTICLE I GENERAL**..................................................................................1
  SECTION 1.1.   Formation and Organization .........................................1
  SECTION 1.2.   Name ...............................................................................2
  SECTION 1.3.   Principal Office ...............................................................2
  SECTION 1.4.   Registered Office and Registered Agent.......................2
  SECTION 1.5.   Term ...............................................................................2
  SECTION 1.6.   Purposes ..........................................................................2
  SECTION 1.7.   Powers ............................................................................2
  SECTION 1.8.   Qualification in Other Jurisdictions ..............................2
**ARTICLE II MANAGEMENT**.......................................................................3
  SECTION 2.1.   General............................................................................3
  SECTION 2.2.   Responsibilities of the Managing Member ...................3
  SECTION 2.3.   Cost Allocation...............................................................3
  SECTION 2.4.   Other Matters Affecting the Managing Member ..........4
  SECTION 2.5.   Officers...........................................................................5
  SECTION 2.6.   Reliance by Third Parties ...............................................7
**ARTICLE III MEMBERS**.............................................................................7
  SECTION 3.1.   Admission of Members...................................................7
  SECTION 3.2.   No Liability for Company Obligations ..........................7
  SECTION 3.3.   No Resignation or Withdrawal by Members .................7
  SECTION 3.4.   Meetings of Members.....................................................8
  SECTION 3.5.   Outside Activities of the Members ................................9
**ARTICLE IV CAPITAL**................................................................................9
  SECTION 4.1.   Capital Contributions .....................................................9
  SECTION 4.2.   Capital Accounts ..........................................................10
  SECTION 4.3.   Member Loans ..............................................................10
  SECTION 4.4.   No Return of Capital Contributions .............................10
  SECTION 4.5.   Preemptive Rights. .......................................................10
**ARTICLE V ALLOCATIONS; DISTRIBUTIONS**....................................11
  SECTION 5.1.   Allocations of Net Income and Net Loss to Capital Accounts ....11
  SECTION 5.2.   Regulatory Allocations.................................................12
  SECTION 5.3.   Allocations of Taxable Income or Loss .......................13
  SECTION 5.4.   Distributions.................................................................14
**ARTICLE VI TRANSFER; WITHDRAWAL** ............................................14
  SECTION 6.1.   Restrictions on Transfer ...............................................14
  SECTION 6.2.   Sale Rights ....................................................................15
  SECTION 6.3.   Right of First Refusal ...................................................16
  SECTION 6.4.   Tag-Along Rights..........................................................17
  SECTION 6.5.   Exempt Transfers .........................................................18
  SECTION 6.6.   Admission of Successor or Additional Members.........18
  SECTION 6.7.   Withdrawal ...................................................................19

i

**ARTICLE VII DISSOLUTION; WINDING UP**............................................................**20**
    SECTION 7.1.    Dissolution ..................................................................20
    SECTION 7.2.    Winding Up ..................................................................20
    SECTION 7.3.    Application and Distribution of Proceeds of Liquidation ...........21
    SECTION 7.4.    Certificate of Termination .............................................21
**ARTICLE VIII LIABILITY AND INDEMNIFICATION**.......................................**21**
    SECTION 8.1.    No Liability for Company Debts.......................................21
    SECTION 8.2.    Indemnification ...........................................................22
    SECTION 8.3.    Advance Payment and Appearance as a Witness.......................22
    SECTION 8.4.    Insurance ...................................................................22
    SECTION 8.5.    Nonexclusivity of Rights................................................22
    SECTION 8.6.    Company is Primary Obligor ..........................................22
    SECTION 8.7.    Savings Clause ............................................................23
**ARTICLE IX CERTAIN TAX MATTERS**..........................................................**23**
    SECTION 9.1.    Partnership Classification...............................................23
    SECTION 9.2.    Tax Returns ................................................................23
    SECTION 9.3.    Tax Elections ..............................................................23
    SECTION 9.4.    Partnership Representative ..............................................24
    SECTION 9.5.    Withholding................................................................25
**ARTICLE X BOOKS AND RECORDS**...............................................................**25**
    SECTION 10.1.    Maintenance of and Access to Books and Records....................25
    SECTION 10.2.    Bank Accounts ............................................................26
    SECTION 10.3.    Fiscal Year .................................................................26
**ARTICLE XI DEFINITIONS** ..............................................................................**26**
    SECTION 11.1.    Definitions.................................................................26
    SECTION 11.2.    Other Defined Terms ....................................................32
    SECTION 11.3.    Construction ..............................................................32
**ARTICLE XII MISCELLANEOUS**......................................................................**33**
    SECTION 12.1.    Notices.....................................................................33
    SECTION 12.2.    Confidentiality............................................................33
    SECTION 12.3.    Transaction Expenses ...................................................34
    SECTION 12.4.    Entire Agreement ........................................................34
    SECTION 12.5.    Waiver or Consent.......................................................34
    SECTION 12.6.    Amendment...............................................................34
    SECTION 12.7.    Governing Law...........................................................35
    SECTION 12.8.    Assignment................................................................35
    SECTION 12.9.    Binding Effect; Benefits.................................................35
    SECTION 12.10.    Further Assurances.......................................................35
    SECTION 12.11.    Counterparts ..............................................................35

Exhibit A — Members
Exhibit B – Spousal Consent

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**BISON LAND & MINERALS LLC**

This AMENDED AND RESTATED  LIMITED LIABILITY COMPANY AGREEMENT OF BISON LAND & MINERALS LLC (this "Agreement"), dated as of March 20, 2022 (the "Effective Date"), is entered into by and among the Persons (as hereinafter defined) identified on Exhibit A as Members (as hereinafter defined) of Bison Land & Minerals LLC, a Delaware limited liability company (the "Company"). Capitalized terms used herein without definition shall have the respective meanings assigned to them in Article XI.

**W I T N E S S E T H:**

WHEREAS, the Company was formed as a limited liability company under the laws of the State of Delaware by Geary Trigleth effective as of August 5, 2019;

WHEREAS, Geary Trigleth executed the Company Agreement of the Company, effective as of August 5, 2019 (the "Original Agreement"), as the sole member of the Company; and

WHEREAS, the parties hereto desire to amend and restate the Original Agreement in its entirety in order to evidence the admission of each of the persons identified in Exhibit A as New Member (as hereinafter defined) and to set forth their agreement with regard to, among other things, (i) the regulation and management of the business and affairs of the Company, (ii) the making of Capital Contributions to the Company by the Members, (iii) the distribution of funds and other assets and the allocation of Net Income and Net Loss to the Members and (iv) the Transfer of Interests in the Company;

NOW, THEREFORE, in consideration of the premises, the terms and provisions set forth herein, the mutual benefits to be derived from the performance thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**GENERAL**

SECTION 1.1.                    *Formation and Organization.*   The Company has been formed as a limited liability company under the Act (as hereinafter defined) as a result of the filing of the Certificate of Formation of the Company (the "Certificate of Formation") in the office of the Secretary of State of the State of Delaware.   Upon the execution and delivery of this Agreement, the rights, duties and obligations of the Members in connection with the regulation and management of the Company and the other matters provided for

herein shall be as set forth in this Agreement and, except as otherwise expressly provided herein, the Act.

SECTION 1.2.　　　　　　　*Name.*　The name of the Company shall be "Bison Land & Minerals LLC."  The business of the Company shall be conducted under the name "Bison Land & Minerals LLC" or such other name or names as the Managing Member may determine from time to time.

SECTION 1.3.　　　　　　*Principal Office.*　The principal office of the Company shall be located at _____, or such other place as the Managing Member shall determine from time to time.

SECTION 1.4.　　　　　*Registered Office and Registered Agent.*　The name and address of the registered agent for service of process on the Company in the State of Delaware shall be A Registered Agent Inc., 8 The Green, Suite A, Dover, Delaware 19901. The registered office or registered agent of the Company may be changed from time to time by the Managing Member in the manner provided in the Act.

SECTION 1.5.　　　　　　　*Term.*　The existence of the Company commenced as of the date upon which the Certificate of Formation was filed in the office of the Secretary of State of the State of Delaware, and the Company shall continue in existence until it is dissolved in accordance with the provisions of this Agreement, and to the extent provided under the Act, until its affairs are wound up and the Company is terminated in accordance with the provisions of this Agreement and the Act.

SECTION 1.6.　　　　　　*Purposes.*　The purposes of the Company are to transact any or all lawful businesses for which limited liability companies may be organized under the Act.

SECTION 1.7.　　　　　　*Powers.*　The Company shall have all such powers as are necessary, appropriate or incidental to the accomplishment of its purposes and all other powers conferred upon a limited liability company pursuant to the Act.

SECTION 1.8.　　　　　*Qualification in Other Jurisdictions.*　The Managing Member shall cause the Company to be qualified, formed or registered under foreign qualification statutes, assumed or fictitious name statutes or similar Laws in any jurisdiction other than the State of Delaware in which the Company transacts business and in which such qualification, formation or registration is necessary or appropriate.  The Managing Member and any authorized officer of the Company shall have the authority to execute, deliver and file such certificates and other instruments (and any amendments or restatements thereof) as are necessary for the Company to be qualified, formed or registered under any such foreign qualification statutes, assumed or fictitious name statutes or similar Laws in any jurisdiction other than the State of Delaware in which the Company transacts business.  Each Member shall, to the extent reasonably requested by the Managing Member, execute, acknowledge, swear to and deliver all documents and instruments required to enable the Managing Member to comply with its obligations under this Section 1.8.

**ARTICLE II**

# MANAGEMENT

SECTION 2.1.                    *General.*

(a)    The Company shall be managed by the Managing Member. Except where the approval of the Members is expressly required pursuant to this Agreement or under the provisions of applicable Law, (i) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed by, the Managing Member and (ii) all decisions regarding any matter set forth herein or otherwise relating to the business of the Company shall be made by the Managing Member.

(b)    The Managing Member shall have the authority to elect the officers of the Company.  Subject to the direction of the Managing Member, the officers of the Company shall have such authority and perform such duties as are provided in or pursuant to this Agreement, or as shall be specified by the Managing Member in the resolution or resolutions pursuant to which such officers are elected.

(c)    Except as expressly provided herein, the Members other than the Managing Member shall not have any right, power or authority to take part in the management, operation or control of the business and affairs of the Company.  No Members or other Person (other than the Managing Member) shall be agents of the Company or be authorized to transact any business in the name of the Company or to act for or on behalf of or to bind the Company.

SECTION 2.2.                    *Responsibilities of the Managing Member.*

(a)    The Managing Member shall monitor and supervise all business, operations and other activities of the Company, and shall fulfill all obligations imposed on the Managing Member under the terms of this Agreement.

(b)    The Managing Member shall also cause to be filed such certificates or filings as may be required for the continuation and operation of the Company as a limited liability company under the laws of the State of Delaware and any other state or jurisdiction in which the Company elects to do business.  The Managing Member shall file any necessary amendments to the Certificate of Formation and shall otherwise use its best efforts to do all things (including, but not limited to, the filing of certificates, the appointment of registered agents of the Company and maintenance of registered offices of the Company) requisite to the maintenance of the Company as a limited liability company under the laws of the State of Delaware and the preservation of the limited liability of the Members to the fullest extent provided by Law.  Where applicable Law so permits, the Company may omit from certificates filed with Governmental Authorities all information not required by Law, including the names and addresses of Members as well as information relating to Capital Contributions or the economic interests of the Members in the Company.

SECTION 2.3.                    *Cost Allocation.*  The Managing Member shall be reimbursed by the Company (i) for all reasonable direct expenses it incurs or makes on behalf of the Company (including amounts paid to any Person to perform services for the Company) in connection with the management of the Company and (ii) for the portion of

the legal, accounting, telephone, secretarial, bookkeeping, reporting, data processing, office rent and other office expenses, salaries and other compensation expenses, other administrative expenses and other incidental expenses of the Managing Member or Affiliates which are reasonably incurred by the Managing Member in operating the Company's business and which are allocated to the Company in any reasonable manner determined by the Managing Member.

SECTION 2.4.                    *Other Matters Affecting the Managing Member.*

(a)      Each Member expressly acknowledges and agrees that a fundamental premise of this Agreement is that the Members are sharing in the manner provided herein, through and to the extent of their Interests, in all of the risks and benefits that relate to or are in any way connected with the ownership of the properties and assets of the Company and the conduct of its business activities.   The Managing Member will manage the Company as an accommodation to the other Members, but each Member agrees that **neither the Managing Member nor any other Covered Person shall owe any fiduciary or similar duty to the Company or its Members or to any other Person that is a party to or is bound by or entitled to the benefits of this Agreement**; *provided, however*, that the Managing Member shall (i) have an implied duty of good faith and fair dealing in performing the terms of this Agreement to the extent required by the Act and (ii) not engage in any conduct that constitutes willful misconduct or gross negligence in performing its obligations under this Agreement (the obligations described in clause (i) and (ii) above being hereinafter referred to as the "Standard of Conduct").   Each of the Members acknowledges and agrees that Managing Member shall not be deemed to have made or to make any implied covenants with respect to the performance of its duties under this Agreement, other than in respect of its implied duty of good faith and fair dealing described in clause (i) of the proviso to the immediately preceding sentence.  Each Member hereby irrevocably agrees not to assert any claim against the Managing Member or any other Covered Person arising from or based upon any action or omission on the part of such Person that does not constitute a breach of the Standard of Conduct applicable to the Managing Member.

(b)      Neither the Managing Member nor any other Covered Person shall be liable to the Company or any Member for, and each Member does hereby release the Managing Member and each other Covered Person from, any Covered Losses arising from, any act or omission, including any mistake of fact or error in judgment, taken, suffered or made by the Managing Member or such other Covered Person in connection with this Agreement or the transactions or arrangements contemplated hereby, **regardless of whether such Covered Losses arise from the negligence or other fault of the Managing Member or such other Covered Person**, except to the extent that any such Covered Losses are finally determined by a court of competent jurisdiction to have arisen directly from any act or omission of the part of such Covered Person that constitutes a breach of the Standard of Conduct applicable to the Managing Member.   No Member shall be liable to the Company or any Member for any action taken by any other Member.

(c)      Whenever this Agreement or any other agreement contemplated herein provides that the Managing Member is permitted or required to make a decision in its "sole discretion" or "discretion" or to make a decision or take an action that it deems

"necessary or appropriate" or under a grant of similar authority or latitude, (i) the Managing Member shall be entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any other interest of, or factors affecting, the Company or any Member and (ii) the Managing Member shall make such decision in a manner that complies with the Standard of Conduct and shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated hereby or under the Act or any other Law.

(d)     Neither the Managing Member nor any other Covered Person shall incur any liability in acting in good faith upon any signature or writing believed by such Covered Person to be genuine. The Managing Member may rely and shall be protected in acting or refraining from acting, upon any consent, approval or other action taken by the Members, and upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Without limiting the generality of the foregoing, the Managing Member may rely in good faith on a certificate signed by any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge and may rely in good faith on an opinion of counsel selected by such Covered Person with respect to legal matters. The Managing Member and any other Covered Person may exercise any of the powers granted to it hereunder or by the Managing Member and perform any of the duties imposed upon it hereunder or by the Managing Member either directly or by or through agents and shall not be responsible for any misconduct or negligence on the part of any such agent. The Managing Member and any other Covered Person may consult with counsel, appraisers, valuation experts, engineers, accountants, brokers and other skilled Persons selected by such Covered Person and shall not be liable for anything done, suffered or omitted in good faith in reliance upon the advice of any of such Persons even if such Persons acted negligently.

(e)     In no event shall the Managing Member or any of its Affiliates be liable for the return of the Capital Contributions of any Member, and such return shall be made solely from the assets of the Company, if any, available for distribution to the Members, and each Member hereby waives any and all claims that it may have against the Managing Member or any Affiliate thereof in respect of the return of its Capital Contributions.

SECTION 2.5.                    *Officers.*

(a)     The Managing Member shall have the authority to elect one or more officers of the Company. Each officer of the Company shall be a natural person. An officer need not be a resident of the State of Delaware, a Member or an employee of the Company.

(b)     Each officer of the Company shall have such powers and authority, subject to the provisions of this Article II and the direction and control of the Managing Member, and shall perform such duties in connection with the management of the business and affairs of the Company as may be determined from time to time by resolution of the Managing Member.

(c)      Any vacancy occurring in an office shall be filled by the Managing Member.

(d)      Any officer of the Company may be removed by the Managing Member for any reason, but such removal shall be without prejudice to the contract rights, if any, of the officer so removed.  Holding any position as an officer of the Company shall not of itself create any contract or employment rights.

(e)      The Company shall initially have one officer, the Chief Executive Officer, who shall be appointed by the Managing Member.  In addition, the Managing Member may appoint such other officers and assistant officers as it may from time to time determine.  Any two or more offices may be held by the same person.  The duties, powers and authority of the officers of the Company shall be as follows:

(i)      *Chief Executive Officer*.  The Chief Executive Officer, under the direction and control of the Managing Member, shall supervise and control the business and affairs of the Company.  The Chief Executive Officer shall perform all such other duties, responsibilities and functions as may be prescribed from time to time by the Managing Member.

(ii)      *General*.  Subject to obtaining the approval of the Managing Member for the execution thereof (unless such approval is not required in accordance with guidelines established from time to time by the Managing Member), any officer of the Company may execute any deeds, mortgages, bonds, contracts or other instruments of the Company, except in cases where the execution and delivery thereof shall be expressly and exclusively delegated to another officer of the Company by the Managing Member or this Agreement, or where the execution and delivery thereof shall be required by Law to be carried out by another Person.  Unless otherwise provided by the Managing Member, any officer shall have the requisite power and authority on behalf of the Company to execute any consents of shareholders, partners or members and to attend, and to act and to vote in person or by proxy at, any meetings of the shareholders, partners or members of any corporation, partnership or limited liability company in which the Company may own stock or other equity securities, and at any such meetings, any officer of the Company shall possess and may exercise any and all of the rights and powers incident to the ownership of such securities that, as the owner thereof, the Company might have possessed and exercised if present.

(f)      The initial officer of the Company shall be as follows:

| <u>Name</u> | <u>Title</u> |
| --- | --- |
| Geary Trigleth | Chief Executive Officer |

(g)      In the case of any absence of any officer of the Company or for any other reason that the Managing Member may deem sufficient, the Managing Member may

delegate some or all of the powers or duties of such officer to any other officer for whatever period of time the Managing Member deems appropriate.

(h)     The officers of the Company shall be entitled to receive such salaries or other compensation as may be determined from time to time by the Managing Member.

SECTION 2.6.                    *Reliance by Third Parties*.   Notwithstanding any other provision contained in this Agreement, no lender, purchaser or other Person shall be required to verify any representation by the Managing Member or any officer of the Company as to the extent of the interest in the properties and assets of the Company that the Managing Member or such officer is entitled to encumber, sell or otherwise use, and any such lender, purchaser or other Person shall be entitled to rely exclusively on the representations of the Managing Member or such officer as to its authority to enter into such financing or sale arrangements and shall be entitled to deal with the Managing Member or such officer, without the joinder of any other Person, as if the Managing Member or such officer were the sole party in interest therein, both legally and beneficially.

# ARTICLE III
## MEMBERS

SECTION 3.1.                    *Admission of Members*.

(a)     Each Person identified in <u>Exhibit A</u> as a "New Member" (each a "New Member") shall be admitted to the Company as a Member upon the execution of this Agreement by each of the parties hereto (which shall be deemed to be the date stated in the records of the Company as the date each Person becomes a Member).

(b)     Any Person to which Interests are issued by the Company after the date hereof shall be admitted to the Company as a Member on the date of issuance of such Interests.

(c)     Any Person to which Interests are Transferred as contemplated by Article VI shall be admitted to the Company as a Member on the date upon which such Transfer has been effected and the requirements set forth in Sections 6.1(c) and 6.6 have been satisfied.

(d)     Spouses of Members do not become Members as a result of such marital relationship.   Each spouse of a Member has executed a "Spousal Consent" in the form of Exhibit B.

SECTION 3.2.                    *No Liability for Company Obligations*.   Without limiting the generality of Article VIII, a Member is not liable for the debts, obligations and liabilities of the Company, including under a judgment, decree or order of a court.

SECTION 3.3.                    *No Resignation or Withdrawal by Members*.   Except in connection with a Transfer of all of its Interest as permitted under Article VI, no Member shall be entitled to resign or withdraw from the Company.

SECTION 3.4.                    *Meetings of Members.*

(a)     *Place of Meetings.*  Meetings of Members may be held at such place within or without the State of Delaware as may be designated by the Managing Member.

(b)     *Meetings.*  Meetings of the Members may be called from time to time by the Managing Member.  Only business within the purpose or purposes described in the notice of meeting referred to in paragraph (c) below may be conducted at a meeting of Members.

(c)     *Notice of Meeting.*  Written or printed notice of all meetings of the Members stating the place, date and time of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten nor more than 60 days before the date of the meeting by or at the direction of the Managing Member or the appropriate officers of the Company to each Member entitled to vote at such meeting.

(d)     *Quorum.*  The presence, in person or represented by proxy, of the holders of Interests with sufficient voting power to approve a matter shall constitute a quorum for the purpose of considering such matter at a meeting of the Members.  If a meeting of the Members cannot be organized because a quorum has not attended, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time until a quorum shall be present or represented.  When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting at which a quorum shall be present or represented, the Members may transact any business which might have been transacted at the original meeting.

(e)     *Required Vote.*  Except as otherwise expressly provided herein, any matter brought before any meeting of the Members shall be decided by a Majority Vote.

(f)     *Conduct of Meetings of Members.*  At each meeting of the Members, a chairman chosen by the Managing Member shall preside and act as chairman of the meeting.  In addition, a person whom the chairman of such meeting shall appoint shall act as secretary of such meeting and keep the minutes thereof.  The Managing Member may adopt such rules and regulations as it determines are reasonably necessary or appropriate in connection with the organization and conduct of any meeting of the Members.

(g)     *Proxies.*  Each Member entitled to vote at a meeting of the Members may authorize another person or persons to act for such Member by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in Law to support an irrevocable power.

(h)     *Written Consent.*  Any action required or permitted to be taken at any meeting of Members may be taken without a meeting, without prior notice, and without

a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by Members owning sufficient Interests to cast a Majority Vote. Every written consent shall bear the date of signature of each Member that signs the consent. Delivery shall be by hand or certified or registered mail, return receipt requested, to the Company's principal place of business and shall be addressed to the Managing Member.

(i)     *Telephonic Meetings*. Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Members participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting.

(j)     *Minutes*. All decisions and resolutions of the Members reached or adopted pursuant to this Section 3.4 shall be reported in the minutes of the meetings, which shall state the date, time and place of the meeting (or the date of the written consent in lieu of a meeting), the persons present at the meeting, the resolutions put to a vote (or the subject of a written consent) and the results of such voting (or written consent). The minutes of all meetings of the Members shall be kept at the principal office of the Company.

SECTION 3.5.               *Outside Activities of the Members*. None of the Members, their Affiliates or any of their respective shareholders, partners, members, directors, managers, officers or employees shall be expressly or impliedly restricted or prohibited by virtue of this Agreement or the relationships created hereby from engaging in other activities or business ventures of any kind or character whatsoever. Each Member and its Affiliates and their respective shareholders, partners, members, directors, managers, officers and employees shall have the right to conduct, or to possess a direct or indirect ownership interest in, activities and business ventures of every type and description, including activities and business ventures in direct competition with the Company. None of the Members, their Affiliates or any of their respective shareholders, partners, members, directors, managers, officers or employees shall be obligated by virtue of this Agreement to present any particular business opportunity to the Company even if such opportunity is of a character that, if presented to the Company, could be taken or pursued by the Company, and the Members, their Affiliates and their respective shareholders, partners, members, directors, managers, officers or employees shall have the right to take or pursue any such opportunity for their own account (individually or as a partner, member, shareholder, fiduciary or otherwise) or to present or recommend it to any third party. Neither the Company nor any Member shall have any rights or claims by virtue of this Agreement or the relationships created hereby in any activities or business ventures of any other Member or its Affiliates or their respective shareholders, partners, members, directors, managers, officers and employees (it being expressly understood and agreed that any and all such rights and claims are hereby irrevocably waived by each Member on behalf of itself and on behalf of the Company).

**ARTICLE IV**
**CAPITAL**

SECTION 4.1.               *Capital Contributions*. Each Member shall have contributed to the Company the amount set forth opposite its name on <u>Exhibit A</u> under the

column "Initial Capital Contribution" on or before March 20, 2022. Such contributions are referred to herein as the "Initial Capital Contributions."

SECTION 4.2.                    *Capital Accounts.*

(a)    A separate Capital Account for each Member shall be established and maintained on the books of the Company in accordance with Treasury Regulations § 1.704-1(b)(2)(iv) and, to the extent not in conflict with such Treasury Regulations, the provisions of this Agreement. Each Member shall have a single Capital Account that reflects all of its Interests, regardless of class or the time or manner in which acquired. Upon a transfer of all or part of any Interest, the Capital Account and Capital Contributions of the transferor attributable to the transferred Interest shall carryover to the transferee.

(b)    There will be credited to the Capital Account of each Member (i) the amount of cash, value of services and the initial Book Basis of any property contributed by such Member to the Company, (ii) such Member's share of Net Income (as determined in accordance with Section 5.1) and any items of income or gain specially allocated to such Member pursuant to Section 5.2 and (iii) the amount of any liabilities of the Company assumed by such Member or which are secured by any property distributed to such Member.

(c)    There will be debited to the Capital Account of each Member (i) the amount of any cash and the Book Basis (as determined in clause (iii) of the definition thereof) of any property distributed by the Company to such Member, (ii) such Member's share of Net Loss (as determined in accordance with Section 5.1), and any items of loss or deduction specially allocated to such Member pursuant to Section 5.2, and (iii) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

SECTION 4.3.                    *Member Loans.* Any Member may, with the consent of the Managing Member, loan funds to the Company. Loans by a Member to the Company will not be treated as Capital Contributions but will be treated as debt obligations having such terms as are approved by the Managing Member.

SECTION 4.4.                    *No Return of Capital Contributions.* Except as expressly provided herein, a Member shall not be entitled to the return of any part of his or its Capital Contributions or to be paid any interest, salary or drawing in respect of its or his Capital Contributions. A Capital Contribution which has not been repaid is not a liability of the Company or any Member.

SECTION 4.5.                    *Preemptive Rights.*

(a)    If the Company proposes to sell or issue any Interests or other equity securities of the Company or securities that are convertible into or exchangeable for such equity securities (collectively, "Equity Securities") to any Person in a transaction or transactions, other than Interests issued (i) in connection with the acquisition of any other Person, business or assets or (ii) as compensation to officers or employees of the Company

or its Affiliates, each Member shall be offered the right to purchase its Allocable Share (as defined below) of such Equity Securities in accordance with paragraph (b) below.

(b)     In the event of a proposed transaction or transactions that would give rise to preemptive rights of the Members under this Section 4.5, the Company shall provide notice (the "Initial Notice") to the Members no later than 30 days prior to the expected consummation of such transaction or transactions. Each Member shall provide notice indicating whether or not it elects to exercise its preemptive right within ten business days after delivery of such Initial Notice from the Company (each Member electing to exercise its preemptive right in such instance being referred to as an "Electing Party"). The election by an Electing Party to exercise its preemptive right in any instance will be irrevocable, and the Electing Party will be bound and obligated to consummate the purchase of the applicable Equity Securities on the terms and conditions set forth in this Section 4.5. The failure of a Member to deliver a notice of election and affirmatively exercise its preemptive right in accordance with the terms of this Section 4.5 shall be deemed an election not to exercise its preemptive right in connection with such proposed transaction or transactions. If a Member shall elect (or be deemed to have elected) not to exercise its preemptive right, then each Electing Party shall have the right (during such time periods and in accordance with such procedures as may be established by the Managing Member) to purchase additional Equity Securities as to which the preemptive rights of the Members were not exercised, on a pro rata basis, based on the ratio of the Allocable Share of such Electing Party to the aggregate Allocable Shares of all Electing Parties. As used in this Section 4.5, "Allocable Share" of a Member means, with respect to Equity Securities that are subject to the preemptive rights granted pursuant to this Section 4.5, a percentage amount of such Equity Securities that is equal to the Capital Percentage of such Member.

## ARTICLE V
## ALLOCATIONS; DISTRIBUTIONS

SECTION 5.1.          *Allocations of Net Income and Net Loss to Capital Accounts.* Except as provided in Section 5.2, all Net Income and Net Loss of the Company for each fiscal year or other relevant period shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 5.2, the Capital Account balance of each Member, immediately after making such allocations and adjusting for all Capital Contributions and Distributions through the end of such fiscal year or other relevant period, is, as nearly as possible, equal to, and in proportion to, (i) the amount of distributions that would be made to such Member pursuant to Section 5.4 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability), and the remaining cash and net assets of the Company were distributed, in accordance with Section 5.4, to the Members immediately after making such allocations, minus (ii) such Member's share of "partnership minimum gain" (as defined in Treasury Regulations § 1.704-2(b)(2) and as computed under Treasury Regulations § 1.704-2(d)) and "partner nonrecourse debt minimum gain" (as defined in Treasury Regulations § 1.704-2(i)(2)), computed immediately prior to the hypothetical sale of assets. The Managing Member may, for any particular period, allocate items of income, gain, loss, and deduction among the Members if the Managing Member

determines in its reasonable discretion such allocations are needed to ultimately achieve the result described in this Section 5.1.

SECTION 5.2.                    *Regulatory Allocations.*   For each fiscal year or other relevant period, the following items of income or loss shall, to the extent not previously reflected in the Capital Accounts of the Members, be specially allocated to their Capital Accounts, in the following order and priority:

(a)     If there is a net decrease in "partnership minimum gain" (as defined in Treasury Regulations § 1.704-2(b)(2) and as computed under Treasury Regulations § 1.704-2(d)) for the fiscal year or other relevant period, then, to the extent required by the Treasury Regulations, items of income (determined in accordance with the provisions of Treasury Regulations § 1.704-2(f)(6)) shall be specially allocated to the Members in an amount equal to each Member's share of the net decrease in partnership minimum gain (determined in accordance with the provisions of Treasury Regulations § 1.704-2(g)).  This Section 5.2(a) shall be interpreted consistently with, and subject to the exceptions contained in, Treasury Regulations § 1.704-2(f).

(b)     If there is a net decrease in "partner nonrecourse debt minimum gain" (as defined in Treasury Regulations § 1.704-2(i)(2)) for the fiscal year or other relevant period, then, to the extent required by Treasury Regulations, items of income (determined in accordance with the provisions of the Treasury Regulations § 1.704-2(i)(4)) shall be specially allocated to the Members in an amount equal to each Member's share of the net decrease in partner nonrecourse debt minimum gain (determined in accordance with the provisions of Treasury Regulations § 1.704-2(i)(5)).  This Section 5.2(b) shall be interpreted consistently with, and subject to the exceptions contained in, Treasury Regulations § 1.704-2(i)(4).

(c)     If any Member unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), (5) or (6), such Member will be allocated items of income and gain (including gross income) in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit balance in the Member's Adjusted Capital Account as quickly as possible; provided that an allocation pursuant to this Section 5.2(c) shall be made only if and to the extent that the Member has a deficit balance in its Adjusted Capital Account after all other allocations provided for in Section 5.1 and this Section 5.2 have been tentatively made as if this Section 5.2(c) was not in this Agreement.  It is intended that this Section 5.2(c) qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulations § 1.704-1(b)(2)(ii)(d).

(d)     "Nonrecourse deductions" (as defined in Treasury Regulations §§ 1.704-2(b)(1) and (c)) shall be specially allocated to the Members in proportion to their respective Capital Percentages.

(e)     "Partner nonrecourse deductions" (as defined in Treasury Regulations § 1.704-2(i)(2)) shall be specially allocated to the Members who bear the economic risk of loss for the liability to which the deductions are attributable, determined in accordance with the principles of Treasury Regulations § 1.704-2(i)(1).

-12-

(f)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code §§ 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Treasury Regulations § 1.704-1(b)(2)(iv)(m), the amount of the adjustment shall be included as an item of income (if positive) or loss (if negative) and shall be specially allocated to the Members consistent with the manner in which their Capital Accounts are required to be adjusted by such Treasury Regulation.

(g)    In the event the allocations specified in paragraphs (a) through (f) above (the "Regulatory Allocations") cause adjustments to the Members' Capital Accounts that are inconsistent with the manner in which the Distributions are divided among the Members pursuant to Section 5.4, the Managing Member shall divide other allocations of Net Income, Net Loss, and other items among the Members so as to prevent the Regulatory Allocations from distorting the manner in which Distributions will be divided among the Members pursuant to this Agreement.  In general, the Members anticipate that this will be accomplished by specially allocating other Net Income, Net Loss, and items of income, gain, loss and deduction among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Person is zero.  However, the Managing Member will have discretion to accomplish this result in any reasonable manner.

(h)    The Company's "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)) shall be allocated among the Members in proportion to their respective Capital Percentages.

(i)    Simulated Depletion and, in the case of a sale or other disposition of depletable property, the portion of the amount realized on such sale or other disposition that does not exceed the Company's Simulated Basis in the depletable property, shall be allocated among the Members in proportion to their respective Capital Percentages.  The portion of the amount realized on the sale or other disposition of each depletable property that exceeds the Company's Simulated Basis in the property (i.e., Simulated Gain) shall be allocated among the Members in the same manner that Net Income is allocated pursuant to Section 5.1.

SECTION 5.3.                    *Allocations of Taxable Income or Loss.*

(a)    Except as otherwise provided in this Section 5.3 or as otherwise required by the Code or Treasury Regulations, solely for federal income tax purposes, items of Company taxable income, gain, loss and deduction for each fiscal year shall be allocated among the Members in the same manner as each correlative item of income, gain, loss and deduction, as determined for Capital Account purposes, is allocated pursuant to Sections 5.1 and 5.2.

(b)    If property contributed to the Company by a Member has an adjusted tax basis that differs from its initial Book Basis on the date of contribution or if the Book Basis of property is adjusted upon the occurrence of a Revaluation Event, income, gain, loss and deductions with respect to such property will, solely for tax purposes, be allocated among the Members so as to take account of such difference.  Such allocations will be made among the Members in the manner provided in Section 704(c) of the Code,

pursuant to such methods described in Treasury Regulations Section 1.704-3 as are selected by the Managing Member.

(c)     Cost and percentage depletion deductions with respect to, and any gain or loss on the sale or other disposition of, any property the production from which is or would be (in the case of nonproducing properties) subject to depletion shall be determined in a manner that is consistent with Section 613A(c)(7)(D) of the Code.  For purposes of making such determination, the Company's adjusted tax basis in each depletable property shall be allocated under Section 613A(c)(7)(D) of the Code among the Members in proportion to their respective Capital Percentages.

(d)     Depreciation, amortization, intangible drilling cost and depletion recapture under Sections 1245, 1250 and 1254 of the Code, as well as similar ordinary income items, shall, to the maximum extent possible, be allocated to the Interests that were allocated the depreciation, depletion, amortization and intangible drilling costs giving rise to such recapture amounts.

(e)     Any election or other decision relating to allocations pursuant to this Section 5.3 shall be made by the Managing Member in any manner that reasonably reflects the purposes and intention of this Agreement or is otherwise in the best interest of the Company in the reasonable discretion of the Managing Member.    Subject to any requirements of Section 704(b) of the Code, Managing Member is hereby authorized to allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Article V to the extent that allocating income, gain, loss, deduction, or credit (or item thereof) is in the best interest of the Company, in the reasonable discretion of the Managing Member. Any allocation made pursuant to this Section 5.3(e) shall be deemed to be a complete substitute for any allocation otherwise provided for in this Article V and no amendment of this Agreement or approval of any Member shall be required.  Allocations pursuant to this Section 5.3 are for purposes of federal, state and local taxes only and shall not affect or in any way be taken into account in computing any Member's Capital Account balance or share of Net Income, Net Losses or Distributions pursuant to any provision of the Agreement.

SECTION 5.4.                    *Distributions*.  Any Available Cash or other property shall be distributed to the Members solely at such times and in such amounts as the Managing Member shall determine.   Each such Distribution shall be made to the Members in accordance with their respective Capital Percentages.

## ARTICLE VI
## TRANSFER; WITHDRAWAL

SECTION 6.1.                    *Restrictions on Transfer*.

(a)     No Member shall Transfer any Interests owned or held by it unless the Managing Member shall have approved such Transfer; *provided, however*, that the foregoing requirement shall not apply to any Transfer that is required or permitted pursuant to Sections 6.2, 6.3, 6.4 or 6.5.

(b)     No Member shall Transfer any Interests owned or held by it unless each of the following requirements shall have been satisfied (or waived in the sole discretion of the Managing Member):

(i)     such Transfer will not violate the Securities Act and any applicable state securities or blue sky laws;

(ii)     such Transfer will not adversely affect the status of the Company as a partnership under Subchapter K of the Code for federal income tax purposes or cause the Company to become a publicly traded partnership within the meaning of Section 7704 of the Code; and

(iii)     the transferee or transferor shall have paid to the Company all costs and expenses, including attorneys' fees, incurred by the Company in connection with the Transfer.

(c)     Any transferee of Interests (including any transferee that is an Affiliate of the transferor) who is not then a Member shall upon consummation of, and as a condition to, the Transfer execute and deliver to the Company an agreement in form and substance satisfactory to the Managing Member pursuant to which such transferee (together with such transferee's spouse if such transferee is an individual residing in a community property state) agrees to be bound by the terms of this Agreement.

(d)     Any Transfer or attempted Transfer of Interests in violation of any provision of this Agreement shall be void *ab initio*.  In the case of any Transfer made in contravention of this Article VI that cannot be treated as void under applicable Law, the transferee shall have only such rights as it is required to have under applicable Law, but shall not be admitted as a Member.

SECTION 6.2.                    *Sale Rights*.   The Managing Member has the right to initiate a Sale Transaction at any time in accordance with this Section 6.2.

(a)     The Managing Member may exercise its right to initiate a Sale Transaction by notifying the other Members of such intent, and all of the Members shall be obligated to comply with the remaining provisions set forth in this Section 6.2.  If the Managing Member has exercised its right to initiate a Sale Transaction, the Managing Member may in its sole discretion cause all of the outstanding Interests held by the Members to be sold, whether pursuant to a sale of Interests, a merger or otherwise (a "Sale Transaction"), to one or more Third-Party Purchasers.

(b)     If the Managing Member exercises its right to cause the other Members to consummate a Sale Transaction, the Managing Member shall give not less than 30 days' prior written notice of such intended transaction to each of the other Members.  Such notice (the "Sale Notice") will set forth the terms and conditions of the Sale Transaction, including the name of the Third-Party Purchaser, the purchase price to be paid in exchange for the Interests to be sold by or for the benefit of the Members and the other material terms of the transaction.  Upon receipt of such Sale Notice, each Member will be obligated to Transfer all of its Interests to such Third-Party Purchaser upon the same terms

and conditions as the Managing Member and to cooperate with the Managing Member in connection with the approval of the Sale Transaction and to vote for (or consent to) any such Sale Transaction (whether such vote or consent is required by applicable law, the relevant transaction documents or otherwise).

(c)     At the closing of any proposed Sale Transaction (or, in the case of any actions required to be taken prior to closing, at earlier such time as such actions are required to be taken under applicable law, the relevant transaction documents or otherwise), the Members will transfer and assign to the Third-Party Purchaser, free and clear of all liens or other encumbrances, all of the outstanding Interests in the Company or execute and deliver such other consents, certificates and other documents as are reasonably necessary or appropriate to consummate and make effective the Sale Transaction and will receive in exchange therefor the consideration to be paid or delivered by such purchaser as described in the Sale Notice.

(d)     Any consideration paid to the Members in a Sale Transaction shall be apportioned among the Members in the same manner as if such consideration were being distributed to the Members in accordance with Section 5.4.

SECTION 6.3.                    *Right of First Refusal.*

(a)     If a Member other than the Managing Member (the "Transferring Member") desires to sell all or any portion of the Interests owned or held by it, it shall obtain a bona fide arm's-length offer (a "Third-Party Offer") from a Third-Party Purchaser to purchase such Interests (the "Third-Party Offered Interests") in exchange for a payment in cash and otherwise on terms that the Transferring Member desires to accept and shall deliver a written notice (the "Third-Party Offer Notice") to the Managing Member notifying the Managing Member of the Transferring Member's desire to Transfer the Third-Party Offered Interests, which notice shall describe in reasonable detail (i) the price to be paid for the Third-Party Offered Interests, which shall be denominated and be payable in U.S. dollars (the "Third-Party Offer Price"), (ii) the identity of the Third-Party Purchaser and (iii) all other material terms and conditions of the proposed transaction, and shall include a copy of such Third-Party Offer as an attachment thereto, which Third-Party Offer must be in writing, signed by the Third-Party Purchaser and accompanied by reasonable supporting documentation evidencing the Third-Party Purchaser's ability to pay the Third-Party Offer Price.

(b)     Within 30 days after receipt by the Managing Member of the Third-Party Offer Notice (the "Election Period"), the Managing Member shall have the right to elect to purchase the Third-Party Offered Interests for the Third-Party Offer Price and on the terms set forth in the Third-Party Offer Notice by communicating such election in writing to the Transferring Member.  If the Managing Member elects to purchase the Third-Party Offered Interests, the Transferring Member and the Managing Member, acting in good faith, shall proceed to close the purchase and sale of the Third-Party Offered Interests as soon as practicable thereafter.

(c)     If the Managing Member does not elect to purchase the Third-Party Offered Interests pursuant to paragraph (b) above, the Transferring Member may

consummate the Transfer of the Third-Party Offered Interests to the Third-Party Purchaser, subject to compliance with Section 6.1(b) and (c), on the same terms and conditions set forth in the Third-Party Offer Notice at any time within the 90-day period following the expiration of the Election Period (which such 90-day period may be extended for up to an additional 30 days to the extent reasonably necessary to obtain required approvals or consents from any Governmental Authority). After the expiration of such 90-day period (as extended, to the extent applicable), any proposed Transfer shall once again be subject to the terms and conditions of this Section 6.3.

SECTION 6.4.                 *Tag-Along Rights*.

(a)      If the Managing Member proposes to sell all or any portion of its Interests to a Third-Party Purchaser, each other Member (each, a "Tag-Along Member") will be permitted to participate in the proposed sale of Interests (a "Tag-Along Sale") on the terms and conditions set forth in this Section 6.4.

(b)      The Managing Member shall deliver to each Tag-Along Member a written notice (a "Tag-Along Offer Notice") no later than 30 days prior to the expected consummation of the proposed sale, which notice shall describe in reasonable detail (i) the price to be paid for the Interests proposed to be sold by the Managing Member, which shall be denominated and payable in U.S. dollars, (ii) the identity of the Third-Party Purchaser and (iii) all other material terms and conditions of the proposed transaction. The Tag-Along Offer Notice will make reference to the rights of the Tag-Along Members under this Section 6.4.

(c)      Each Tag-Along Member may exercise its right to participate in the Tag-Along Sale by delivering to the Managing Member a written notice (a "Tag-Along Notice") stating its intention to include all or any portion of Interests of such Tag-Along Member (up to but not in excess of its Tag-Along Portion (as defined below)) no later than 10 days after receipt of the Tag-Along Notice.

(d)      The Managing Member and each Tag-Along Member timely electing to participate in the Tag-Along Sale pursuant to paragraph (c) above shall have the right to Transfer in the Tag-Along Sale an aggregate amount of Interests equal to the product of (i) the Interests proposed to be sold by the Managing Member (or such greater amount of Interests as the Third-Party Purchaser indicates to the Managing Member in writing that it is willing to purchase from the Managing Member and all Tag-Along Members) and (ii) the ratio of the Capital Percentage of such Member to the aggregate Capital Percentages of the Managing Member and all the Tag-Along Members timely electing to participate in the Tag-Along Sale (such amount the "Tag-Along Portion").

(e)      The offer of each Tag-Along Member set forth in a Tag-Along Notice will be irrevocable, and, to the extent such offer is accepted, such Tag-Along Member will be bound and obligated to consummate the Transfer on the terms and conditions set forth in this Section 6.4.

(f)      Each Tag-Along Member who does not deliver a Tag-Along Notice in compliance with paragraph (c) above will be deemed to have waived its right to

participate in the Tag-Along Sale, and the Managing Member will (subject to the rights of any other participating Tag-Along Member) thereafter be permitted to consummate the Tag-Along Sale.

(g)    In any sale of Interests subject to this Section 6.4, the aggregate consideration to be paid by the Third-Party Purchaser shall be allocated among the Managing Member and each participating Tag-Along Member based on the relative Capital Percentage of each such Member's Interests to be sold in the Tag-Along Sale.

(h)    Each participating Tag-Along Member will make or provide the same representations, warranties, covenants, indemnities and agreements as the Managing Member makes or provides in connection with the Tag-Along Sale; *provided, however*, that all indemnification obligations of the Managing Member and each Tag-Along Member (other than with respect to individual representations and warranties as to its title to and ownership of its Interests, authorization, execution and delivery of relevant documents, enforceability of such documents against the Managing Member and each Tag-Along Member, and other matters relating specifically to the Managing Member or a Tag-Along Member) will be pro rata based on the consideration received by the Managing Member and each Tag-Along Member, and the maximum amount thereof will not exceed the aggregate proceeds received by the Managing Member or each such Tag-Along Member in connection with the Tag-Along Sale.

(i)    Each Tag-Along Member shall take all actions as may be reasonably necessary to consummate the Tag-Along Sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Managing Member, but subject to paragraph (h) above.

(j)    The fees and expenses incurred by the Managing Member in connection with a Tag-Along Sale which, in the good faith judgment of the Managing Member, are or will be for the benefit of both the Managing Member and all Tag-Along Members, to the extent not paid or reimbursed by the Company or the Third Party Purchaser, will be shared by the Managing Member and all the participating Tag-Along Members on a pro rata basis, based on the consideration received by each such Member; *provided*, that no Tag-Along Member will be obligated to pay or reimburse the Managing Member for any such fees and expenses prior to the consummation of the Tag-Along Sale.

SECTION 6.5.                    *Exempt Transfers*.  Geary Trigleth may Transfer Interests to an Affiliate of Bison Land & Minerals LLC that is wholly owned by Geary Trigleth without complying with the provisions of Sections 6.1(a) or Section 6.4, but subject to the other applicable provisions of this Article VI.

SECTION 6.6.                    *Admission of Successor or Additional Members*.  Any Person acquiring an Interest upon the consummation of a Transfer permitted pursuant to this Article VI shall be admitted to the Company as a Member when such Person shall have furnished to the Managing Member (i) the agreement referred to in Section 6.1(a) and (ii) such other documents or instruments as may be required under the Act in order to effect the admission of such Person as a member of the Company.

SECTION 6.7.                    *Withdrawal and Transfer Upon Death.*

(a)       No Member may withdraw from the Company, other than as a result of a Transfer of its entire Interest as permitted pursuant to this Article VI.

(b)       Upon the death of a Member (such Member and his or her estate, heirs, executors, devisees, administrators, and representatives, together with all persons succeeding to ownership Interest by reason of such death (the Deceased Holder"), the executor, administrator of other legal representative of the Deceased Holder shall promptly give notice of such death (the "Death Notice") to the Company.  The Company shall promptly deliver a copy of such Death Notice to each of the other Members, and the Deceased Holder shall be deemed to have granted to the Company and each of the other Members an option to purchase any and all Interest held by the Deceased Holder at a price equal to the Appraisal Value.

(c)       Within 10 days after the delivery of the Death Notice, or the date that the Appraisal Value is established, whichever is later, the Company shall notify the other Members of the amount of the Interest that the Company elects to purchase from the Deceased Holder or of the Company's failure to exercise.

(d)       If the Company notifies the other Members that the Company will exercise its option for none or less than all of the Interest covered by the Death Notice, each of such Members shall have until 20 days after the date of delivery of such notice from the Company to notify the Company of his, her or its election to purchase a pro rata share  (or any other amount as such Members may agree) of all or part of the remaining Interest; and if any such Member does not exercise his, her or its option by the end of such 20-day period, then each Member that has exercised his, her or its option to purchase the Interest subject to the Death Notice shall have the option, for five (5) days following the expiration of such 20-days period, to purchase that proportion of the Interest equal to a fraction of which the numerator is the amount of the Interest such Members elected to purchase during the applicable 20-day period and the denominator is the total Interest all Members elected to purchase during such 20-days  period (less the Interest, if any, elected to be purchased by a Member during such 20-day period that does not wish to purchase an additional Interest during the 5-day period) (or any other proportion as such Members may agree).

(e)       Upon determination of the amount of the Interest to be purchased from the Deceased Holder by the Company and each of the other Members (and in any event within 55 days after the date of the Death Notice or the date that the Appraisal Value is established, whichever is later), the Company, on its behalf and on behalf of each of the other Members, shall give notice of exercise to the Deceased Holder.

(f)       If any of the Interest subject to the Death Notice is not purchased by the Company or the other Members, then any Person that is the recipient of any Transfer resulting from such Death Holder's death shall be deemed an assignee and not a Member, until such Person is made a Member in accordance with this Agreement.

(g)       Neither the Company nor any Member may assign its right of first refusal under this Section.

-19-

# ARTICLE VII
# DISSOLUTION; WINDING UP

SECTION 7.1.                    *Dissolution.*

(a)     Except as provided in this Section 7.1, no Member shall have the right to cause the Company to be dissolved.

(b)     The Company shall be dissolved upon the first to occur of any of the following events:

(i)     the written agreement by each of the Members that the business of the Company shall be discontinued at any time;

(ii)     the written determination by the Managing Member that the business of the Company shall be discontinued at any time; or

(iii)     any other event required to cause the dissolution of the Company under the Act.

(c)     Any dissolution of the Company shall be effective as of the date on which the event occurs giving rise to such dissolution, but the Company shall not terminate unless and until all its affairs have been wound up and its assets distributed as provided in this Article VII and the applicable provisions of the Act.

SECTION 7.2.                    *Winding Up.*  Upon the occurrence of an event that results in the dissolution of the Company, the business of the Company shall be wound up and shall, except to the extent consistent with such winding up, cease.  The Managing Member shall appoint a Person (who may be the Managing Member or any Affiliate of the Managing Member) to act as liquidator.  The liquidator shall proceed diligently to wind up the business and affairs of the Company and may determine all matters in connection with the winding up of the Company, including any arrangements to be made with creditors, the amount or necessity of reserves to cover contingent or unforeseen liabilities, and whether, to what extent, for what consideration, and on what terms any or all of the assets of the Company are to be sold or distributed in kind to the Members.  The liquidator may in its discretion retain any obligations due to the Company and distribute (or apply in satisfaction of Company obligations) the proceeds thereof as collected.  The costs and expenses of the winding up and liquidation of the Company shall be borne by the Company.  Until final distribution, the liquidator shall continue to manage the Company's affairs and, if the liquidator is other than the Managing Member, shall, to the extent consistent with the liquidator's obligations, have all of the power and authority of the Managing Member and be entitled to indemnification and advance payment of expenses in accordance with the provisions of this Agreement as if the liquidator were the Managing Member.  The liquidator shall give or cause to be given all notices to creditors required by applicable Law and, in addition to any reports otherwise required by this Agreement to be given to the Members, shall cause a proper accounting of the Company's assets, liabilities and operations to be made and furnished to the Members as of the date all assets of the

Company are finally distributed to the Members or applied in payment of Company liabilities.

SECTION 7.3. *Application and Distribution of Proceeds of Liquidation.* During or upon completion of the winding up of the Company, the assets of the Company shall be applied and distributed by the liquidator, in one or more installments, in the following order and priority:

(a) to the payment, or provision for payment, of the costs and expenses of the winding up;

(b) to the payment, or provision for payment, of creditors of the Company in the order of priority provided by Law;

(c) to the establishment of any reserves deemed necessary or appropriate by the liquidator to provide for contingent or unforeseen liabilities of the Company; and

(d) to the Members in accordance with Section 5.4.

All distributions to the Members pursuant to paragraph (d) above shall be in the form of cash or in kind, as determined by the Managing Member. The Managing Member shall value each Company asset to be distributed in kind. Readily Tradable Securities shall be valued based on average Market Price of the securities during the 10-day period prior to the date of distribution. All other assets shall be valued at their current fair market value as determined in good faith by the Managing Member. The determination of fair market value by the Managing Member shall be binding on each of the Members.

SECTION 7.4. *Certificate of Termination.* On completion of the distribution of Company assets as provided herein, the liquidator (or such other Person or Persons as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware, cancel any other filings as necessary and take such other actions as may be necessary to terminate the existence of the Company.

## ARTICLE VIII
## LIABILITY AND INDEMNIFICATION

SECTION 8.1. *No Liability for Company Debts.* Except as expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be liable for any such debts, obligations or liabilities. Additionally, except as otherwise expressly provided herein or required by Law, no Member, in its capacity as a Member, shall have any liability in excess of (a) the amount of its Capital Contributions, (b) its share of any assets and undistributed profits of the Company, (c) its obligation to make other payments expressly provided for in this Agreement and (d) the amount of any distributions wrongfully distributed to it.

SECTION 8.2.                *Indemnification*.  To the fullest extent permitted by Law, each Covered Person shall be indemnified and held harmless by the Company from and against any and all Covered Losses arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its status as such, **regardless of whether any of the foregoing arise from the negligence or other fault of such Covered Person**; *provided,* that the conduct of such Covered Person has not been finally determined by a court of competent jurisdiction to have engaged in conduct that constitutes a violation of the Standard of Conduct and is related to the claim giving rise to the Covered Losses for which such Covered Person is seeking indemnification.  The termination of any action, suit or proceeding by judgment, order, settlement or upon a plea of *nolo contendere*, or its equivalent shall not, of itself, create a presumption that the Covered Person failed to meet the Standard of Conduct.  Any indemnification hereunder shall be satisfied solely out of the assets of the Company.  In no event may a Covered Person subject the Members to personal liability by reason of these indemnification provisions.

SECTION 8.3.                *Advance Payment and Appearance as a Witness*.  To the fullest extent permitted by applicable Law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, cause of action, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, cause of action, action, suit or proceeding; *provided*, that the Covered Person has furnished the Company with a written undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified under Section 8.2.  The Company shall pay or reimburse expenses incurred by a Person who is or was a Member, officer or employee of the Company in connection with its or his appearance as a witness or other participant in a proceeding at a time when it or he is not a named defendant or respondent in the proceeding.

SECTION 8.4.                *Insurance*.  The Company will purchase and maintain insurance, to the extent and in such amounts as the Managing Member shall, in its sole discretion, deem reasonable, on behalf of Covered Persons and such other Persons as the Managing Member shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

SECTION 8.5.                *Nonexclusivity of Rights*.  The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VIII shall not be deemed exclusive of, and shall not limit, any other rights or remedies to which any Indemnified Person may be entitled or which may otherwise be available to any Indemnified Person at Law or in equity.

SECTION 8.6.                *Company is Primary Obligor*.  The Company hereby acknowledges and agrees that (a) it is and shall at all times be the indemnitor of first resort for each of the Covered Persons with respect to any and all Covered Losses or advancement of expenses pursuant to this Article VIII, (b) the obligations of the Company to each

Covered Person under this Article VIII are primary, and any obligations of any Member or any of its Affiliates to provide advancement of expenses or indemnification to any Covered Persons that are employed by or are representatives of such Member or any of its Affiliates are secondary and (c) if a Member or any of its Affiliates is obligated to pay, or pays, or causes to be paid for any reason, any expense that the Company is otherwise obligated to pay to or on behalf of a Covered Person, then (i) such Member or its Affiliate, as the case may be, shall be fully subrogated to and otherwise succeed to all rights of such Covered Person with respect to such payment, including with respect to rights to claim such amounts from the Company and (ii) the Company shall reimburse, indemnify and hold harmless such Member or its Affiliate, as the case may be, for all such payments actually made by such Person on behalf of or for the benefit of such Covered Person.

SECTION 8.7.                    *Savings Clause.*  If all or any part of this Article shall be invalidated for any reason by any court of competent jurisdiction, the Company shall nevertheless indemnify and hold harmless each Person who is or was a Member or officer, and may indemnify and hold harmless any other Person, for costs, charges, expenses (including attorneys' fees), judgments, fines and amounts paid in settlement, in connection with any claim, to the fullest extent permitted by any portion of this Article not invalidated and to the fullest extent otherwise permitted by applicable Law.

## ARTICLE IX
## CERTAIN TAX MATTERS

SECTION 9.1.                    *Partnership Classification.*  Except with the prior written consent of all Members, for federal income tax purposes, the Company shall not elect under Treasury Regulations § 301.7701-3 or otherwise to be taxed other than as a partnership, nor shall the Company or any Member elect to exclude the Company from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state Law.

SECTION 9.2.                    *Tax Returns.*  The Managing Member shall cause all required federal, state, local and foreign tax returns of the Company to be prepared and timely filed.  Each Member shall furnish to the Company all pertinent information in its possession relating to the Company, its assets and operations necessary to enable the Company's tax returns to be prepared and timely filed.  The Managing Member shall cause to be delivered to each Member within five business days of receiving same from the independent certified accountants of the Company a complete copy of the Company's Form 1065 and all attachments and schedules thereto (including Schedule K-1 for such Member) and such other information with respect to the Company as may be necessary for the preparation of such Member's federal or state income tax or information returns.  All costs and expenses incurred in connection with the preparation and filing of any such tax returns shall be borne by the Company.

SECTION 9.3.                    *Tax Elections.*  Except as provided otherwise in this Agreement, the Managing Member shall have the exclusive authority to make all tax elections required or permitted to be made by the Company; *provided, however,* that (i) no election shall be made to classify the Company as an association taxable as a corporation without the consent of all the Members and (ii) the Managing Member shall cause the

Company to make an election under Section 754 of Code if any Member transferring part or all of its Interest so requests and agrees in writing to reimburse the Company for the tax and accounting expenses associated with such election.

SECTION 9.4.                              *Partnership Representative.*

      (a)    Unless otherwise determined by the Managing Member, the Company shall be the "partnership representative" of the Company within the meaning of Section 6223(a) of the Code as amended by the Bipartisan Budget Act of 2015 (in such capacity, the "Partnership Representative") with respect to taxable years of the Company beginning on or after the Effective Date, and is authorized to represent the Company in connection with any examination of the Company's affairs by any tax authority, including administrative and judicial proceedings, and to expend Company funds for professional services and the costs associated therewith.  Each Member agrees to cooperate with and assist the Partnership Representative, including by executing and filing forms or other statements and providing information about such Member, and to do or refrain from doing any and all things reasonably requested by the Partnership Representative to conduct such proceedings or to enable the Company to satisfy any applicable tax reporting or compliance requirements, make any tax election, qualify for an exception from, or reduced rate of, tax or other tax benefit or be relieved of liability for any tax.   Any individual that the Partnership Representative appoints as the "designated individual" (within the meaning of Treasury Regulations § 301.6223-1(b)(3)) shall be treated as the Partnership Representative for purposes of this Agreement.

      (b)    In the event the Company receives a notice of final partnership adjustment containing an imputed underpayment, the Partnership Representative may, in the Partnership Representative's sole discretion, cause the Company to make the election under Section 6226 of the Code.  If such an election is made, the Partnership Representative shall determine each Member's share of the adjusted items as set forth in the notice of final partnership adjustment, and each such Member shall take such share of adjustments into account as required under Section 6226(b) of the Code and shall be liable for, and timely pay, any related tax, interest, penalty or additional amount.

      (c)    If, or to the extent that, an election under Section 6226 of the Code is ineffective or not otherwise made, and the Company or any entity in which the Company owns an equity interest is held directly liable for any additional tax, interest, penalty or additional amount under the Code as a result of an adjustment to the Company's or such entity's federal income tax returns (such amount, an "Imputed Underpayment"), each Member shall be required, upon 5 days' written demand from the Partnership Representative, to pay the Company its share (as determined by the Partnership Representative on behalf of the Company) of any such Imputed Underpayment.  To the fullest extent permitted by law, each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability for such Member's share of an Imputed Underpayment.

      (d)    Any amount not paid by a Member within 5 days of the date requested by the Partnership Representative under this Section 9.4 shall accrue interest at the rate of 10% per annum, compounded quarterly, until paid, and such Member shall also

be liable to the Company for any damages resulting from a delay in making such payment when due, and for this purpose the fact that the Company could have paid this amount with other funds shall not be taken into account in determining such damages. Additionally, any such unpaid amounts may, in the sole discretion of the Managing Member, be withheld from Distributions otherwise payable to such Member (in which case, such withheld amounts shall be treated as if distributed to such Member and then paid to the Company). Any amounts paid to the Company by a Member pursuant to this Section 9.4 shall not be treated as a Capital Contribution for any purposes of this Agreement.

(e)     Each Member shall remain bound by the provisions of this Section 9.4, and all obligations hereunder, which shall survive the termination, dissolution, liquidation, and winding up of the Company or such Member ceasing to be a member of the Company. For purposes of this Section 9.4, the use of the term "Member" or "Members" shall include former Members.

(f)     Any cost or expense incurred by the Partnership Representative in connection with its duties, including the preparation for, or pursuance of, administrative or judicial tax proceedings, shall be paid or reimbursed by the Company.

(g)     The principles and requirements set forth in this Section 9.4 shall apply *mutatis mutandis* to any state, local and foreign tax audit or tax proceeding regimes to which the Company becomes subject to the extent that such state, local or foreign tax audit or tax proceeding regimes have rules similar to the rules of Sections 6221-6241 of the Code.

SECTION 9.5.          *Withholding.* The Company may withhold and pay to any applicable tax authority all amounts which the Managing Member determines are required by any Law to be withheld by the Company from or with respect to Distributions to a Member or from or with respect to a Member's distributive share of Company taxable income or loss (or item thereof). Each Member shall timely provide to the Company all information, forms and certifications necessary or appropriate to enable the Company to comply with any such withholding obligation and covenants to the Company that the information, forms and certifications furnished by it shall be true and accurate in all respects. Each Member shall, upon demand by the Company, indemnify the Company for the indemnifying Member's share of any such withholding and all related costs and expenses of the Company. Any amounts so withheld in respect of a Member shall be treated as a Distribution to such Member for all purposes of this Agreement.

**ARTICLE X**
**BOOKS AND RECORDS**

SECTION 10.1.          *Maintenance of and Access to Books and Records.* At all times until the dissolution and termination of the Company, the Company shall maintain separate books of account which show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the conduct of the business of the Company in accordance with this Agreement. In addition, the Company shall keep and maintain in its principal office all records and information required to be kept and maintained in accordance with the Act and shall make such information available to any Member or representative requesting the same

upon reasonable advance notice and at such reasonable times during regular business hours as the Managing Member shall determine. Notwithstanding the foregoing, the Managing Member shall furnish to each Member, no less than quarterly and at the expense of the Company, a balance sheet as of the end of such quarter and statement of income and expense for the quarter then ended. Within 90 days after the end of each fiscal year, the Managing Member shall cause to be delivered to each Member an annual accounting consisting of a balance sheet and statement of income and expense for the year then ended and such other information necessary for the preparation of such Member's federal and state income tax returns.

SECTION 10.2.                *Bank Accounts*.  The Managing Member shall cause to be established and maintained for and in the name of the Company one or more bank or investment accounts or arrangements.  All Company funds shall be deposited in such account(s) and shall not be commingled with funds of any other Person.  All deposits to and disbursements from such account(s) shall be made only for proper Company purposes and shall be signed by one or more authorized signatories designated by the Managing Member.

SECTION 10.3.                *Fiscal Year*.  The fiscal year of the Company shall initially be the calendar year.  The Managing Member may change the fiscal year of the Company and shall notify each Member of any such change.

# ARTICLE XI
# DEFINITIONS

SECTION 11.1.                *Definitions*.  Except as otherwise required by the context, the following terms shall have the following meanings:

"Act" means the Delaware Limited Liability Company Act, as amended from time to time, or any successor statute thereto.

"Adjusted Capital Account" means, as of the end of each fiscal year or other relevant period, the balance in a Member's Capital Account (i) increased by (A) any additional Capital Contributions the Member is obligated to make, or is treated as obligated to make pursuant to the provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(c), (B) the amount of the Member's share of any "partnership minimum gain" (as defined in Treasury Regulations § 1.704-2(b)(2)), and (C) the amount of the Member's share of any "partner nonrecourse debt minimum gain" (as defined in Treasury Regulations § 1.704-2(i)(2)), and (ii) decreased by any adjustments, allocations or distributions described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6).  This definition shall be interpreted and applied consistently with the provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(d).

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person.

"Appraisal Criteria" means, the following criteria: the valuation of the Interest based on the price at which such Interest would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the

latter is not under compulsion to sell, both parties have reasonable knowledge of relevant facts and such buyer being able to trade and being well-informed about the Interest; provided however, that (1) the Interest shall be treated as having value equal to every other Interest and (2) any insurance policy maintained by the Company in connection with the Company's right to purchase such any Interest shall be excluded from any such valuation.

"Appraisal Value" means the value of the Interest: (1) established by the written agreement in effect at the time of the applicable  Transfer among the Company and each of the Members; or (2) in the absence of the satisfaction of clause (1), the value assigned most recently to an Interest before the Transfer to which this definition applies through the use of the Appraisal Criteria by a valuation expert experienced in establishing the value of companies similarly situated to the Company (an "Appraiser") and neither the Company nor the Deceased Holder delivers notice to the other party  requesting an updated valuation opinion within 15 days following the delivery of the applicable Death Notice; or (3) in the absence of the satisfaction of clause (1) or clause (2), the value assigned through use of the Appraisal Criteria by an Appraiser agreed upon by the Company and the Deceased Holder.

"Available Cash" means the amount of cash on hand (including cash equivalents and temporary investments of Company cash but excluding amounts that are available through Capital Contributions from the Members) from time to time in excess of amounts required, in the sole determination of the Managing Member, to pay or provide for payment of existing and projected obligations, capital expenditures and acquisitions, and to provide a reasonable reserve for working capital and contingencies.

"Book Basis" means, with respect to each Company asset, the adjusted basis of the asset for federal income tax purposes, except that (i) the initial Book Basis of an asset other than money contributed by a Member to the Company shall be the fair market value of the asset on the date of contribution, as determined by the Managing Member, (ii) upon the occurrence of a Revaluation Event, the Book Basis of all Company assets (including intangibles) shall be adjusted to their respective fair market values on such date, as determined by the Managing Member, (iii) the Book Basis of any Company asset distributed to any Member will be adjusted to equal the fair market value of such asset on the date of distribution as determined by the Managing Member, (iv) the Book Basis of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and Section 5.2(f); *provided, however*, that Book Basis shall not be adjusted under this clause (iv) to the extent the Managing Member determines that an adjustment pursuant to clause (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv), and (v) if the Book Basis of any Company asset has been determined pursuant to the preceding subsections, the Book Basis of the asset shall thereafter be adjusted by Simulated Depletion or Book Depreciation in lieu of any depletion, depreciation, amortization or other cost recovery deductions otherwise allowable for federal income tax purposes.

"Book Depreciation" means, with respect to any depreciable or amortizable Company asset, an amount which bears the same ratio to the Book Basis of such asset as the amount of depreciation, amortization or other cost recovery deductions with respect to such asset, computed for federal income tax purposes, bears to the adjusted tax basis of such asset; *provided, however*, that, if the adjusted tax basis of the asset is zero, Book Depreciation shall be determined under any reasonable method selected by the Managing Member, and; *provided, further,* if such asset is subject to adjustments under the remedial allocation method of Treasury Regulations Section 1.704-3(d), Book Depreciation shall be determined under Treasury Regulations Section 1.704-3(d)(2).

"Capital Account" means the account established for each Member pursuant to Section 4.2.

"Capital Contribution" means the amount of money and the initial Book Basis of any asset other than money (net of liabilities secured thereby that the Company is treated as having assumed or taken subject to pursuant to Code Section 752) contributed by a Member or a Member's predecessors in interest to the capital of the Company.  All in kind contributions shall be valued at their fair market value at the time of contribution as determined in good faith by the Managing Member.   The Managing Member's determination of fair market value of any such contribution shall be final and binding upon all parties.

"Capital Percentage" means, with respect to any Member at any time, the ratio which the aggregate amount of the Capital Contributions of such Member to the Company bears to the total amount of Capital Contributions made by all the Members to the Company, which percentage is set forth opposite such Member's name on Exhibit A hereto in the column titled "Capital Percentage."

 "Code" means the Internal Revenue Code of 1986, as amended (including any corresponding provisions of succeeding law).

"Confidential Information" means any proprietary or confidential information of or relating to the Company or, with respect to each Member, the other Members, including, but not limited to, any business information, intellectual property, trade secrets or other information relating to the respective businesses, operations, assets or liabilities of the Company or the Members; *provided, however*, that any information that is generally available to the public (other than through a breach by the party disclosing the same of its obligations under this Agreement) shall not be deemed "Confidential Information".

"Control," "Controlling" and "Controlled by" mean the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by contract or otherwise.

"Covered Losses" means any and all losses, assessments, fines, penalties, taxes, administrative orders, obligations, judgments, amounts paid in settlement, costs, expenses, liabilities and damages (whether actual, consequential or punitive), including

interest, penalties, reasonable court costs and attorney's fees, disbursements and costs of investigations, deficiencies, levies, duties and imposts.

"Covered Person" means (i) the Managing Member, any Affiliate of the Managing Member or any shareholder, partner, manager, member, director, officer, employee or agent of the Managing Member or any of its Affiliates, (ii) any officer of the Company, in each case to the extent any such Person is acting in such capacity in connection with the business of the Company or (iii) the Partnership Representative.

"Distributions" means any distributions paid pursuant to Section 5.4 or 7.3(d), whether from operations or a sale or other disposition of assets and whether prior to or in connection with a liquidation of the Company.

"Governmental Authority" means any nation or government, any state, city, municipality or political subdivision thereof, any federal or state court and any other agency, body, authority or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Interest" means, with respect to any Member, the entire interest of such Member in the Company, including, but not limited to, (i) the right of such Member to share in the profits of the Company, (ii) the right of such Member to Distributions of the properties and assets of the Company and (iii) the right of such Member, if any, to participate in the management of the affairs of the Company.

"Law" means any applicable constitutional provision, statute, act, code, law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision, declaration, or interpretative or advisory opinion or letter of a Governmental Authority having valid jurisdiction.

"Majority Vote" means the affirmative vote of Members whose aggregate Capital Percentages exceed 50%.

"Managing Member" means Geary Triglath or successor thereto upon the resignation or removal thereof pursuant to the terms of this Agreement.  In which event, the successor shall be elected by a majority of the Members.

"Market Price" of a Readily Tradable Security as of a specified date means the last sale price for such security on such date (or if such date is not a trading day, on the next preceding trading day) as reported by the principal national securities exchange on which such security is listed.

"Members" means any Person admitted as a member of the Company as of the date hereof or at any time hereafter in accordance with this Agreement (but such term does not include any Person who has ceased to be a member of the Company).

"Net Income" and "Net Loss" means, the taxable income or loss of the Company, as the case may be, as determined for federal income tax purposes as of the close

of each of the fiscal years or other relevant periods of the Company, computed with the following adjustments:

        (a)      Tax-exempt income received by the Company will be included in gross income;

        (b)      Expenditures described in Section 705(a)(2)(B) of the Code will be treated as deductible expenses;

        (c)      Any items of income, gain, loss, or deduction allocated pursuant to any provision of Section 5.2 will be excluded from the computation of Net Income and Net Loss for purposes of applying Section 5.1;

        (d)      For purposes of determining Net Income and Net Loss, the allocation of depletable basis in, depletion allowances with respect to, and taxable gain or loss from the sale, exchange or other disposition of, the Company's depletable properties provided for in Section 613A(c)(7)(D) of the Code and/or otherwise computed for federal income tax purposes shall be disregarded. Instead, Net Income and Net Loss shall be determined by taking into account Simulated Depletion and Simulated Gain or Loss, as determined and defined in the following sentence. For purposes of determining Simulated Depletion and Simulated Gain or Loss, (i) the Company shall determine its tax basis in its depletable properties ("Simulated Basis") without regard to the special rules set forth in Section 613A(c)(7)(D) of the Code, (ii) the Company shall determine depletion allowances ("Simulated Depletion") with respect to such depletable properties by using either the cost depletion method or the percentage depletion method (as determined by the Managing Member on a property by property basis), (iii) the Company shall reduce the Simulated Basis of such depletable properties by the Simulated Depletion attributable to such depletable properties, and (iv) the Company shall compute gain or loss on a sale, exchange, or other disposition of such depletable properties by subtracting Simulated Basis from the amount realized by the Company upon such disposition ("Simulated Gain or Loss");

        (e)      In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation for such fiscal year or other period;

        (f)      Gain or loss from the disposition of, any Company asset that, because of the application of the provisions of Treasury Regulations Sections 1.704-1(b)(2)(iv)(d) or (f), has a Book Basis that differs from the asset's adjusted tax basis, will be computed based upon the Book Basis (rather than the adjusted tax basis) of such asset in accordance with the provisions of Treasury Regulations Sections 1.704(b)(2)(iv)(g) and 1.704-1(b)(4)(i); and

        (g)      Any increase or decrease to Book Basis resulting from a Revaluation Event or from the distribution of any Company asset to a Member shall be included in the computation of Net Income or Net Loss.

"Person" means any individual, corporation, partnership, limited liability company, business trust or other entity, series of an entity, or government or governmental agency or instrumentality.

"Readily Tradable Securities" means securities of an issuer which are listed on a national securities exchange; *provided, however,* that such term shall not be deemed to include (i) any other securities of the same issuer that are not listed on a national securities exchange or (ii) any securities that are not readily tradable in open transactions on a national securities exchange, including, but not limited to, (A) securities that are subject to substantial restrictions on the transfer thereof under the terms of any contract or agreement entered into with the issuer or any other Person or (B) securities that constitute "restricted securities" within the meaning of Rule 144 under the Securities Act, unless a registration statement is in effect with respect to such securities that permits the sale of such securities in open market transactions without further registration or unless such securities may be sold pursuant to Rule 144 under the Securities Act without compliance with the volume limitations or manner of sale requirements of such Rule.

"Revaluation Event" means, except as otherwise agreed by the Managing Member, (i) the acquisition of an additional Interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution or as consideration for the performance of services on behalf of the Company; (ii) the Distribution by the Company to a Member of more than a *de minimis* amount of money or other property as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Treasury Regulations § 1.704-1(b)(2)(ii)(g).

"Securities Act" means the Securities Act of 1933, as amended.

"Simulated Basis" has the meaning set forth in clause (d) of the definition of "Net Income" and "Net Loss."

"Simulated Depletion" has the meaning set forth in clause (d) of the definition of "Net Income" and "Net Loss."

"Simulated Gain or Loss" has the meaning set forth in clause (d) of the definition of "Net Income" and "Net Loss."

"Third-Party Purchaser" means a purchaser that is not an Affiliate of (i) the Managing Member, with respect to a Sale Transaction pursuant to Section 6.2 or a Tag-Along Sale pursuant to Section 6.4, or (ii) the applicable Transferring Member, with respect to a Transfer pursuant to Section 6.3.

"Transfer" as to any Interest, means to sell, or in any other way directly or indirectly transfer, assign, distribute, encumber, pledge, mortgage, or otherwise dispose of, either voluntarily or involuntarily; and "Transferred" means the condition of a Transfer having occurred.

"Treasury Regulations" means temporary and final regulations promulgated under the Code by the United States Department of the Treasury, as amended (including any corresponding provisions of succeeding regulations).

SECTION 11.2.                    *Other Defined Terms.*  Each of the terms is defined in the provision of the Agreement identified opposite such term in the following table:

| Term | Provision |
|------|-----------|
| Agreement | Preamble |
| Allocable Share | Section 4.5(b) |
| Certificate of Formation | Section 1.1 |
| Company | Preamble |
| Effective Date | Preamble |
| Electing Party | Section 4.5(b) |
| Election Period | Section 6.3(b) |
| Equity Securities | Section 4.5(a) |
| Imputed Underpayment | Section 9.4(c) |
| Initial Capital Contributions | Section 4.1 |
| Initial Notice | Section 4.5(b) |
| New Member | Section 3.1(a) |
| Partnership Representative | Section 9.4(a) |
| Regulatory Allocations | Section 5.2(g) |
| Sale Notice | Section 6.2(b) |
| Sale Transaction | Section 6.2(a) |
| Standard of Conduct | Section 2.4(a) |
| Spousal Consent | Section 3.1(d) |
| Tag-Along Member | Section 6.4(a) |
| Tag-Along Notice | Section 6.4(c) |
| Tag-Along Offer Notice | Section 6.4(b) |
| Tag-Along Portion | Section 6.4(d) |
| Tag-Along Sale | Section 6.4(a) |
| Third-Party Offer | Section 6.3(a) |
| Third-Party Offer Notice | Section 6.3(a) |
| Third-Party Offer Price | Section 6.3(a) |
| Third-Party Offered Interests | Section 6.3(a) |
| Transaction Expenses | Section 12.3 |
| Transferring Member | Section 6.3(a) |

SECTION 11.3.                    *Construction.*  When required by the context, the gender of words in this Agreement includes the masculine, feminine and neuter genders, and the singular includes the plural (and vice versa).  Unless otherwise specified, references in this Agreement to (a) Articles and Sections are to Articles and Sections of this Agreement, (b) Schedules, Exhibits or Annexes are to those attached hereto, each of which is incorporated herein and made a part hereof for all purposes, (c) Article and Section headings are for convenience only and shall not affect the interpretation of this Agreement, (d) the terms "herein," "hereof," "hereinafter" or similar derivations are to this Agreement as a whole and not to any particular Article or Section, and (e) the terms "include," "including" or similar derivations are without limitation.

## ARTICLE XII
## MISCELLANEOUS

SECTION 12.1.            *Notices.*  All notices and other communications under this Agreement or in connection herewith shall be in writing and shall be given by delivery in person or by overnight courier, by registered or certified mail (return receipt requested and with postage prepaid thereon) or by cable, facsimile transmission or electronic mail to the parties at the respective addresses set forth in Exhibit A (or at such other address as any party shall have furnished to the others in accordance with the terms of this Section 12.1). All notices and other communications that are addressed as provided in or pursuant to this Section 12.1 shall be deemed duly and validly given (a) if delivered in person or by overnight courier, upon delivery, (b) if delivered by registered or certified mail (return receipt requested and with postage paid thereon), 72 hours after being placed in a depository of the United States mails and (c) if delivered by facsimile transmission or electronic mail, upon transmission thereof.

SECTION 12.2.            *Confidentiality.*

(a)      Each party hereto acknowledges the proprietary and confidential nature of the Confidential Information, and agrees that it shall preserve the confidentiality of the Confidential Information and shall not use, publish, disseminate, distribute or otherwise disclose all or any portion thereof without the prior written approval of the Managing Member.

(b)      In the event that a Member receives either a request to disclose any Confidential Information under the terms of a subpoena or order issued by a court or other Governmental Authority of competent jurisdiction or advice of legal counsel that disclosure is required under applicable Law, such Member agrees that, prior to disclosing any Confidential Information, it shall (i) notify the Managing Member of the existence and terms of, and the circumstances attendant to, such request or advice, (ii) consult with the Managing Member as to the advisability of taking legally available steps to resist or narrow any such request or to otherwise eliminate the need for such disclosure and (iii) if disclosure is required, use its reasonable best efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as is required to be disclosed.  Any such Member shall keep the Managing Member informed regarding any actions taken by it as contemplated by this paragraph (b).

(c)      Notwithstanding the foregoing, a Member may use or disclose Confidential Information to the extent (i) solely in the case of the Managing Member, the use or disclosure is necessary in connection with the due and proper performance of its duties pursuant to this Agreement, (ii) to the extent necessary to enforce rights hereunder (*provided, however*, that the Member seeking to enforce its rights takes commercially reasonable steps to preserve the confidential nature of the Confidential Information and to limit the harm to the Company or the other Members from the disclosure thereof) or (iii) in the case of the Managing Member, in connection with disclosures of a general nature regarding general financial information, return on investment and similar information, including without limitation, in connection with communications to direct and indirect beneficial owners of interests in the Managing Member and general marketing efforts.  The

agreements contained in this Section 12.2 shall survive the withdrawal of any Member and the termination of the Company.

SECTION 12.3.                *Transaction Expenses*.  The Company shall be responsible for the payment of all fees and expenses incurred by the Managing Member or any of its Affiliates, but not those incurred by other Members or their Affiliates, in connection with the preparation of this Agreement and all agreements and documents ancillary hereto (collectively, the "Transaction Expenses").  Transaction Expenses shall include all fees, costs, and expenses of legal counsel, accountants and all other third party consultants and advisors engaged by the Managing Member and its Affiliates to assist with the due diligence reviews conducted by them or the negotiation or preparation of this Agreement or other agreements and all other related out-of-pocket expenses.

SECTION 12.4.                *Entire Agreement*.  This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior written or oral agreements and understandings and all contemporaneous oral agreements and understandings among the parties or any of them with respect to the subject matter hereof. All Exhibits and Schedules hereto are expressly made a part of this Agreement.

SECTION 12.5.                *Waiver or Consent*.  A waiver or consent, express or implied, of or to any breach or default by any Person in the performance of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act or omission of any Person or to declare any Person in breach or default with respect to an obligation, irrespective of how long that failure continues, shall not be construed as a waiver of the breach or default until the applicable statute of limitations has run.  No waiver of any obligation under this Agreement or the Act shall be effective unless in writing signed by or on behalf of the Person or Persons to whom the obligation is owed.

SECTION 12.6.                *Amendment*.  Except as otherwise expressly provided herein, any amendment to this Agreement shall become effective only upon the execution of a written instrument executed by the Managing Member and Members whose total Capital Percentages represent in excess of 50% of the total Capital Percentages of all Members; *provided, however*, that, (i) except as expressly provided herein, including clause (ii) below, any amendment to any of the economic terms or provisions applicable to a Member or other rights adversely affecting a Member shall be effective only upon the execution of a written instrument by such Member and (ii) notwithstanding the foregoing clause (i), the Managing Member may amend this Agreement, without the approval of any other Member, to reflect any amendment that the Managing Member determines to be necessary or appropriate in connection with the creation, authorization or issuance of any additional Membership Interests, including any class or series of Membership Interests that is entitled to preferences with respect to voting, distributions or other economic terms or provisions, *provided* that such Membership Interests are issued in accordance with the provisions of Section 4.5.

SECTION 12.7.  *Governing Law*.  This Agreement shall be governed by and construed and interpreted in accordance with the Laws of the State of Delaware, without regard to any principles of conflict of laws that would result in the application of the Laws of any other jurisdiction.

SECTION 12.8.  *Assignment*.  No party may assign this Agreement without the prior written consent of each of the other parties hereto; provided, however, that Geary Trigleth may assign this Agreement to an Affiliate of Bison Land & Minerals LLC that is wholly owned by Geary Trigleth without obtaining the consent of any other party hereto.  It is expressly understood and agreed that any attempted or purported assignment by any party of this Agreement in violation of the provisions of this Section 12.8 shall be null and void.

SECTION 12.9.  *Binding Effect; Benefits*.  This Agreement shall be binding upon the parties and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns and (i) to the extent provided in Section 3.5, the Affiliates of the Members and the respective shareholders, partners, members, directors, managers, officers or employees of the Members or their Affiliates and (ii) to the extent provided in Article VIII, any Covered Persons (it being understood and agreed that, except as expressly provided herein, nothing contained in this Agreement is intended to confer any rights, benefits or remedies of any kind or character on any other Person under or by reason of this Agreement).  Nothing in this Agreement expressed or implied, shall be construed to give to any creditor of the Company or of any Member any legal or equitable right, remedy or claim under or in respect of this Agreement.

SECTION 12.10.  *Further Assurances*.  In connection with this Agreement and the transactions contemplated hereby, each Member agrees to execute and deliver any additional documents and instruments and to perform any additional acts necessary or appropriate to effectuate the provisions of this Agreement and those transactions.

SECTION 12.11.  *Counterparts*.  This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which shall constitute one and the same instrument.

[*signature page follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**MEMBERS:**

_____

Geary Trigleth

_____

Greg Pollard

_____

Kiat Tze Goh

[*Signature Page to Limited Liability Company Agreement*]

## EXHIBIT A

## MEMBERS

### This Exhibit is dated as of March 20, 2022

| Members and Addresses | Membership Status | Initial Capital Contribution | Capital Percentage |
|---|---|---|---|
| Geary Trigleth<br><br>Address: | Member | $ | 55.0% |
| Greg Pollard<br><br>Address: | New Member | $250,000 | 22.5% |
| Kiat Tze Goh<br><br>Address: | New Member | $250,000 | 22.5% |
| Total | | $ | 100.000% |

## EXHIBIT B

## SPOUSAL CONSENT

I, _____, the spouse of _____, who is a Member of Bison Land & Minerals LLC, a Delaware limited liability company (the "Company"), hereby sign this Spousal Consent.

1. I have read the Limited Liability Company Agreement of the Company dated March 20, 2022 (the "Agreement"), to which the form of this Spousal Consent is attached, and understand the provisions of the Agreement relating to the contributions of cash and/or property to the Company, the purchase, sale, or other disposition of any Member's Interest in the Company, and management of the Company and Company property.

2. I recognize that the community property laws of certain jurisdictions including the U.S. states of Louisiana, Arizona, California, Texas, Washington, Idaho, Nevada, New Mexico, and Wisconsin may provide me with community property rights in property acquired during the marriage, including my spouse's Interest in the Company, and that community property rights may frustrate the intentions of the other Member or other parties to the Agreement.

3. I am aware that, under the Agreement, my spouse has agreed to certain restrictions on my spouse's ability to sell my spouse's Interest as more fully described in the Agreement.

4. I hereby consent to each and every provision or restriction set forth in the Agreement and approve all of the provisions of the Agreement.

5. I hereby designate and appoint my spouse which appointment is coupled with an interest and hereby declared irrevocable as my true and lawful attorney-in-fact for all purposes of the Agreement, including without limitation, to act for and bind me in all Company matters and affairs.

6. If I and my spouse divorce or our marriage is otherwise legally dissolved, I will transfer and sell any interest that I have or may acquire in the Company to my spouse for fair market value and a court may award any such interest to my spouse as part of the legal division of our property. The previous sentence is not intended waive or relinquish any community property right that I have in the Company, but to agree to accept other property or assets of substantially equivalent value as part of any property settlement agreement or other legal division of property upon dissolution of my marriage.

7. I agree not to transfer or bequeath any community property interest that I have in the Company by will, trust, or any other testamentary disposition to anyone other than my current spouse. Any residuary clauses in any will or trust shall not include any interest I have or may acquire in the Company.

8. This Spousal Consent is binding on my heirs, executors, administrators, and assigns.

9. I am aware that this Spousal Consent involves issues of limited liability company and community property law that may be complex. I acknowledge that I am free to seek independent legal or financial counsel regarding this Spousal Consent. I have either sought

the advice of independent counsel or, after carefully reading the Agreement, am satisfied with its terms without seeking the advice of independent counsel. I understand and have received full disclosure of the rights that I am agreeing to waive under this Agreement.

10. I knowingly and voluntarily intend to be bound by the Spousal Consent and hereby agree that any and all interest I may have in the Company by community property laws or otherwise shall be governed by the terms of the Agreement and this Spousal Consent.

11. This Spousal Consent applies to the Agreement as it currently exists and to any subsequent amendments, restatements, or other changes to the Agreement as may be agreed upon by the parties to the Agreement. I agree that my spouse may join in any amendment, restatement, or other change to the Agreement without any further signature, acknowledgment, agreement, or consent on my part or notice to me.

My signature is effective on the date signed below.


Date: _____          _____
                                            Signature
                                            Print Name: _____

| **From:** | Geary Trigleth |
| **To:** | G.pollard@bisonexploration.com; "KENNY GOH" |
| **Subject:** | Re: FW: NorthSTAR correspondence |
| **Date:** | Wednesday, November 16, 2022 5:39:53 PM |

Great work guys. This accomplished a lot moving forward. We now know what is needed to do to lay out our drilling plans.
Thanks Greg and Allen.
gt

On Wed, Nov 16, 2022 at 4:31 PM, <G.pollard@bisonexploration.com> wrote:

APD Approved

-----Original Message-----
From: NoReply@nd.gov <NoReply@nd.gov>
Sent: Wednesday, November 16, 2022 4:25 PM
To: G.POLLARD@BISONEXPLORATION.COM; sdihle@nd.gov
Subject: NorthSTAR correspondence
Importance: High

Your Notice submission 67444 for Well API 3307501491 has been approved by the Oil and Gas Division.

| From: | Geary Trigleth |
|---|---|
| To: | greg_pollard@verizon.net |
| Cc: | "KENNY GOH"; "Kenny Goh" |
| Subject: | RE: WDC 1H |
| Date: | Tuesday, December 13, 2022 11:23:07 AM |
| Attachments: | image001.png |
| | image.png |

Greg,

To do this the right way there will need to be a little hand holding by us. This is easy to do if we communicate and help each other. I'll make sure what ever comes here will be forwarded or taken care of.

If it takes any additional rig days over 20 on this well, we have that covered as there will be no additional rig costs than what we paid already. And no de-mob expense to us. That can be a good savings for us. Just the de-mob should save us $20,000.

I could use some rig costs related to repairs and new parts and any big upcoming expenses if possible.

– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email: g.trigleth@bisonexploration.com
Web: BisonExploration.com



------- Original Message -------
On Tuesday, December 13th, 2022 at 10:43 AM, Greg Pollard <greg_pollard@verizon.net> wrote:

> That's a big number right now—we have had quite a few things with start up.
>
> Greg

**From:** Geary Trigleth <G.Trigleth@bisonexploration.com>
**Sent:** Tuesday, December 13, 2022 10:15 AM
**To:** greg_pollard@verizon.net
**Cc:** 'KENNY GOH' <kennygogo@aol.com>; 'Kenny Goh' <kennygogo@aim.com>
**Subject:** RE: WDC 1H

I need to know any maintenance and up keep cost on rig we do please.

– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email:   g.trigleth@bisonexploration.com
Web:     BisonExploration.com

image

------- Original Message -------
On Tuesday, December 13th, 2022 at 9:53 AM, Greg Pollard
<greg_pollard@verizon.net> wrote:


I have gotten the invoice for the painting paid. I am waiting for the
run check for the TOP wells from November to get some $$ for
paying the landman-Have you gotten that check yet?

Thanks,

Greg


**From:** Geary Trigleth <G.Trigleth@bisonexploration.com>
**Sent:** Tuesday, December 13, 2022 9:50 AM
**To:** greg_pollard@verizon.net
**Cc:** 'KENNY GOH' <kennygogo@aol.com>; 'Kenny Goh'
<kennygogo@aim.com>
**Subject:** Re: WDC 1H


Greg,

Please remit:

Payment to SunCoast Land Company:   Chk# 919  $10,054.88

Payment to SunCoast Land Company:   Chk# 924  $ 3,500.35

Total Due:                                    $13,555.23

I forwarded several invoices, Linda's and just sending one for cleaning

and painting tank. That one is old and needs to be paid.

I realize it is very difficult with weather conditions and hard on everyone. We need to keep people paid as we go, if I need to help with that I can.

Thanks.


– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email:  g.trigleth@bisonexploration.com
Web:  BisonExploration.com


image


------- Original Message -------
On Tuesday, December 13th, 2022 at 9:22 AM, Greg Pollard <greg_pollard@verizon.net> wrote:

> We are waiting on weather due to icy roads.  The BOP testers and tank cleaners are trying to get out.  We are nippled up and ready to test.
>
> Hopefully get out this morning.
>
> Pump mechanic is due out this afternoon.
>
>
> Greg
>
>
> *Greg Pollard*
>
> 7700 Cody Ln #2911
>
> Sachse, Texas 75048
>
> 469-834-3056

38-2023-CV-00007

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | greg_pollard@verizon.net |
| **Subject:** | Re: WDC 1H DDR |
| **Date:** | Monday, December 19, 2022 10:54:23 AM |
| **Attachments:** | image.png |

I realize the weather has been a large problem with hands and equipment. Stay safe and warm you guys, let me know if I can help in any way.

– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email: g.trigleth@bisonexploration.com
Web: BisonExploration.com



------- Original Message -------
On Monday, December 19th, 2022 at 10:13 AM, Greg Pollard <greg_pollard@verizon.net> wrote:

> Guys—we had our 2 day crew members not show up and the driller texted that they were quitting. We have replacements in route. We cannot operate with only the night crew working over a partial day. We are just below the shoe and will circulate and centrifuge the mud today while waiting for 1900 and night crew. We should be fully staffed tomorrow.
>
>
> *Greg Pollard*
>
> 7700 Cody Ln #2911
>
> Sachse, Texas 75048
>
> 469-834-3056

Exhibit E    38-2023-CV-00007

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | G.pollard@bisonexploration.com |
| **Subject:** | Re: West Dry Creek 1H Operations Update |
| **Date:** | Monday, January 16, 2023 3:16:24 PM |

Great job!!
gt


On Mon, Jan 16, 2023 at 3:14 PM, <G.pollard@bisonexploration.com> wrote:

All,

We have successfully drilled the West Dry Creek 1H. I have attached an operational update for your review and records. All indications are we have been successful. This well is in "CONFIDENTIAL" status with the North Dakota Industrial Commission / Dakota Mineral Resources. We will begin completion operations as soon as the drilling rig is demobilized which is scheduled for 1/28. I am currently working on securing a workover rig to handle the completion. I will update accordingly.

Thanks for the continued support.

Greg

| From: | Geary Triplett |
|---|---|
| To: | greg_pollard@verizon.net |
| Subject: | Re: WDC 1H Summary |
| Date: | Tuesday, February 7, 2023 9:24:53 AM |

Greg and Kenny

Our agreement is that I retain 15% and Sparrow take responsibility to drill and complete the well from that point forward. I gave you an accounting three months ago. What I sent you is what we had left after buying the tubulars, etc. you and Kenny owed ~$76,000 to the company which meant I returned $440,000 to you. I also relinquished over 6% of my interest to help pay additional expenses. 6 x $50,000 = $300,000 additional funds.

I agreed to let you take control and full responsibility of this project with me, retaining 15% and that's what we're going to do! If you will remember, I ask everybody to sell more interest and get more funds in place before we drilled the well. Your response was that Kenny wanted to buy the interest. Your response was that you and Kenny had it all worked out and that's what you were going to do and go and do that and keep the balance of the interest in Try to make a little more interest in the well. As you can see, it doesn't always work out that way.

I am not, and will not except the fact that you go out there and take full responsibility and spend my money without me having a say so, and then asked me to pay for your incompetence. It's not going to happen.

The audacity to tell me, you have to get an accounting from me to verify the balance of the money that I sent you is childish. I'm really tired of the childish, woo woo bullshit from you people! You're always pointing fingers at other people and you can't do your own deal!

You also need to understand that no interest in this well can be sold and or conveyed without my signature on the subscription agreement. You have no authority to do that!

The bottom line is that you and Kenny took full responsibility to drill and complete this well with the funds that I transferred to you and the remaining interest that was not sold and that I retained. There are only about 15 emails and a letter agreement between us that discussed that Greg. And you did your typical delay delay, delay, bullshit and didn't get that executed or completed due to the fact that you and Kenny again wanted to watch expenses in the outcome, to make the decision and hand off a hot poker.

Look, the bullshit stops today. You guys need to pay the bills and complete the well.! Don't call me don't pass go if you can't get it done let me know!

You ignored me, tight holed me, lied to me, now that bills are do all of a sudden it's WE!! You are the engineer, did the AFE and drilled the well.

Payment to Bison is still owed by you and Kenny, ~$11,500 for leases and Landman cost. Not only do I not need to send money you and Kenny owe Bison.

It's time to put your money where your mouth is!! You two stepped up to the plate so show everyone what you got!! The Bullshit stops here.

On Tue, Feb 7, 2023 at 7:27 AM, Greg Pollard <greg_pollard@verizon.net> wrote:

Kenny/Geary-Please see below the summary of the WDC 1H. **We are extremely over budget.** The overage is due basically to the rig repair time. We originally estimated the well cost of $1.4 million.

We need a follow up on the accounting of the ~$1.1 million spent prior to drilling operations commencing (only $281k remained in the escrow account at rig move). I know that we had all the tubulars and much of the surface equipment for completion purchased but not sure of the breakdown of other items charged to the well. We need to get the estimated remaining completion costs of ~$110k immediately.

I think we all agree that we need to get this well completed , tested and on production ASAP. The rig availability is ~10 days out. I have checked with 2 rig providers and Charlie Braun is also checking. The weather outlook is good for our timing. It is too warm right now and will become more seasonal in our time frame which will have the roads/location frozen rather than muddy.

Note this is the summary only and we did a complete workbook with all invoices.

As we try to get this well completed we have spent on the drilling operation $1.8 million. ($659k has been paid and $1.2 is still owed) We have an estimated $110k to complete and test the well.

**West Dry Creek 1H Summary**

| | |
|---|---|
| days pre spud/post release | 12 |
| days downtime due to rig | |
| repairs | 16 |
| total rig operating | 35 |

total rig time 47

**Total Outstanding / Need**

| | Total Paid | to be Paid | Grand Total |
|---|---|---|---|
| **Rig Ops** | | | |
| Labor and associated costs | $313,172.79 | $176,700.00 | $489,872.79 |
| Rig Repairs | $8,396.62 | $57,878.27 | $66,274.89 |
| **Well Ops** | | | |
| Fuel | $30,149.64 | $155,224.83 | $185,374.47 |
| Rentals | $65,748.20 | $290,575.58 | $356,323.78 |
| Directional | $195,325.00 | $192,725.00 | $388,050.00 |
| Other | $47,045.01 | $301,432.67 | $348,477.68 |
| **Totals** | **$659,837.26** | **$1,174,536.35** | **$1,834,373.61** |

**Completion To Be Paid**

| Date | Invoice | Name | Amount |
|---|---|---|---|
| 11/3/2022 | 1 | Dakota Roustabout | $6,500.00 |
| 11/4/2022 | 5735 | Star Well Services | $1,622.50 |
| 11/6/2022 | 2 | Dakota Roustabout | $2,816.62 |
| 11/29/2022 | 3 | Dakota Roustabout | $437.25 |
| 9/1/2022 | BIS9 | C Braun Contract Work | $198.00 |
| 10/1/2022 | BIS10 | C Braun Contract Work | $355.00 |
| 10/1/2022 | BIS11 | C Braun Contract Work | $391.00 |
| 2/6/2023 | | Farden | $2,742.00 |
| | | | **$15,062.37** |

Completion Estimated Expenditures

| | |
|---|---|
| 40 HRS well service rig @$500/hr | $20,000.00 |
| CBL Log | $8,000.00 |
| Hot Oil or Pump | $5,000.00 |
| Rods | $28,000.00 |
| Tubing | |
| Downhole equipment | $5,000.00 |
| Hookupn40hrs @250/hr | $10,000.00 |
| misc | $5,000.00 |
| elec | $5,000.00 |
| trucking | $5,000.00 |
| | **$91,000.00** |

**Total Needed To Complete**    **$106,062.37**

Funding for well Operations

| | |
|---|---|
| Investors | $1,400,000.00 |
| spent prior to Sparrow | -$1,118,584.42 |
| Net escrow account | $281,415.58 |
| Entec | $160,000.00 |
| Leases?? | -$76,463.95 |
| Kenny direct payment | $300,000.00 |
| | |
| Used for drilling current operations | $664,951.63 |

*Greg Pollard*

7700 Cody Ln #2911

Sachse, Texas 75048

469-834-3056

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | greg_pollard@verizon.net |
| **Subject:** | RE: WDC 1H Summary |
| **Date:** | Tuesday, February 7, 2023 4:13:20 PM |
| **Attachments:** | image01.png |

---

I don't care if he is on Mars!! I'm done with this bull shit!! No more excuses!! I'm not a vendor remember that!! I don't really care what Kenny says or thinks!!

On Tue, Feb 7, 2023 at 4:09 PM, Greg Pollard <greg_pollard@verizon.net> wrote:

> Geary—Kenny is 14 hrs ahead of us timewise—It's currently 6:00 am for him. Let's see what we can do to get this worked out.
>
> I have been tied up with calls and at the dr's office-sorry I haven't called you back yet.
>
> Greg

---

**From:** Geary Trigleth <G.Trigleth@bisonexploration.com>
**Sent:** Tuesday, February 7, 2023 11:53 AM
**To:** greg_pollard@verizon.net
**Cc:** ezgogo88@gmail.com
**Subject:** RE: WDC 1H Summary

Greg, Kenny,

I think we should have a three way call today.


– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email: g.trigleth@bisonexploration.com
Web:    BisonExploration.com



## BISON LAND & MINERALS LLC
"WORKING FOR AMERICA'S ENERGY INDEPENDENCE"

------- Original Message -------
On Tuesday, February 7th, 2023 at 11:38 AM, Greg Pollard <greg_pollard@verizon.net> wrote:

> Minimal—we had some rock spread to get trucks into the backside of the location. Charlie had some for the completion rig when he had the dead men set

---

**From:** Geary Trigleth <G.Trigleth@bisonexploration.com>
**Sent:** Tuesday, February 7, 2023 11:35 AM
**To:** greg_pollard@verizon.net; ezgogo88@gmail.com
**Subject:** Re: WDC 1H Summary

Greg,

Have you spread any material on the location, rock and or gravel?


– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email: g.trigleth@bisonexploration.com
Web:    BisonExploration.com



## BISON LAND & MINERALS LLC
"WORKING FOR AMERICA'S ENERGY INDEPENDENCE"

------- Original Message -------
On Tuesday, February 7th, 2023 at 10:20 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

Remember when I said, "we need to raise more funds" your reply was "Kenny wants the interest"! My understanding is he was doing that. That's when Sparrow came into the picture. Again it seems we have some crawfishing, and it isn't going to fly with me. You and Kenny need to pay those bills now!! I do not do business like this Greg. It's wrong to treat people like that! Believe it or not Gregg people in this world understand what goes on in these industries. You're not the first person to go out there and drill a well without having the money you need in your pocket. I told you that and that's why I did what I did. I know how to fix it. It's just you may not like the outcome. But believe me one way or another we're going to get these bills paid and the fact that you can't pay the bills on the well and you want to continue operating is totally asinine!  that ain't gonna happen! Probably not a good idea to have a company that owns $1 million that can't pay its way. Operate a well for me.

On Tue, Feb 7, 2023 at 10:06 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> You had no rights or authorization to bill or charge any services to Bison. Which I believe you did. Those invoices need to be paid immediately!! This is not the way to do business Greg. You are causing Bison and EnTec hardships with your delinquencies and non payment. This is unacceptable by all means!!

On Tue, Feb 7, 2023 at 9:57 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> I would say if you owe $1,200,000 and have 24% left to sell that it's not a good idea to sell interest in that well for less than $50,000 a point. Easy math.

On Tue, Feb 7, 2023 at 9:45 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> No way I can see the rig expenses in your email to understand those cost. We need to see that accounting to be able to discuss any solutions to those expenditures. If you want or need resolution to any of those we need to see an accounting. I am covering about another $100,000 for extra rig days and demob expenses. I am in no hurry and Sparrow needs to pay its Bills!! Bison was not and is not involved in the drilling and completion operations of this well.
>
> You shit on me, treated me like a negro galley slave and thought nothing about me and my family's interest in these companies. It has always been you and Kenny.
>
> By my accounting there was 39% (with Gary taking one %) and my 15% leaves 24% remaining in the well. You and Kenny need to pay the balance. When we discussed this situation your response was that Kenny wanted the interest so we didn't need to sell to other people. Again we are getting the crawdad response and refusing to honor your commitment. Not gonna work this time.

On Tue, Feb 7, 2023 at 9:24 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> Greg and Kenny
>
> Our agreement is that I retain 15% and Sparrow take responsibility to drill and complete the well from that point forward. I gave you an accounting three months ago. What I sent you is what we had left after buying the tubulars, etc. you and Kenny owed ~$76,000 to the company which meant I returned $440,000 to you. I also relinquished over 6% of my interest to help pay additional expenses. 6 x $50,000 = $300,000 additional funds.
>
> I agreed to let you take control and full responsibility of this project with me, retaining 15% and that's what we're going to do!
>
> If you will remember, I ask everybody to sell more interest and get more funds in place before we drilled the well. Your response was that Kenny wanted to buy the interest. Your response was that you and Kenny had it all worked out and that's what you were going to do and go and do that and keep the balance of the interest in Try to make a little more interest in the well. As you can see, it doesn't always work out that way. I am not, and will not except the fact that you go out there and take full responsibility and spend my money without me having a say so, and then asked me to pay for your incompetence. It's not going to happen.
>
> The audacity to tell me, you have to get an accounting from me to verify the balance of the money that I sent you is childish. I'm really tired of the childish, woo woo bullshit from you people! You're always pointing fingers at other people and you can't do your own deal!
>
> You also need to understand that no interest in this well can be sold and or conveyed without my signature on the subscription agreement. You have no authority to do that!
>
> The bottom line is that you and Kenny took full responsibility to drill and complete this well with the funds that I transferred to you and the remaining interest that was not sold and that I retained. There are only about 15 emails and a letter agreement between us

that discussed that Greg. And you did your typical delay delay, delay, bullshit and didn't get that executed or completed due to the fact that you and Kenny again wanted to watch expenses in the outcome, to make the decision and hand off a hot poker.

Look, the bullshit stops today. You guys need to pay the bills and complete the well.! Don't call me don't pass go if you can't get it done let me know!

You ignored me, tight holed me, lied to me, now that bills are do all of a sudden it's WE!! You are the engineer, did the AFE and drilled the well.

Payment to Bison is still owed by you and Kenny, ~$11,500 for leases and Landman cost. Not only do I not need to send money you and Kenny owe Bison.

It's time to put your money where your mouth is!! You two stepped up to the plate so show everyone what you got!! The Bullshit stops here.

On Tue, Feb 7, 2023 at 7:27 AM, Greg Pollard <greg_pollard@verizon.net> wrote:

Kenny/Geary-Please see below the summary of the WDC 1H. **We are extremely over budget**. The overage is due basically to the rig repair time. We originally estimated the well cost of $1.4 million.

We need a follow up on the accounting of the ~$1.1 million spent prior to drilling operations commencing (only $281k remained in the escrow account at rig move). I know that we had all the tubulars and much of the surface equipment for completion purchased but not sure of the breakdown of other items charged to the well. We need to get the estimated remaining completion costs of ~$110k immediately.

I think we all agree that we need to get this well completed , tested and on production ASAP. The rig availability is ~10 days out. I have checked with 2 rig providers and Charlie Braun is also checking. The weather outlook is good for our timing. It is too warm right now and will become more seasonal in our time frame which will have the roads/location frozen rather than muddy.

Note this is the summary only and we did a complete workbook with all invoices.

As we try to get this well completed we have spent on the drilling operation $1.8 million. ($659k has been paid and $1.2 is still owed). We have an estimated $110k to complete and test the well.

### West Dry Creek 1H Summary

| | |
|---|---|
| days pre spud/post release | 12 |
| days downtime due to rig | |
| repairs | 16 |
| total rig operating | 35 |
| total rig time | 47 |

| | Total Paid | Total Outstanding / Need to be Paid | Grand Total |
|---|---|---|---|
| **Rig Ops** | | | |
| Labor and associated costs | $313,172.79 | $176,700.00 | $489,872.79 |
| Rig Repairs | $8,396.62 | $57,878.27 | $66,274.89 |
| **Well Ops** | | | |
| Fuel | $30,149.64 | $155,224.83 | $185,374.47 |
| Rentals | $65,748.20 | $290,575.58 | $356,323.78 |
| Directional | $195,325.00 | $192,725.00 | $388,050.00 |
| Other | $47,045.01 | $301,432.67 | $348,477.68 |
| **Totals** | **$659,837.26** | **$1,174,536.35** | **$1,834,373.61** |

### Completion To Be Paid

| Date | Invoice | | Name | Amount |
|---|---|---|---|---|
| 11/3/2022 | | 1 | Dakota Roustabout | $6,500.00 |
| 11/4/2022 | | 5735 | Star Well Services | $1,622.50 |
| 11/6/2022 | | 2 | Dakota Roustabout | $2,816.62 |
| 11/29/2022 | | 3 | Dakota Roustabout | $437.25 |
| 9/1/2022 | | BIS9 | C Braun Contract Work | $198.00 |
| 10/1/2022 | | BIS10 | C Braun Contract Work | $355.00 |
| 10/1/2022 | | BIS11 | C Braun Contract Work | $391.00 |
| 2/6/2023 | | | Farden | $2,742.00 |
| | | | | **$15,062.37** |

Completion Estimated Expenditures

| | |
|---|---|
| 40 HRS well service rig | |
| @$500/hr | $20,000.00 |
| CBL Log | $8,000.00 |
| Hot Oil or Pump | $5,000.00 |
| Rods | $28,000.00 |
| Tubing | |
| Downhole equipment | $5,000.00 |
| Hookupn40hrs @250/hr | $10,000.00 |
| misc | $5,000.00 |
| elec | $5,000.00 |
| trucking | $5,000.00 |
| | **$91,000.00** |

| | |
|---|---|
| **Total Needed To Complete** | **$106,062.37** |

Funding for well Operations

| | |
|---|---|
| Investors | $1,400,000.00 |
| spent prior to Sparrow | -$1,118,584.42 |
| Net escrow account | $281,415.58 |
| Entec | $160,000.00 |
| Leases?? | -$76,463.95 |
| Kenny direct payment | $300,000.00 |
| | |
| Used for drilling current | |
| operations | $664,951.63 |

*Greg Pollard*

7700 Cody Ln #2911

Sachse, Texas 75048

469-834-3056

Exhibit H

38-2023-CV-00007

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | greg_pollard@verizon.net |
| **Subject:** | Fuck you. |
| **Date:** | Tuesday, February 7, 2023 8:45:46 PM |

You hiding crying piece of shit!!' You and your crooked partner! Let's go mother fucker. Fuck you you punk!!

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | greg_pollard@verizon.net; kennygogo@aim.com |
| **Subject:** | Problem |
| **Date:** | Tuesday, February 7, 2023 8:54:01 PM |

What are you two morons don't understand is that bison. Has controls of all and every percent of that interest in that well. You have no rights to transfer. Or sell any by law. Neither one of you fucking morons know what you're doing and I'm gonna have to educate you dumb motherfuckers. Obviously Sparrow went and spent these funds not Bison. What a fucking stupid name anyway.

I will contact all investor's tomorrow and we will all have a meeting with me and discuss details!! I will plug this fucking well if you guck with me!! You total piece of shot. You run around and hide from everyone. Why don't you take a quick trip to ND. Because you are a ducking coward and no paying piece of shit!! Meet me in ND and let's find out whom owes whom!!

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | greg_pollard@verizon.net |
| **Subject:** | Fuck you punk |
| **Date:** | Tuesday, February 7, 2023 8:58:24 PM |

I should just whip you ass!!

**From:**      Geary Trigleth
**To:**        greg_pollard@verizon.net
**Subject:**   Know it
**Date:**      Tuesday, February 7, 2023 8:59:34 PM

I would bitch slap your punk ass boy!!! I'm an old man and would kick you punk ass!!

**From:** Geary Trigleth
**To:** greg_pollard@verizon.net; kennygogo@aim.com
**Subject:** Stupid is as stupid does!!
**Date:** Tuesday, February 7, 2023 9:03:02 PM

Kenny you are a total moron. Greg. You couldn't lead yourself to a lunch counter!! Which you never miss!! Absolutely total morons and I will plug this mother fucker you fuck with me!!!! Try me!!!

**From:**     Geary Trigleth
**To:**       greg_pollard@verizon.net; kennygogo@aim.com
**Subject:**  Plugging well
**Date:**     Tuesday, February 7, 2023 9:13:29 PM

As of now our intention is to plug the well. Abandon the location and move on!!! Not worth the trouble to deal with an asshole like you!!

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | greg_pollard@verizon.net; kennygogo@aim.com |
| **Subject:** | Plugging reports |
| **Date:** | Tuesday, February 7, 2023 9:16:01 PM |

Tomorrow Bison starts plugging procedures on WDC 1-H. Will set plugs on well and abandon.

**From:** Geary Trigleth
**To:** greg_pollard@verizon.net; kennygogo@aim.com
**Subject:** Investors
**Date:** Tuesday, February 7, 2023 9:20:14 PM

I will send out a plugging report to all investors tomorrow. Then plug the well. You just don't really understand how much I don't give a fuck!!! I can afford to run this up your non paying re mugging ASS!

**From:** Geary Trigleth
**To:** greg_pollard@verizon.net; kennygogo@aim.com
**Subject:** Plugged well.
**Date:** Tuesday, February 7, 2023 9:23:36 PM

Cheaper to plug than complete. Sparrow has billings to them also. Let's see how this all works out!! I forgot more about how this industry works than yiu will ever know!!

**From:** Geary Trigleth
**To:** greg_pollard@verizon.net
**Subject:** Plugging of well.
**Date:** Tuesday, February 7, 2023 9:43:36 PM

We do not see it feasible to continue with operations on this well due to liabilities and non payment by contracted operations and direct interest owners. Bison is hereby notifying all interest owners that plugging the well is imminent. Please forward to any interest owners our interest to plug and abandon this well.

Geary Trigleth
President
Bison Land & Minerals LLC

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | greg_pollard@verizon.net; kennygogo@aim.com |
| **Subject:** | Plugging well |
| **Date:** | Tuesday, February 7, 2023 9:30:49 PM |

The only reasonable way for Bison is to plug the well and file legal action on Sparrow!!which I will start tomorrow. I'm tired of fucking with you amateurs!!

**From:**     Geary Trigleth
**To:**       greg_pollard@verizon.net; kennygogo@aim.com
**Subject:**  Filing for plug and abandon
**Date:**     Tuesday, February 7, 2023 10:47:51 PM

Tomorrow Bison will start the process to plug and abandon the WDC 1-H. The reports do not merit completion. Please notify investors of results.

**From:** Geary Trigleth
**To:** greg_pollard@verizon.net; kennygogo@aim.com
**Subject:** Plug and abandoned
**Date:** Tuesday, February 7, 2023 10:49:24 PM

This is an easy decision.
gt

From:      Geary Trigleth
To:        kennygogo@jam.com; greg_pollard@verizon.net
Subject:   Re: WDC 1H Operations & Financial
Date:      Wednesday, February 8, 2023 10:02:19 AM

The very last thing you need to worry about is my language. If I were you I would concentrate on paying the $1,200,000 you just spent. You fucking moron. That is from a sound mind and you point fingers on common sense and you go spend $1,200,000 you don't have and you have the audacity to challenge my sensibility!! You fucking moron. I did not authorize one single penny drilling that well!! I told both of you I would not be a part of going there and drilling until we were financially prepared. That's when super Sparrow came into play. You and Greg took the balance of interest not sold and responsibility to drill and complete the well!!
I'm sitting here contemplating during you and greg.
That may be the end result yet!
The only thing that is going to happen on that well is to pour cement and plug it at this point!!
By the way, you don't go spend $1,200,000 and leave and go home and tell everyone you are not going to pay them!! Are you fucking kidding me!!
You are both morons to do that. Then ask me to pay!! Really!! You are a fucking moron!
It's not unconstitutional to call someone a moron. You have to be a moron to say that!!!

On Tue, Feb 7, 2023 at 9:28 PM, KENNY GOH <kennygogo@jam.com> wrote:

Geary,
What ever you called me, it not civilized and not a normal person of sound mind and behavior would hv said that and even so as a partner in our Bison company , you being the Chairman/ CEO and majority shareholder. I am just stating facts that ndls. I did not verbally or in any words in our emails/conversations or meetings used any uncalled for names like you did to me and Greg many times and now a very racist remarks to me and at the sametime threatening me. This is legally and constitutionally totally unacceptable and I strongly advise you to stop immediately.

I just want to ensure we all understand the present situation about our legal responsibility and accountability to our investors and Bison ( which I am share holders with 22.5 % ) the financial situation of our investors money for the well that we hv drilled which by all indications is a successful well. The well cost hv been well over budgeted due to weather and rig problems. I hv provided another 300k$ to enable to drill to TD.
To completed the well another 100k plus is needed and we need the investors  money left from $1.05 million that was held under Bison's escrow bank account.

I do not understand why are you no providing anwers or the financial accounts of the 1.05$ million or assisting financially to complete the well. Please provide the balance in the investor escrowed money and complete the well and we can pay all the outstanding bills with well productions and drill new wells.
That is all and I said this with good faith and intentions as a business partnership.

Kenny Goh

On Feb 8, 2023, at 10:38 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

I am going to stump break your ass moron!! Tired of the ASIAN BULLSHIT AND ATTITUDE. THERE WAS NOT A COMPLETE DOCUMENT TO EVEN AGREE NOR EXECUT!! I will stick this well up your punk ass!!!

On Tue, Feb 7, 2023 at 7:30 PM, KENNY GOH <kennygogo@jam.com> wrote:

Geary,
As I understand the investors money $1.4 m for the well is put under an escrow and Greg only received 350k for drilling the well. Can you please clarify.

On the other hand you not sign any documents to transfer Boison ND & Louisiana property & drilling rights to sparrow energy inspite of all emails requests and telephone conversations by Greg to you. In return you hv full control of the Mississippi property under the our ( you 55% , Greg 22.5 % , Me 22.5% ) Boison company ownership which is still valid unless a new agreement is being fully executed.

To clear all misunderstandings I suggest you sign the transfer agreement documents and full account of the investors money escrowed for the well under Boison. The farmout agreements are under Boison and Bison will be legally responsible for all the money meant for the drilling of the WDC 1H  well. Any litigation will be against Boison as all money is wired into Boison bank account as per contract.

Thanks
Kenny Goh

On Feb 8, 2023, at 6:26 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

You had no authority to bill nor operate under Bison L & M. You need to pay any invoices you billed funded BLM immediately or face legal recourse. This is not a correct way to do business with partners nor vendors!!! I will retain legal counsel to respond to any additional recourse necessary to your non payment and delinquencies.

On Tue, Feb 7, 2023 at 4:13 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

I don't care if he is on Mars!! I'm done with this bull shit!! No more excuses!! I'm not a vendor remember that!!  I don't really care what Kenny says or thinks!!

On Tue, Feb 7, 2023 at 4:09 PM, Greg Pollard <greg_pollard@verizon.net> wrote:

Geary—Kenny is 14 hrs ahead of us timewise—It's currently 6:00 am for him. Let's see what we can do to get this worked out.

I have been tied up with calls and at the dr's office-sorry I haven't called you back yet.

Greg

............................................................................................................................................................................

From: Geary Trigleth <G.Trigleth@bisonexploration.com>
Sent: Tuesday, February 7, 2023 11:53 AM
To: greg_pollard@verizon.net
Cc: ezgogo88@gmail.com
Subject: RE: WDC 1H Summary

Greg, Kenny,

I think we should have a three way call today.

~ Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296

Email:  g.trigleth@bisonexploration.com
Web:   BisonExploration.com

<image001.png>

------- Original Message -------
On Tuesday, February 7th, 2023 at 11:38 AM, Greg Pollard <greg_pollard@verizon.net> wrote:

> Minimal—we had some rock spread to get trucks into the backside of the location. Charlie had some for the completion rig when he had the dead men set

·······························································································································································

**From:** Geary Trigleth <G.Trigleth@bisonexploration.com>
**Sent:** Tuesday, February 7, 2023 11:35 AM
**To:** greg_pollard@verizon.net; caxogo58@gmail.com
**Subject:** Re: WDC 1H Summary

Greg,

Have you spread any material on the location, rock and or gravel?

– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email:  g.trigleth@bisonexploration.com
Web:   BisonExploration.com

<image001.png>

------- Original Message -------
On Tuesday, February 7th, 2023 at 10:20 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> Remember when I said, "we need to raise more funds" your reply was "Kenny wants the interest"! My understanding is he was doing that. That's when Sparrow came into the picture. Again it seems we have some crawfishing, and it isn't going to fly with me. You and Kenny need to pay those bills now!! I do not do business like this Greg. It's wrong to treat people like that!! Believe it or not Gregg people in this world understand what goes on in these industries. You're not the first person to go out there and drill a well without having the money you need in your pocket. I told you that and that's why I did what I did. I know how to fix it. It's just you may not like the outcome. But believe me one way or another we're going to get these bills paid and the fact that you can't pay the bills on the well and you want to continue operating is totally asinine!  that ain't gonna happen! Probably not a good idea to have a company that owns $1 million that can't pay its way. Operate a well for me.

> On Tue, Feb 7, 2023 at 10:06 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:
>
>> You had no rights or authorization to bill or charge any services to Bison. Which I believe you did. Those invoices need to be paid immediately!! This is not the way to do business Greg. You are causing Bison and EnTec hardships with your delinquencies and non payment. This is unacceptable by all means!!

> On Tue, Feb 7, 2023 at 9:57 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:
>
>> I would say if you owe $1,200,000 and have 24% left to sell that it's not a good idea to sell interest in that well for less than $50,000 a point. Easy math.

> On Tue, Feb 7, 2023 at 9:45 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:
>
>> No way I can see the rig expenses in your email to understand those cost. We need to see that accounting to be able to discuss any solutions to those expenses. If you want or need resolution to any of those we need to see an accounting. I am covering about another $100,000 for extra rig days and demob expenses. I am in no hurry and Sparrow needs to pay its Bills!! Bison was not and is not involved in the drilling and completion operations of this well.
>>
>> You shit on me, treated me like a negro galley slave and thought nothing about me and my family's interest in these companies. It has always been you and Kenny.
>>
>> By my accounting there was 39% (with Gary taking one %) and my 15% leaves 24% remaining in the well. You and Kenny need to pay the balance. When we discussed this situation your response was that Kenny wanted the interest so we didn't need to sell to other people. Again we are getting the crawdad response and refusing to honor your commitment. Not gonna work this time.

On Tue, Feb 7, 2023 at 9:24 AM, Geary Trigleth
<G.Trigleth@bisonexploration.com> wrote:

Greg and Kenny

Our agreement is that I retain 15% and Sparrow take
responsibility to drill and complete the well from that
point forward. I gave you an accounting three months
ago. What I sent you is what we had left after buying the
tubulars, etc. you and Kenny owed ~$76,000 to the
company which meant I returned $440,000 to you. I also
relinquished over 6% of my interest to help pay
additional expenses. 6 x $50,000 = $300,000 additional
funds.

I agreed to let you take control and full responsibility of
this project with me, retaining 15% and that's what
we're going to do!

If you will remember, I ask everybody to sell more
interest and get more funds in place before we drilled the
well. Your response was that Kenny wanted to buy the
interest. Your response was that you and Kenny had it all
worked out and that's what you were going to do and go
 and do that and keep the balance of the interest in Try to
make a little more interest in the well. As you can see, it
doesn't always work out that way.
I am not, and will not except the fact that you go out
there and take full responsibility and spend my money
without me having a say so, and then asked me to pay
for your incompetence. It's not going to happen.

The audacity to tell me, you have to get an accounting
from me to verify the balance of the money that I sent
you is childish. I'm really tired of the childish, woo woo
bullshit from you people! You're always pointing fingers
at other people and you can't do your own deal!

You also need to understand that no interest in this well
can be sold and or conveyed without my signature on the
subscription agreement. You have no authority to do
that!

The bottom line is that you and Kenny took full
responsibility to drill and complete this well with the
funds that I transferred to you and the remaining interest
that was not sold and that I retained. There are only
about 15 emails and a letter agreement between us that
discussed that Greg. And you did your typical delay
delay, delay, bullshit and didn't get that executed or
completed due to the fact that you and Kenny again
wanted to watch expenses in the outcome, to make the
decision and hand off a hot poker.

Look, the bullshit stops today. You guys need to pay the
bills and complete the well.! Don't call me don't pass go
if you can't get it done let me know!

You ignored me, tight holed me, lied to me, now that
bills are do all of a sudden it's WE!! You are the
engineer, did the AFE and drilled the well.

Payment to Bison is still owed by you and Kenny,
~$11,500 for leases and Landman cost. Not only do I not
need to send money you and Kenny owe Bison.

It's time to put your money where your mouth is!! You
two stepped up to the plate so show everyone what you
got!! The Bullshit stops here.

On Tue, Feb 7, 2023 at 7:27 AM, Greg Pollard
<greg_pollard@verizon.net> wrote:

Kenny/Geary-Please see below the
summary of the WDC 1H. **We are
extremely over budget.** The overage is due
basically to the rig repair time. We
originally estimated the well cost of $1.4
million.

We need a follow up on the accounting of
the ~$1.1 million spent prior to drilling
operations commencing (only $281k
remained in the escrow account at rig
move). I know that we had all the tubulars
and much of the surface equipment for
completion purchased but not sure of the
breakdown of other items charged to the
well. We need to get the estimated
remaining completion costs of ~$110k
immediately.

I think we all agree that we need to get this
well completed , tested and on production
ASAP. The rig availability is ~10 days out.
I have checked with 2 rig providers and
Charlie Braun is also checking. The
weather outlook is good for our timing. It is
too warm right now and will become more
seasonal in our time frame which will have
the roads/location frozen rather than

muddy.

Note this is the summary only and we did a
complete workbook with all invoices.

As we try to get this well completed we have spent on the
drilling operation $1.8 million.  ($69k has been paid and $1.2 is
still owed)  We have an estimated $110k to complete and test
the well.

**West Dry Creek 1H Summary**

| | |
|---|---|
| days pre spud/post release | 12 |
| days downtime due to rig | |
| repairs | 16 |
| total rig operating | 35 |
| total rig time | 47 |

| | Total Paid | Total Outstanding / Need to be Paid | Grand Total |
|---|---|---|---|
| **Rig Ops** | | | |
| Labor and associated costs | $313,172.79 | $176,700.00 | $489,872.79 |
| Rig Repairs | $8,396.62 | $57,878.27 | $66,274.89 |
| **Well Ops** | | | |
| Fuel | $30,149.64 | $155,224.83 | $185,374.47 |
| Rentals | $65,748.20 | $290,575.58 | $356,323.78 |
| Directional | $195,325.00 | $192,725.00 | $388,050.00 |
| Other | $47,045.01 | $301,432.67 | $348,477.68 |
| **Totals** | **$659,837.26** | **$1,174,536.35** | **$1,834,373.61** |

**Completion To Be Paid**

| Date | Invoice | Name | Amount |
|---|---|---|---|
| 11/3/2022 | 1 | Dakota Roustabout | $6,500.00 |
| 11/4/2022 | 5735 | Star Well Services | $1,622.50 |
| 11/6/2022 | 2 | Dakota Roustabout | $2,816.62 |
| 11/29/2022 | 3 | Dakota Roustabout | $437.25 |
| 9/1/2022 | BIS9 | C Braun Contract Work | $198.00 |
| 10/1/2022 | BIS10 | C Braun Contract Work | $355.00 |
| 10/1/2022 | BIS11 | C Braun Contract Work | $391.00 |
| 2/6/2023 | | Farden | $2,742.00 |
| | | | **$15,062.37** |

Completion Estimated Expenditures

| | |
|---|---|
| 40 HRS well service rig @$500/hr | $20,000.00 |
| CBL Log | $8,000.00 |
| Hot Oil or Pump | $5,000.00 |
| Rods | $28,000.00 |
| Tubing | |
| Downhole equipment | $5,000.00 |
| Hookups40hrs @250/hr | $10,000.00 |
| misc | $5,000.00 |
| elec | $5,000.00 |
| trucking | $5,000.00 |
| | **$91,000.00** |

| | |
|---|---|
| **Total Needed To Complete** | **$106,062.37** |

Funding for well Operations

| | |
|---|---|
| Investors | $1,400,000.00 |
| spent prior to Sparrow | $1,118,584.42 |
| Net escrow account | $281,415.58 |
| Entec | $160,000.00 |
| Leases?? | $76,463.95 |
| Kenny direct payment | $300,000.00 |
| | |
| Used for drilling current operations | $664,951.63 |

*Greg Pollard*

7700 Cody Ln #2911

Sachse, Texas 75048

469-834-3056

**From:** Geary Trigleth
**To:** greg_pollard@verizon.net
**Subject:** Run but can't hide
**Date:** Wednesday, February 8, 2023 8:11:36 AM

I would recommend you never go to North Dakota again they're gonna hang you by your fucking neck

Exhibit J

38-2023-CV-00007

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | kennygogo@aim.com; greg_pollard@verizon.net |
| **Subject:** | Re: WDC 1H Operations & Financial |
| **Date:** | Wednesday, February 8, 2023 10:02:19 AM |

The very last thing you need to worry about is my language. If I were you I would concentrate on paying the $1,200,000 you just spent. You fucking moron. That is from a sound mind and you point fingers on common sense and you go spend $1,200,000 you don't have and you have the audacity to challenge my sensibility!! You fucking moron. I did not authorize one single penny drilling that well!! I told both of you I would not be a part of going there and drilling until we were financially prepared. That's when super Sparrow came into play. You and Greg took the balance of interest not sold and responsibility to drill and complete the well!!
I'm sitting here contemplating during you and greg.
That may be the end result yet!
The only thing that is going to happen on that well is to pour cement and plug it at this point!!
By the way, you don't go spend $1,200,000 and leave and go home and tell everyone you are not going to pay them!! Are you fucking kidding me!!
You are both morons to do that. Then ask me to pay!! Really!! You are a fucking moron!
It's not unconstitutional to call someone a moron. You have to be a moron to say that!!!

On Tue, Feb 7, 2023 at 9:28 PM, KENNY GOH <kennygogo@aim.com> wrote:

Geary,
What ever you called me, it not civilized and not a normal person of sound mind and behavior would hv said that and even so as a partner in our Bison company , you being the Chairman/ CEO and majority shareholder. I am just stating facts that nils. I did not verbally or in any words in our emails/conversations or meetings used any uncalled for names like you did to me and Greg many times and now a very racist remarks to me and at the sametime threatening me. This is legally and constitutionally totally unacceptable and I strongly advise you to stop immediately.

I just want to ensure we all understand the present situation about our legal responsibility and accountability to our investors and Bison ( which I am share holders with 22.5 % ) the financial situation of our investors money for the well that we hv drilled which by all indications is a successful well. The well cost hv been well over budgeted due to weather and rig problems. I hv provided another 300k$ to enable to drill to TD.
To completed the well another 100k plus is needed and we need the investors  money left from $1.05 million that was held under Bison's escrow bank account.

I do not understand why are you no providing anwers or the financial accounts of the 1.05$ million or assisting financially to complete the well. Please provide the balance in the investor escrowed money and complete the well and we can pay all the outstanding bills with well productions and drill new wells.
That is all and I said this with good faith and intentions as a business partnership.

Kenny Goh

On Feb 8, 2023, at 10:38 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:


I am going to stump break your ass moron!! Tired of the ASIAN BULLSHIT AND ATTITUDE. THERE WAS NOT A COMPLETE DOCUMENT TO EVEN AGREE NOR EXECUT!! I will stick this well up your punk ass!!!

On Tue, Feb 7, 2023 at 7:30 PM, KENNY GOH <kennygogo@aim.com> wrote:

Geary,
As I understand the investors money $1.4 m for the well is put under an escrow and Greg only received 350k for drilling the well. Can you please clarify.

On the other hand you not sign any documents to transfer Boison ND & Louisiana property & drilling rights to sparrow energy inspite of all emails requests and telephone conversations by Greg to you. In return you hv full control of the Mississippi property under the our ( you 55% , Greg 22.5 % , Me 22.5% ) Boison company ownership which is still valid unless a new agreement is being fully executed.

To clear all misunderstandings I suggest you sign the transfer agreement documents and full account of the investors money escrowed for the well under Boison. The farmout agreements are under Boison and Bison will be legally responsible for all the money meant for the drilling of the WDC 1H  well. Any litigation will be against Boison as all money is wired into Boison bank account as per contract.


Thanks
Kenny Goh

On Feb 8, 2023, at 6:26 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:


You had no authority to bill nor operate under Bison L & M. You need to pay any invoices you billed funded BLM immediately or face legal recourse. This is not a correct way to do business with partners nor vendors!!! I will retain legal counsel to respond to any additional recourse necessary to your non payment and delinquencies.

On Tue, Feb 7, 2023 at 4:13 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

I don't care if he is on Mars!! I'm done with this bull shit!! No more excuses!! I'm not a vendor remember that!!  I don't really care what Kenny says or thinks!!

On Tue, Feb 7, 2023 at 4:09 PM, Greg Pollard <greg_pollard@verizon.net> wrote:

Geary—Kenny is 14 hrs ahead of us timewise—It's currently 6:00 am for him. Let's see what we can do to get this worked out.

I have been tied up with calls and at the dr's office-sorry I haven't called you back yet.

Greg

...........................................................................................................................................................................................................

**From:** Geary Trigleth <G.Trigleth@bisonexploration.com>
**Sent:** Tuesday, February 7, 2023 11:53 AM
**To:** greg_pollard@verizon.net
**Cc:** ezgogo88@gmail.com
**Subject:** RE: WDC 1H Summary

Greg, Kenny,

I think we should have a three way call today.


-- Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296

Email:  g.trigleth@bisonexploration.com
Web:  BisonExploration.com

<image001.png>

------- Original Message -------
On Tuesday, February 7th, 2023 at 11:38 AM, Greg Pollard <greg_pollard@verizon.net> wrote:

> Minimal—we had some rock spread to get trucks into the backside of the location. Charlie had some for the completion
> rig when he had the dead men set

........................................................................................................................................

**From:** Geary Trigleth <G.Trigleth@bisonexploration.com>
**Sent:** Tuesday, February 7, 2023 11:35 AM
**To:** greg_pollard@verizon.net; exxogo58@gmail.com
**Subject:** Re: WDC 1H Summary

Greg,

Have you spread any material on the location, rock and or gravel?

– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email:  g.trigleth@bar-nexploration.com
Web:  BisonExploration.com

<image001.png>

------- Original Message -------
On Tuesday, February 7th, 2023 at 10:20 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> Remember when I said, "we need to raise more funds" your reply was "Kenny wants the interest"! My
> understanding is he was doing that. That's when Sparrow came into the picture. Again it seems we have
> some crawfishing, and it isn't going to fly with me. You and Kenny need to pay those bills now!! I do not
> do business like this Greg. It's wrong to treat people like that!! Believe it or not Gregg people in this world
> understand what goes on in these industries. You're not the first person to go out there and drill a well
> without having the money you need in your pocket. I told you that and that's why I did what I did. I know
> how to fix it. It's just you may not like the outcome. But believe me one way or another we're going to get
> these bills paid and the fact that you can't pay the bills on the well and you want to continue operating is
> totally asinine!  that ain't gonna happen! Probably not a good idea to have a company that owns $1 million
> that can't pay its way. Operate a well for me.

> On Tue, Feb 7, 2023 at 10:06 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:
>
>> You had no rights or authorization to bill or charge any services to Bison. Which I believe you
>> did. Those invoices need to be paid immediately!! This is not the way to do business Greg.
>> You are causing Bison and EnTec hardships with your delinquencies and non payment. This is
>> unacceptable by all means!!

>> On Tue, Feb 7, 2023 at 9:57 AM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:
>>
>>> I would say if you owe $1,200,000 and have 24% left to sell that it's not a good
>>> idea to sell interest in that well for less than $50,000 a point. Easy math.

>>> On Tue, Feb 7, 2023 at 9:45 AM, Geary Trigleth
>>> <G.Trigleth@bisonexploration.com> wrote:
>>>
>>>> No way I can see the rig expenses in your email to understand those
>>>> cost. We need to see that accounting to be able to discuss any
>>>> solutions to those expenditures. If you want or need resolution to any
>>>> of those we need to see an accounting. I am covering about another
>>>> $100,000 for extra rig days and demob expenses. I am in no hurry
>>>> and Sparrow needs to pay its Bills!! Bison was not and is not
>>>> involved in the drilling and completion operations of this well.
>>>>
>>>> You shit on me, treated me like a negro galley slave and thought
>>>> nothing about me and my family's interest in these companies. It has
>>>> always been you and Kenny.
>>>>
>>>> By my accounting there was 39% (with Gary taking one %) and my
>>>> 15% leaves 24% remaining in the well. You and Kenny need to pay
>>>> the balance. When we discussed this situation your response was that
>>>> Kenny wanted the interest so we didn't want to sell to other people.
>>>> Again we are getting the crawdad response and refusing to honor
>>>> your commitment. Not gonna work this time.

On Tue, Feb 7, 2023 at 9:24 AM, Geary Trigleth
<G.Trigleth@bisonexploration.com> wrote:

Greg and Kenny

Our agreement is that I retain 15% and Sparrow take
responsibility to drill and complete the well from that
point forward. I gave you an accounting three months
ago. What I sent you is what we had left after buying the
tubulars, etc. you and Kenny owed ~$76,000 to the
company which meant I returned $440,000 to you. I also
relinquished over 6% of my interest to help pay
additional expenses. 6 x $50,000 = $300,000 additional
funds.

I agreed to let you take control and full responsibility of
this project with me, retaining 15% and that's what
we're going to do!

If you will remember, I ask everybody to sell more
interest and get more funds in place before we drilled the
well. Your response was that Kenny wanted to buy the
interest. Your response was that you and Kenny had it all
worked out and that's what you were going to do and go
ahead do that and keep the balance of the interest in Try to
make a little more interest in the well. As you can see, it
doesn't always work out that way.
I am not, and will not except the fact that you go out
there and take full responsibility and spend my money
without me having a say so, and then asked me to pay
for your incompetence. It's not going to happen.

The audacity to tell me, you have to get an accounting
from me to verify the balance of the money that I sent
you is childish. I'm really tired of the childish, woo woo
bullshit from you people! You're always pointing fingers
at other people and you can't do your own deal!

You also need to understand that no interest in this well
can be sold and or conveyed without my signature on the
subscription agreement. You have no authority to do
that!

The bottom line is that you and Kenny took full
responsibility to drill and complete this well with the
funds that I transferred to you and the remaining interest
that was not sold and that I retained. There are only
about 15 emails and a letter agreement between us that
discussed that Greg. And you did your typical delay
delay, delay, bullshit and didn't get that executed or
completed due to the fact that you and Kenny again
wanted to watch expenses in the outcome, to make the
decision and hand off a hot poker.

Look, the bullshit stops today. You guys need to pay the
bills and complete the well.! Don't call me don't pass go
if you can't get it done let me know!

You ignored me, tight holed me, lied to me, now that
bills are do all of a sudden it's WE!! You are the
engineer, did the AFE and drilled the well.

Payment to Bison is still owed by you and Kenny,
~$11,500 for leases and Landman cost. Not only do I not
need to send money you and Kenny owe Bison.

It's time to put your money where your mouth is!! You
two stepped up to the plate so show everyone what you
got!! The Bullshit stops here.

On Tue, Feb 7, 2023 at 7:27 AM, Greg Pollard
<greg_pollard@verizon.net> wrote:

Kenny/Geary-Please see below the
summary of the WDC 1H. **We are
extremely over budget.** The overage is due
basically to the rig repair time. We
originally estimated the well cost of $1.4
million.

We need a follow up on the accounting of
the ~$1.1 million spent prior to drilling
operations commencing (only $281k
remained in the escrow account at rig
move). I know that we had all the tubulars
and much of the surface equipment for
completion purchased but not sure of the
breakdown of other items charged to the
well. We need to get the estimated
remaining completion costs of ~$110k
immediately.

I think we all agree that we need to get this
well completed , tested and on production
ASAP. The rig availability is ~10 days out.
I have checked with 2 rig providers and
Charlie Braun is also checking. The
weather outlook is good for our timing. It is
too warm right now and will become more
seasonal in our time frame which will have
the roads/location frozen rather than

muddy.

Note this is the summary only and we did a
complete workbook with all invoices.

As we try to get this well completed we have spent on the
drilling operation $1.8 million.  ($69k has been paid and $1.2 is
still owed)  We have an estimated $110k to complete and test
the well.

### West Dry Creek 1H Summary

| | |
|---|---|
| days pre spud/post release | 12 |
| days downtime due to rig | |
| repairs | 16 |
| total rig operating | 35 |
| total rig time | 47 |

| | Total Paid | Total Outstanding / Need to be Paid | Grand Total |
|---|---|---|---|
| **Rig Ops** | | | |
| Labor and associated costs | $313,172.79 | $176,700.00 | $489,872.79 |
| Rig Repairs | $8,396.62 | $57,878.27 | $66,274.89 |
| **Well Ops** | | | |
| Fuel | $30,149.64 | $155,224.83 | $185,374.47 |
| Rentals | $65,748.20 | $290,575.58 | $356,323.78 |
| Directional | $195,325.00 | $192,725.00 | $388,050.00 |
| Other | $47,045.01 | $301,432.67 | $348,477.68 |
| **Totals** | **$659,837.26** | **$1,174,536.35** | **$1,834,373.61** |

### Completion To Be Paid

| Date | Invoice | Name | Amount |
|---|---|---|---|
| 11/3/2022 | 1 | Dakota Roustabout | $6,500.00 |
| 11/4/2022 | 5735 | Star Well Services | $1,622.50 |
| 11/6/2022 | 2 | Dakota Roustabout | $2,816.62 |
| 11/29/2022 | 3 | Dakota Roustabout | $437.25 |
| 9/1/2022 | BIS9 | C Braun Contract Work | $198.00 |
| 10/1/2022 | BIS10 | C Braun Contract Work | $355.00 |
| 10/1/2022 | BIS11 | C Braun Contract Work | $391.00 |
| 2/6/2023 | | Farden | $2,742.00 |
| | | | **$15,062.37** |

Completion Estimated Expenditures

| | |
|---|---|
| 40 HRS well service rig @$500/hr | $20,000.00 |
| CBL Log | $8,000.00 |
| Hot Oil or Pump | $5,000.00 |
| Rods | $28,000.00 |
| Tubing | |
| Downhole equipment | $5,000.00 |
| Hookups40hrs @250/hr | $10,000.00 |
| misc | $5,000.00 |
| elec | $5,000.00 |
| trucking | $5,000.00 |
| | **$91,000.00** |

| | |
|---|---|
| **Total Needed To Complete** | **$106,062.37** |

Funding for well Operations

| | |
|---|---|
| Investors | $1,400,000.00 |
| spent prior to Sparrow | $1,118,584.42 |
| Net escrow account | $281,415.58 |
| Entec | $160,000.00 |
| Leases? | $76,463.95 |
| Kenny direct payment | $300,000.00 |
| | |
| Used for drilling current operations | $664,951.63 |

*Greg Pollard*

7700 Cody Ln #2911

Sachse, Texas 75048

469-834-3056

| From: | Geary Trigleth |
|---|---|
| To: | GREG POLLARD; Kenny Goh |
| Subject: | Cease and Desist |
| Date: | Friday, February 10, 2023 2:08:11 PM |
| Attachments: | image.png |

greg and kenny

I have notified and am notifying Bison's vendors and customers that neither one of you have any type or kind of authority as an office or representative for Bison Land & Minerals LLC or EnTec Services LL/DBA Bison Drilling.

The contacts and relationships Bison has with its business involvement's are private and confidential. You have charged services to both of these entities with no authorization or right to. (Even though this is not unconstitutional, it is basically illegal!) My comment was that if they wanted to work for you or sparrow or the devil that I had nothing to do with that, nor Bison or EnTec. I gave you a lot of help and leeway and you shit on me!!! As well as everyone else involved. You just do NOT go and do that Greg!! I can't believe you don't understand that!

I need you greg to return the key to the office, please mail. kenny you need to return my tapes you got from Tom. Those belong to me and you need to return those immediately. How is all that for responding to your bullshit demands and child like actions? You don't like me commenting on you spending $1,200,000 and leaving companies and people owing them all that! Then don't do it! I call a mule a mule, crook a crook and speak the TRUTH! If you gonna treat people like shit, they will throw it back! I don't care what kind of WOKE ignorant ass attitude you may have but all people are that way, and you expect people to treat you different based on your constitutional rights. You are an idiot! The Constitution of the United States allows under the second amendment freedom of speech. This country is not founded on holding the hands of the weak and trying to protect everyone oh so sensitive FEELINGS if they think someone may not like them! Or agree, you democrats use racism in every single aspect of denial. But you will learn a hard lesson from me kenny, I don't give a fuck about your chicken shit WOKE absolutely moronic attitude and if I want to call you a piece of shit, cocksucker, liar and a cheat, Asian or an Indian I will. I have that right as a MAN first of all, then as an American. And Fuck you if you don't like it and not a single fucking thing you will do to change it! If you don't like my tone or attitude I am happy to meet with you to clear any misunderstandings up, happy too.

You throw out all this total bullshit to attempt to cover facts and create excuses. Excuses do not matter, reality will drive that Bus. And i promise one of the first stops will be your house!

You do NOT go to Minot ND, spend $1,200,000 you don't have and LEAVE!!! You and greg did that, you never had to physically never had to be there, you are Sparrow. The little birdy that flies AWAY>>>>>>>>>>>>>>>>>

The child's play is over. Three swings your OUT!!

– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email:  g.trigleth@bisonexploration.com
Web:  BisonExploration.com





MATTHEW S. WOLCOTT
mwolcott@freemanmillspc.com
682-316-1672

38-2023-CV-00007

February 10, 2023

***Via e-Mail and CMRRR***

Geary Trigleth
Bison Land & Minerals LLC
240 Buckhead Drive
Madison, MS 39110

  Re: Bison Land & Minerals LLC Restructuring; West Dry Creek No. 1H

Dear Mr. Trigleth:

I represent Sparrow Oil & Gas LLC and its shareholders in respect to the disputes and potential disputes with you and Bison Land & Minerals LLC regarding the West Dry Creek No. 1H Well in North Dakota, as well as the restructuring and settlement agreement between you and Bison and my clients, a draft of which was sent to you by Greg Pollard on December 12, 2022. Please cease all communications with Sparrow, Greg Pollard, Kenny Goh, and Geir Rorstad.

**Yesterday afternoon, you told Greg Pollard that you are "working with attorneys" on** these matters. Please immediately forward this letter to your counsel, copying me. My clients will not be communicating with you directly. Further, unless your attorneys inform me that it is permissible to contact you directly, my future communications regarding these matters will be directed to your counsel.

Moreover, please immediately cease contacting any and all vendors, customers, working interest owners, potential working interest owners, and any other third party regarding these matters. Failure to do so may result in liability for damages for tortious interference and slander, as well as injunctive relief. If you believe that it is absolutely necessary to contact a vendor, working interest owner, or other third party, such communication needs to be coordinated by your counsel and me.

     Sincerely,

     Matthew Wolcott

38-2023-CV-00007

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | Matthew S. Wolcott |
| **Subject:** | Re: Sparrow/Trigleth |
| **Date:** | Wednesday, February 15, 2023 1:55:31 PM |

Matthew, don't even try this sign the agreement bullshit! Your moronic clients didn't sign the fucking document either! Who the fuck do you think you are acting like Kenny and think you're gonna tell everybody what they're gonna do not gonna do! Let me tell you what stick that agreement up your fucking ass, Matthew how about that shit! Fuck you you, nor can you tell me what I'm gonna do you understand me punk motherfucker

On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott <Mwolcott@freemanmillspc.com> wrote:

Mr. Trigleth:

Please see attached.

Thanks.

Matthew S. Wolcott | FREEMAN MILLS PC

115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102

682.316.1672 | 682.316.1676  Fax

www.freemanmillspc.com

_____

This email may contain confidential or privileged information.

If this is not intended for you, then please delete it immediately.

_____

**From:** Geary Trigleth
**To:** Matthew S. Wolcott
**Subject:** Re: Sparrow/Trigleth
**Date:** Wednesday, February 15, 2023 1:55:31 PM

These morons are going to keep fucking with me and I'm taking them up to court There in Minot North Dakota where everybody wants to hang these some bitches and pull their fingernails off with pliers and we're gonna go up there and there's gonna be some serious ass kicking going on Michael fucking bet that! You better tell these fucking morons to shut their fucking mouth packed their shit and go home and I'm cleaning up their shit and if not, I'm gonna bury their fucking ass son in the courtroom. I don't need to tell my attorney anything. As a matter of fact, you nor kenny tell me or anyone what to do! the fucking judge does! So quit flapping your pie hole and go get some orders from the judge and then tell me what to do but that's the only fucking way in your life you'll ever get me to do jack shit based on you or kenny. We will do it the hard way. I know exactly how to do that! :>)
Enjoy your evening.

On Fri, Feb 10, 2023 at 6:51 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> Your moronic clients send me an email saying that I owe $1.2 million of their debt and they don't want to talk to me! Are you fucking kidding me! I swear on the holy Bible these guys are still in the sixth grade!

> On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott <Mwolcott@freemanmillspc.com> wrote:

>> Mr. Trigleth:

>> Please see attached.

>> Thanks.

>> Matthew S. Wolcott | FREEMAN MILLS PC

>> 115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102

>> 682.316.1672 | 682.316.1676 Fax

>> www.freemanmillspc.com

>> _____

>> This email may contain confidential or privileged information.

If this is not intended for you, then please delete it immediately.

_____

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | Matthew S. Wolcott |
| **Subject:** | Re: Sparrow/Trigleth |
| **Date:** | Wednesday, February 15, 2023 1:55:30 PM |

Let me explain something to you, Matthew. You're obviously not very educated on the situation your moron clients went out and charge services under my company not their company they created liabilities on my company with no right to do that! Bison Land & Mineral's they are there investors bisons investors? McKinney's not Gregg's bison! The vendors are bison van doors your moronic idiot clients left $1.2 million in debt. When they left North Dakota exclamation point are you kidding me! Charged services under my two companies I had no right to do. And you're sending me a letter that says that I can't talk to my own investors and my people that are on $1.2 million because of the morons you represent. Don't be moron number three on this deal buddy. Let me tell ya.  you just don't know the facts and you just jump fucking fucking jump! Do whatever the fuck you think you need to do. You're dealing with a bunch of fucking idiots that are all with the totally wrong about everything they done. Promise you! So I'm fucking call whoever I want to call and deal with the problems. The fucking assholes have created. You don't understand me I'm running to operating company is North Dakota and I'm dealing with these morons bullshit every day because they won't pay the fucking bills dude tell your clients to pay the fucking bills.

On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott <Mwolcott@freemanmillspc.com> wrote:

> Mr. Trigleth:
>
> Please see attached.
>
> Thanks.
>
> Matthew S. Wolcott | FREEMAN MILLS PC
>
> 115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102
>
> 682.316.1672 | 682.316.1676  Fax
>
> www.freemanmillspc.com
>
> _____
>
> This email may contain confidential or privileged information.
>
> If this is not intended for you, then please delete it immediately.
>
> _____

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | Matthew S. Wolcott |
| **Subject:** | Re: Sparrow/Trigleth |
| **Date:** | Wednesday, February 15, 2023 1:55:30 PM |

I don't give a shit if he hires hunter biden! Your clients are literally bankrupting small companies with what they did. You do NOT go to Minot ND spend $1,200,000 yiu can't pay and just leave!! I'll go to hell and back standing up for these vendors and how my companies hav ex been affected so far. Fortunately, for these morons you represent I know how to take care of the situation and have managed all the liability because I am president of Bison Land & Mineral's, and we own all the interest in this well until it sold or assigned out. That is the status there is no agreement with anybody in this project that has not signed a subscription agreement in Bison Land & Mineral's name with my personal signature. Your clients if they're out trying to sell interest in Bison Land & Mineral's. They have no right to do that and they're going to get insecurities problem by doing that because I've notified them I am not honoring anything there after saying or doing they have no authority to do that you better talk to these morons and get the truth before you get in or you look stupid you look stupid


On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott <Mwolcott@freemanmillspc.com> wrote:

> Mr. Trigleth:
>
> Please see attached.
>
> Thanks.
>
>
> Matthew S. Wolcott | FREEMAN MILLS PC
>
> 115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102
>
> 682.316.1672 | 682.316.1676  Fax
>
> www.freemanmillspc.com
>
> _____
>
>
> This email may contain confidential or privileged information.
>
> If this is not intended for you, then please delete it immediately.
>
> _____

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | Matthew S. Wolcott |
| **Subject:** | Re: Sparrow/Trigleth |
| **Date:** | Wednesday, February 15, 2023 1:55:29 PM |

I already know the best legal team in ND and have spoken to them. My current counsel is in Texas and Mississippi. I would have ND legal handle this if necessary. Good luck!!
See ya wouldn't want to be ya! Legal says give you no knowledge of what and how. I am going to disregard their advise because I want to tell you exactly how we will kick you ass in court, step by step! I go to Vegas several times a year. Just like going to court!! Who has the stroke and the looser get's slaughtered.
By the way, I'm not a racist just a total asshole when necessary. Like someone said, "I'm nice until I'm not nice"!

On Fri, Feb 10, 2023 at 9:41 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> 90% of legal action will be done in ND. I know the DA and everyone is related. Small place. Everyone knows who did what who ordered what and whom is responsible. They can run and hide in Texas and make excuse to people here but eventually they will end up there facing these consequences. As I mentioned, I will say this one more time!  They go home mind their own business and be glad I know how to fix their mess. Actually it's MY JOB and legal responsibility to do so!! And I will speak with anyone I need to and please to!
> Once you become a judge you can give orders!' Until then you suck!!
> Just good for thought hometown!
> I love it when I'm 100% right!! I drive it so far up it never comes back!! How do you defend someone who goes and spends over $1,000,000 on the backs of small vendors and even little companies. Causing bankruptcies and chard ships on people and their family. I hope you can explain and defend that. I'm there dealing b with these people everyday. Slot of this shit is glowing back on me! I didn't spend or authorize one single penny of this expenses.
> Really, really, really! I talk to these people and companies everyday. And you want to tell me I have no right to contact these morons and get bills paid? Are you fucking stupid?
>
>
> On Fri, Feb 10, 2023 at 7:24 PM, Geary Trigleth
> <G.Trigleth@bisonexploration.com> wrote:
>
>> These morons are going to keep fucking with me and I'm taking them up to court There in Minot North Dakota where everybody wants to hang these some bitches and pull their fingernails off with pliers and we're gonna go up there and there's gonna be some serious ass kicking going on Michael fucking bet that! You better tell these fucking morons to shut their fucking mouth packed their shit and go home and I'm cleaning up their shit and if not, I'm gonna bury their fucking ass son in the courtroom. I don't need to tell my attorney anything. As a matter of fact, you nor kenny tell me or anyone what to do! the fucking judge does! So quit flapping your pie hole and go get some orders from the judge and then tell me what to do but that's the only fucking way in your life you'll ever get me to do jack shit

based on you or kenny. We will do it the hard way. I know exactly
how to do that! :>)
Enjoy your evening.

On Fri, Feb 10, 2023 at 6:51 PM, Geary Trigleth
<G.Trigleth@bisonexploration.com> wrote:

> Your moronic clients send me an email saying that I owe
> $1.2 million of their debt and they don't want to talk to
> me! Are you fucking kidding me! I swear on the holy
> Bible these guys are still in the sixth grade!

> On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott
> <Mwolcott@freemanmillspc.com> wrote:

>> Mr. Trigleth:

>> Please see attached.

>> Thanks.

>> Matthew S. Wolcott | FREEMAN MILLS PC

>> 115 W. 7th Street | Suite 1225 | Fort Worth,
>> Texas 76102

>> 682.316.1672 | 682.316.1676  Fax

>> www.freemanmillspc.com

>> _____

>> This email may contain confidential or privileged
>> information.

>> If this is not intended for you, then please delete it
>> immediately.

>> _____

**From:**      Geary Trigleth
**To:**        Matthew S. Wolcott
**Subject:**   Re: Sparrow/Trigleth
**Date:**      Wednesday, February 15, 2023 1:55:29 PM

The following are things I'm sure you don't know when I have not been told. One I said, Landon Minerals owns all the leases to I own majority in controlling interest in Bison land and minerals.

I own 100% of in tech services DBA bison drilling. Your clients charge services through Entech and bison drilling with absolutely no authority to do so. The agreement was that sparrow took the interest took over the drilling and completion responsibility and pay the bills for the remaining interest. Gregg overspent at least $1 million that was not necessary to spend and once Greg presented Kenny with the tear in the whore Kenny Ray nig I'm doing the deal and they're trying to lay it back in my lap. I've contacted all the current owners and investors in the well have notified them of the circumstances, and they have first rider refusal to buy the interest in this well that needs to be sold to pay the debt that your two moronic clients left in North Dakota! I have called several large  And small vendors, tremendous hardships with their actions and non-willingness to pay people. That is not right and your client actually said, produce the well and pay the debt out of the revenue. I refuse to do that bison nor Entech will have anything to do with forcing vendor financing in our projects.  I notified Mr. gal and Pollard is their responsibility to pay these invoices and earn their interest remaining interest in the well we're still available. If not the balance of the interest will be sold to pay the debt! It's pretty simple! How the rest of the world it's not a bunch of crooks, do business!  You send me a letter you'll get a response! I'm not having you call my $400 an hour attorneys in flap your gums! I'm not going there! I don't need to ask you or anybody anything to do what I'm doing! I have the legal and corporate authority with what I'm doing and how I'm doing it! I've been doing this 44 years ! I forgot more than you will ever know about the oil and gas business last night! Bet that Matthew  the very last thing that intimidates me as an attorney. If you're any kind of decent attorney, you'll understand the facts and you'll tell these morons to shut up and go home and don't waste their money.

On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott <Mwolcott@freemanmillspc.com> wrote:

> Mr. Trigleth:
>
> Please see attached.
>
> Thanks.
>
> Matthew S. Wolcott | FREEMAN MILLS PC
>
> 115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102
>
> 682.316.1672 | 682.316.1676  Fax
>
> www.freemanmillspc.com

_____

This email may contain confidential or privileged information.

If this is not intended for you, then please delete it immediately.

_____

| From: | Geary Trigleth |
|---|---|
| To: | Matthew S. Wolcott |
| Subject: | Re: Sparrow/Trigleth |
| Date: | Wednesday, February 15, 2023 1:55:28 PM |

I personally know three small vendors that are probably going to file bankruptcy due to Greg and Kenny not paying their bills. I authorize not ONE red cent nor gave anyone authorization to bill to Bison or EnTec. I believe in the legal world that is considered fraud!!

You need to see what is current ownership and legal rights to do anything. It works both way. They have absolutely zero authority with any entity that has legal ownership of any properties that is related to Bison. Minority interest owners in Bison and no corporate position or authority to conduct any business matters. Bison is operator of record on the well in ND. And will remain so.

I have dealt with these idiots your are representing so I understand your inability to get straight facts. I have all corporate books and records that give me full control of assets and business operations with no restrictions. Just act stupid, go to legal actions I will respond and sue for all legal expenses and damages. Either way I'm ready. I'm probably going to end up filing suit for encumbering debt for services on my companies they had no authority to do so. When you operate under Sparrow, normally companies bill to themselves not someone else's company. Really since I know you I guess it's ok to have a few vendors send you and invoice for my work. I'm sure that how you do it. That's what you are trying to tell me.

On Fri, Feb 10, 2023 at 6:51 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> Your moronic clients send me an email saying that I owe $1.2 million of their debt and they don't want to talk to me! Are you fucking kidding me! I swear on the holy Bible these guys are still in the sixth grade!

On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott <Mwolcott@freemanmillspc.com> wrote:

>> Mr. Trigleth:

>> Please see attached.

>> Thanks.

>> Matthew S. Wolcott | Freeman Mills PC

>> 115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102

>> 682.316.1672 | 682.316.1676  Fax

>> www.freemanmillspc.com

_____

This email may contain confidential or privileged information.

If this is not intended for you, then please delete it immediately.

_____

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | Matthew S. Wolcott |
| **Subject:** | Re: Sparrow/Trigleth |
| **Date:** | Wednesday, February 15, 2023 1:55:28 PM |

Your moronic clients send me an email saying that I owe $1.2 million of their debt and they don't want to talk to me! Are you fucking kidding me! I swear on the holy Bible these guys are still in the sixth grade!

On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott <Mwolcott@freemanmillspc.com> wrote:

> Mr. Trigleth:
>
> Please see attached.
>
> Thanks.
>
> Matthew S. Wolcott | FREEMAN MILLS PC
>
> 115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102
>
> 682.316.1672 | 682.316.1676  Fax
>
> www.freemanmillspc.com
>
> _____
>
> This email may contain confidential or privileged information.
>
> If this is not intended for you, then please delete it immediately.
>
> _____

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | Matthew S. Wolcott |
| **Subject:** | Re: Sparrow/Trigleth |
| **Date:** | Wednesday, February 15, 2023 1:55:26 PM |

I want to make sure what you said. Your instructions were to not speak with vendors whom were erroneously contracted or not, under MY company name and discuss the invoices and debt they incurred. Really! Really.
You fucking cracker!! You are dumber than they are. I can see why you were hired.
Remember everything on the internet is true.
Your clients have committed fraud, theft of services, probably securities violations and I bet wire fraud.
Let's go Buckwheat!! Show your ass!!
What a fucking circus!!! You are clown number two though. Kenny has top spot. Greg is on a leash with kenny in hand!!


On Fri, Feb 10, 2023 at 9:50 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> I already know the best legal team in ND and have spoken to them. My current counsel is in Texas and Mississippi. I would have ND legal handle this if necessary. Good luck!!
> See ya wouldn't want to be ya! Legal says give you no knowledge of what and how. I am going to disregard their advise because I want to tell you exactly how we will kick you ass in court, step by step! I go to Vegas several times a year. Just like going to court!! Who has the stroke and the looser get's slaughtered.
> By the way, I'm not a racist just a total asshole when necessary. Like someone said, "I'm nice until I'm not nice"!
>
> On Fri, Feb 10, 2023 at 9:41 PM, Geary Trigleth
> <G.Trigleth@bisonexploration.com> wrote:
>
>> 90% of legal action will be done in ND. I know the DA and everyone is related. Small place. Everyone knows who did what who ordered what and whom is responsible. They can run and hide in Texas and make excuse to people here but eventually they will end up there facing these consequences. As I mentioned, I will say this one more time!  They go home mind their own business and be glad I know how to fix their mess. Actually it's MY JOB and legal responsibility to do so!! And I will speak with anyone I need to and please to!
>> Once you become a judge you can give orders!' Until then you suck!!
>> Just good for thought hometown!
>> I love it when I'm 100% right!! I drive it so far up it never comes back!! How do you defend someone who goes and spends over $1,000,000 on the backs of small vendors and even lathe companies. Causing bankruptcies and chard ships on people and their family. I hope you can explain and defend that. I'm there dealing b with these people everyday. Slot of this shit is glowing back on me! I didn't spend or authorize one single penny of this expenses.
>> Really, really, really! I talk to these people and companies everyday.

And you want to tell me I have no right to contact these morons and get bills paid? Are you fucking stupid?

On Fri, Feb 10, 2023 at 7:24 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> These morons are going to keep fucking with me and I'm taking them up to court There in Minot North Dakota where everybody wants to hang these some bitches and pull their fingernails off with pliers and we're gonna go up there and there's gonna be some serious ass kicking going on Michael fucking bet that! You better tell these fucking morons to shut their fucking mouth packed their shit and go home and I'm cleaning up their shit and if not, I'm gonna bury their fucking ass son in the courtroom. I don't need to tell my attorney anything. As a matter of fact, you nor kenny tell me or anyone what to do! the fucking judge does! So quit flapping your pie hole and go get some orders from the judge and then tell me what to do but that's the only fucking way in your life you'll ever get me to do jack shit based on you or kenny. We will do it the hard way. I know exactly how to do that! :>)
> Enjoy your evening.
>
>
>> On Fri, Feb 10, 2023 at 6:51 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:
>>
>>> Your moronic clients send me an email saying that I owe $1.2 million of their debt and they don't want to talk to me! Are you fucking kidding me! I swear on the holy Bible these guys are still in the sixth grade!
>>>
>>>
>>>> On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott <Mwolcott@freemanmillspc.com> wrote:
>>>>
>>>>> Mr. Trigleth:
>>>>>
>>>>> Please see attached.
>>>>>
>>>>> Thanks.

Matthew S. Wolcott | Freeman Mills PC

115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102

682.316.1672 | 682.316.1676  Fax

*www.freemanmillspc.com*

_____

This email may contain confidential or privileged information.

If this is not intended for you, then please delete it immediately.

_____

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | Matthew S. Wolcott |
| **Subject:** | Re: Sparrow/Trigleth |
| **Date:** | Wednesday, February 15, 2023 1:55:26 PM |

90% of legal action will be done in ND. I know the DA and everyone is related. Small place. Everyone knows who did what who ordered what and whom is responsible. They can run and hide in Texas and make excuse to people here but eventually they will end up there facing these consequences. As I mentioned, I will say this one more time!  They go home mind their own business and be glad I know how to fix their mess. Actually it's MY JOB and legal responsibility to do so!! And I will speak with anyone I need to and please to!

Once you become a judge you can give orders!' Until then you suck!!

Just good for thought hometown!

I love it when I'm 100% right!! I drive it so far up it never comes back!! How do you defend someone who goes and spends over $1,000,000 on the backs of small vendors and even lathe companies. Causing bankruptcies and chard ships on people and their family. I hope you can explain and defend that. I'm there dealing b with these people everyday. Slot of this shit is glowing back on me! I didn't spend or authorize one single penny of this expenses.

Really, really, really! I talk to these people and companies everyday. And you want to tell me I have no right to contact these morons and get bills paid? Are you fucking stupid?


On Fri, Feb 10, 2023 at 7:24 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> These morons are going to keep fucking with me and I'm taking them up to court There in Minot North Dakota where everybody wants to hang these some bitches and pull their fingernails off with pliers and we're gonna go up there and there's gonna be some serious ass kicking going on Michael fucking bet that! You better tell these fucking morons to shut their fucking mouth packed their shit and go home and I'm cleaning up their shit and if not, I'm gonna bury their fucking ass son in the courtroom. I don't need to tell my attorney anything. As a matter of fact, you nor kenny tell me or anyone what to do! the fucking judge does! So quit flapping your pie hole and go get some orders from the judge and then tell me what to do but that's the only fucking way in your life you'll ever get me to do jack shit based on you or kenny. We will do it the hard way. I know exactly how to do that! :>)
> Enjoy your evening.


On Fri, Feb 10, 2023 at 6:51 PM, Geary Trigleth <G.Trigleth@bisonexploration.com> wrote:

> Your moronic clients send me an email saying that I owe $1.2 million of their debt and they don't want to talk to me! Are you fucking kidding me! I swear on the holy Bible these guys are still in the sixth grade!


On Fri, Feb 10, 2023 at 5:53 PM, Matthew S. Wolcott

<Mwolcott@freemanmillspc.com> wrote:

Mr. Trigleth:

Please see attached.

Thanks.


Matthew S. Wolcott | Freeman Mills PC

115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102

682.316.1672 | 682.316.1676  Fax

www.freemanmillspc.com

_____


This email may contain confidential or privileged information.

If this is not intended for you, then please delete it immediately.

_____

Exhibit N

# Bison Land and Minerals LLC

**240 Buckhead Dr.**
**Madison, Mississippi 39110**
**(214) 762-7296**

## Participation Agreement
*Smith Embayment Project*
**Green Field Development Well**
**Sherwood Formation Lateral**
**Renville County, North Dakota**
**March 25th, 2022**

**1.       Lease Acquisition and Drilling Program:**

Bison Land and Minerals LLC, a Delaware corporation (hereinafter called "Bison") has acquired and owns the rights to certain oil, gas and mineral Leases described on Exhibit "A" attached hereto and made a part hereof (hereinafter referred to as the "Leases"), covering lands located in Renville County, North Dakota, as depicted on the plat attached hereto as Exhibit "B" (the "Leases"). Bison proposes to sell participation rights in the Initial Horizontal Well to be drilled, as more particularly described below (collectively, the "Project"). All operations on the Project shall be conducted by Bison Land and Minerals LLC, (hereinafter called "Operator"), pursuant to the terms of that certain Joint Operating Agreement dated April 1st, 2022, a copy of which is attached hereto as Exhibit "C" and incorporated by this reference for all purposes (the "JOA").

**2.       Participation:**

The undersigned, (hereinafter called "Participant"), has indicated a desire to acquire an interest in the Project and participate under the terms and conditions hereinafter set forth with the effective date as defined above.  It is understood that parties, other than those existing participants, hereto may likewise elect to acquire an interest in the Project and all of such parties shall be referred to collectively as "Participants." It is contemplated that the aggregate of new parties under this agreement shall acquire up to an undivided 80% working interest in the Initial Horizontal Project, along with related rights in the Contract Area and subsequently proposed wells, if any. Participation in the Initial Wells shall entitle Participants to have the rights, but not the obligation, to participate on any additional work proposed by Operator in the Contract Area.  However, if Participant ever non-consents to the drilling or rework of a subsequent well, Participant shall forfeit the rights to their existing position in the project, but shall retain all rights and interests theretofore participated in any prior well(s) drilled or reworked on the Project and the Leasehold established for said well(s). Current and Future obligations as per the operating agreement still exist after any opt-out (non-consent) is made.

**3.       Operator:**

It is agreed by Participant that Operator shall operate the Project and conduct all operations hereunder pursuant to the JOA. Participant agrees and acknowledges that its participation interest in the Project is subject to the JOA. Participant further agrees to execute the JOA concurrent with execution of this Agreement.  In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

**4.    Costs:**

The consideration to be paid by Participant upon execution of this Agreement is based upon Participant's proportionate share of the following costs totaling $1,750,000 (the "Green Field Development Project"):

    a.  Bison has agreed to offer, on the initial project, a Turnkey Drilled and Completed Horizontal Well in the Bison 1-H to test the Sherwood Formation for a cost of $1,750,000, on a third for a quarter basis.

    b.  1% WI delivers a 75% NRI x .75 (1/3 FOR ¼) = 56.25 NRI

    c.  Bison is delivering a 75% NRI in the Green Field Project.

    d.  Dry Hole Cost in the Bison 1-H well is $1,450,000.

    e.  The Turnkey price covers for the Bison 1-H well, Land, Geology, Title, Legal, Administrative, Engineering, Drilling and or Completion costs of well.

    f.  Participant shall have the first right of refusal to participate on additional acreage contiguous with or in the Green Field on the same terms as herein defined.

    g.  Connections for gas lines to transportation facilities are not covered in the turnkey price.

    h.  Monthly revenue distributions will be paid on a net, after operating expenses, basis each month.

Upon execution of this Agreement, and the JOA, Participant shall tender to Bison in immediately available funds an amount equal to $17,500 for each 1% undivided working interest in the Green Field Development Project, subscribed by Participant.

**5.    Cost Estimates:**

Participant hereby acknowledges and agrees that the drilling of the Horizontal and Completion of a Horizontal Well is offered on a turnkey cost per well. The costs are as reflected above. Additional cost in addition to Turnkey price could occur.

**6.    Agreements:**

For and in consideration of Participant's share of the Project, the receipt and sufficiency of which are hereby acknowledged, Bison hereby sells and agrees to assign unto Participant the undivided percentage interest in and to the Wells as represented below. The Assignment shall be: (i) made without warranty of title, express or implied, not even for return of the Project Fee, except that Bison agrees to warrant title against all defects arising out of claims by, through or under Bison; (ii) subject to the terms of the Lease; (iii) subject to this Agreement and the JOA; and subject to a reservation of overriding royalty interest equal to the difference between 25% and all outstanding lease burdens. Concurrent with execution of this Agreement, Participant agrees to execute the JOA.

**7.    Information:**

Participant may request and shall be entitled to a copy of the Lease Agreement or Lease to any subsequent Leases acquired, title information such as abstracts of title or drill-site title opinions for the drill-site tract of and drilling the Initial Well and subsequent wells Participant joins in, along with drilling, completion and log reports pertaining to said well(s).

**8.    Initial Well:**

At Operator 's discretion, but no later than the August 1, 2022, and subject to rig availability, Operator shall commence or cause to be commenced operations for the drilling of the Initial Well at a location to be determined within the Leases, located in Renville County, North Dakota, and thereafter continue the drilling of the Initial Well with due diligence to a measured depth of 5,100' TVD or a depth sufficient in Operator's sole opinion, to test the 5,100' Sherwood formation the ("Objective Depth") and drill a lateral to a minimum of 2,600' making a TMD (total measured depth) 7,450' or until Operator decides to complete well. Participant agrees to participate in the drilling of the Initial Well to the Objective Depth to the extent of its undivided working interest ownership as set forth on the Signature Page hereto.

**9.    Ownership:**

Participant shall own the undivided Working Interest as reflected on the Signature Page hereto to all wells, material, equipment, and supplies used or obtained in connection with the drilling, testing completing and equipping and full payment of the Initial Well.

**10.    Tax and Advise Clause - Sophisticated Investors:**

It is not the purpose or intention of this agreement to create, nor shall anything herein be construed as creating, any mining partnership, commercial partnership or other partnership, nor shall the operations of the parties hereunder be construed to be considered as a joint venture. The liability of the parties hereto shall be several and not joint or collective. Each of the parties hereto elects to be excluded from the application of all provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code, as authorized and later amended.

**PARTICIPANT IS URGED TO CONSULT SUCH LEGAL, TAX AND INVESTMENT SOURCES AS MAY BE NECESSARY OR APPROPRIATE.**

By execution of this Agreement, Participant hereby confirms that he/she/it has a working knowledge of the oil and gas industry and has thoroughly investigated participation in the Project. Participant further acknowledges that he/she/it is a sophisticated investor and has a financial net worth in excess of one million dollars ($1,000,000.00). Participant represents he/she/it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of not just its share of the Project Fee, but also its share of all other costs incurred in operations on the Project. PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued there under or the Securities laws of the States of Louisiana or Texas, or any other state. Participant hereby agrees to participate in the Project for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Project within the meaning of said laws.

**11.**   **Miscellaneous:**

a.   This Agreement is subject to all valid, applicable Federal and State (and local) laws, rules and orders of any duly constituted Federal, State or Local regulatory agency having jurisdiction hereof, but shall be governed by and interpreted in accordance with the laws of the State of Mississippi. Likewise, any and all agreements herein or otherwise shall be subject to the terms and provisions of the Leases covering the Initial Wells and any other matter of record in Renville County, North Dakota.

b.   The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

c.   The Parties agree to keep confidential and not disclose any information about this Project, not already disclosed or of public record, to third parties except as required by statutes, regulations, or court order for so long as this Agreement is in effect, but not to exceed five (5) years from the date of this Agreement.

d.   This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors, heirs and assigns.

e.   This Agreement and its attachments constitute the entire agreement of the parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties, or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement. Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each and all of the parties hereto.

f.   All notices between the parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or regular or express mail, addressed to those of the party to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in the JOA. A party may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other party hereto.

g.   The parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that any such assignment must be made subject to the terms and conditions of this Agreement and the JOA.

h.   This Agreement shall remain in full force and effect as between the parties hereto until expiration of the ownership or production from the Leases.

If the above terms and conditions meet with your approval, please indicate your acceptance by signing in the space provided below and returning two fully executed copies of (i) this Agreement, and (ii) the JOA to:

4

Bison Land and Minerals, LLC
240 Buckhead Dr.
Madison, MS 39110

A fully executed copy of this Agreement and the JOA will be returned to the Participant. A Bank Wire Transfer can also be made to:

PlainsCapital Bank
C/O Bison Land & Minerals LLC
Escrow Account
Routing #:      111322994
Account #:      7158910401

This Agreement has been executed in duplicate, each of which when accepted shall constitute an original.

AGREED TO AND ACCEPTED this the _____ day of _____, 2022.

PARTICIPANT


By: _____

## Amount to be remitted for Project Fee with this Participation Agreement

Percentage interest Participant would like to acquire:   _____%

Project Fee (Remitted with this Participation Agreement): _____% X $17,500 = $

Social Security or E.I. Number:_____

Address:_____

Telephone Number:_____

Fax Number:_____

Email Address:_____

Accepted:

Bison Land and Minerals LLC


By: _____
        Geary Trigleth
        Managing Member

5

# EXHIBIT "A"

Oil and Gas Mineral leases in Renville County, North Dakota. Township 160 North, Range 85 West in the N1/2 OF Section 27.

The following are the Mineral Interest Owners of the above referenced Minerals:

AgriBank, FCB, formerly The Federal Land Bank and Farm Credit Bank of Saint Paul.

Leavitt & Sons

Aaron W. Trout and Margaret B. Trout

Beulah Bengtson, as Trustee under the terms of the Last Will and Testament of Harold K. Bengtson

# EXHIBIT "B"



EXHIBIT "C"

Exhibit O

38-2023-CV-00007

**From:** Geary Trigleth
**To:** greg_pollard@verizon.net; ezgogo88@gmail.com
**Subject:** Fuck you and your attorney
**Date:** Saturday, February 11, 2023 8:18:06 AM

Neither one of you morons nor your attorney. Tell me what the fuck to do. Fuck you fuck that cocksucker attorney, and the fucking monkey, moron, rode in on. The investors in Bison are bisons investors not yours moron. You may know some of them but they all sign subscription agreements with bison didn't have your fucking name or sparrow on it you fucking moron You go in charge under my company to vendors and then have an attorney sent me a letter saying, I can't talk to the people you feloniously charge money to my company! Are you fucking people that totally fucking moronic and stupid. U2 monkey motherfuckers are the most out of fucking tune. Outer is a testicle out of this fucking world in total fucking nonsense motherfucker. What fucking morons ! You are a fuck with me. I'm going to North Dakota and start in the fall on your ass and let's all go up there in front of all these people. I'm gonna mark your ass up there so they can have a firing squad but that motherfucker.



MATTHEW S. WOLCOTT
mwolcott@freemanmillspc.com
682-316-1672

February 17, 2023

*Via e-Mail and CMRRR*

Geary Trigleth
Bison Land & Minerals LLC
240 Buckhead Drive
Madison, MS 39110

      Re:    Bison Land & Minerals LLC Restructuring; West Dry Creek No. 1H

Dear Mr. Trigleth:

In my letter dated February 10, 2023, I informed you that you are not authorized to contact my clients directly and that any further communication regarding the present disputes should be directed to me. I also told you to put me in contact with your lawyers and to stop contacting vendors and working interest owners without coordinating such communications through counsel. You have done none of those things.

Since you received my letter, you have contacted vendors and are attempting to authorize completion operations on the West Dry Creek No. 1H, without consulting Greg Pollard and Kenny Goh and without keeping them adequately informed of your activities, despite that they remain shareholders of Bison. You also contacted working interest owners and told them that Bison is now selling an additional 24% interest in the West Dry Creek No. 1H. And you have told Greg Pollard that you intend to immediately plug the three TOP wells.

Please send me an update of the status of current and anticipated operations that you have authorized or intend to authorize on the West Dry Creek No. 1H, including the vendors you have contacted and the anticipated timeline for the proposed operations. Please provide the same information regarding the three TOP wells.

Once again, your response should be directed to me. Cease all communications with Sparrow, Greg Pollard, Kenny Goh, and Geir Rorstad. Further, please immediately forward this letter to your counsel, copying me, and inform your counsel that they are not permitted to contact my clients directly.

Sincerely,

Matthew Wolcott

Exhibit Q

38-2023-CV-00007

| | |
|---|---|
| **From:** | Geary Trigleth |
| **To:** | Matthew S. Wolcott |
| **Subject:** | Re: Sparrow/Trigleth |
| **Date:** | Friday, February 17, 2023 4:10:36 PM |
| **Attachments:** | image |

I can understand the diffilcuty you must have getting the truth an dfacts! One more time I will explain to you, this is the last  time.

Dear Mr. Trigleth: In my letter dated February 10, 2023, I informed you that you are not authorized to contact my clients directly and that any further communication regarding the present disputes should be directed to me. (You do not tell me what i do or don't do! Period)I also told you to put me in contact with your lawyers (Not happening until litigation is established) and to stop contacting vendors (They are Bison Vendors) and working interest owners (They are Bisons WI owners, all documents say Bison, none say greg or kenny) without coordinating such communications through counsel(I don't need counsel nor approval, especially form you). You have done none of those things.(CORRECT! First thing you've gotten right!)Since you received my letter, you have contacted vendors and are attempting (Not attempting Bison is completing the well) to authorize completion operations on the West Dry Creek No. 1H, without consulting Greg Pollard and Kenny Goh(I don't need to keep them anywhere) and without keeping them adequately informed of your activities(I inform them as per MY discression), despite that they remain shareholders of Bison (Minority shareholders, no hand holding necessary) . You also contacted working interest owners and told them that Bison is now selling an additional 24% interest in the West Dry Creek No. 1H (You are correct again). And you have told Greg Pollard that you intend to immediately plug the three TOP wells. (Correct, unless greg transfers those wells to sparrow, Bison will plug the wells for salvage value. He is fine to transfer the operations to any operator, they loose money and are a liability that Bison doesn't want. Since they are big shots and big time operators you would think that would be simple to do and operate their own properties) Please send me an update of the status of current and anticipated operations that you have authorized or intend to authorize on the West Dry Creek No. 1H, (NO) including the vendors you have contacted and the anticipated timeline for the proposed operations.(NO) Please provide the same information regarding the three TOP wells. (NO) Once again, your response should be directed to me. (You are a moron! I will communicate with anyone I please) Cease all communications with Sparrow, Greg Pollard, Kenny Goh, and Geir Rorstad. (Never spoke with Gier don't know him and haven't sent him anything, don't intend to) Further, please immediately forward this letter to your counsel, (NO) copying me, and inform your counsel that they are not permitted to contact my clients directly. Sincerely, Matthew Wolcott
(Kiss my Ass Mathew, my my instructions to you! Works both ways unless your WOKE minded! Are you WOKE minded Matthew?

– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email:  g.trigleth@bisonexploration.com
Web:   BisonExploration.com



------- Original Message -------
On Friday, February 17th, 2023 at 2:37 PM, Matthew S. Wolcott
<Mwolcott@freemanmillspc.com> wrote:

Mr. Trigleth:

Please see attached.

Thanks.


Matthew S. Wolcott | FREEMAN MILLS PC

115 W. 7th Street | Suite 1225 | Fort Worth, Texas 76102

682.316.1672 | 682.316.1676  Fax

*www.freemanmillspc.com*

_____


This email may contain confidential or privileged information.

If this is not intended for you, then please delete it immediately.

_____

**From:** Geary Trigleth <G.Trigleth@bisonexploration.com>
**Date:** February 9, 2023 at 1:11:19 PM CST
**To:** barmstrong@fdc-ltd.com, tgood@dentzone.com, jholshev@mac.com, phagan26@icloud.com, buckstout@att.net, rwmi@icloud.com, Nathan Sheets <nathan@honeyrockgroup.com>, joshdunlap@aol.com, mike@resourcefs.com, tom@thomascusickhomes.com, Joshua Bedell <bedell.josh@gmail.com>
**Subject: Additional interest available in the WDC 1-H**

Do to excessive cost overrun, Bison is selling 24% additional interest in the WDC 1-H. Bison is completing the well and will offer additional interest based on flow rate and value in the asset. The asset will be offered to current interest owners at a possible discount to make up for cost overruns. The reason for selling additional interest is strictly due to help pay the additional cost overruns.

There was a prior commitment from Sparrow oil and gas to acquire the interest but they did not complete the agreement and fund as agreed. Sparrow oil and gas is Greg Pollard and Kenny Goh. There were excessive cost overruns that were weather related but much of those expenses were based on operator decisions. The cost overrun is around $1,200,000 currently and will end up being greater than that by the time we complete the well. Basically we are placing this interest for sale to help pay the outstanding payables due immediately. Timing is of importance due to these outstanding invoices already being delinquent.

My interest in contacting each one of you is simple. You interest is not affected in any way. This should be an opportunity for some of you to acquire additional interest in an exceptional well. All discussions on value will be done after the well is completed. Current interest owners shall have first right of refusal before any interest would be offered to the public.

This was basically dropped in my lap from Sparrow yesterday so timing is of importance. If you have any questions please feel free to contact me at your convenience.

– Geary

**Geary Trigleth | President / CEO**
Direct: 214.762.7296
Email:   g.trigleth@bisonexploration.com
Web:     BisonExploration.com



**BISON LAND & MINERALS LLC**
"WORKING FOR AMERICA'S ENERGY INDEPENDENCE"

Exhibit S

38-2023-CV-00007



I will prepare the transfer forms on those three TOP wells to sparrow. We will transfer these or plug them. Your choice. If you do not respond we will P & A these wells.
Come on you and Kenny are big time oil and gas kings! I'm sure you can take on three wells you personally own! Really!! Big hat no cows.

You need to return all records on the WDC 1-H to the office.

Today 9:53 AM

We are paying outstanding invoices due on the TOP wells. With current and outstanding invoices there